No. 23-1120

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――

IN RE NATIONAL ASSOCIATION OF BROADCASTERS, PETITIONER.

―――――――――――――

On Petition For Writ Of Mandamus
To The Federal Communications Commission

―――――――――――――

## REPLY BRIEF FOR PETITIONER
## NATIONAL ASSOCIATION OF BROADCASTERS

―――――――――――――

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION
OF BROADCASTERS
1 M Street, S.E.
Washington, D.C.  20003
Telephone: (202) 429-5430

Helgi C. Walker
  *Counsel of Record*
Jacob T. Spencer
Andrew G.I. Kilberg
Hadhy H. Ayaz
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 887-3599
Facsimile:  (202) 530-9595
hwalker@gibsondunn.com

*Counsel for Petitioner National Association of Broadcasters*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT .....................................................................................2

    I.       The Commission Has Violated a Crystal-Clear Duty ........................2

    II.     The Commission's Delay Is Egregious ................................................5

CONCLUSION ....................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AT&T Co. v. FCC,*
   978 F.2d 727 (D.C. Cir. 1992)............................................................15

*In re Barr Labs., Inc.,*
   930 F.2d 72 (D.C. Cir. 1991)..............................................................16

*Cinderella Career & Finishing Sch., Inc. v. FTC,*
   425 F.2d 583 (D.C. Cir. 1970)............................................................10

*In re Ctr. for Auto Safety,*
   793 F.2d 1346 (D.C. Cir. 1986)............................................................3

*In re Ctr. for Bio. Diversity,*
   53 F.4th 665 (D.C. Cir. 2022)..............................................................4

*FCC v. Nat'l Citizens Comm. for Broad.,*
   436 U.S. 775 (1978)............................................................................8

*FCC v. Prometheus Radio Project,*
   141 S. Ct. 1150 (2021)........................................................................4

*Fox Television Stations, Inc. v. FCC,*
   280 F.3d 1027 (D.C. Cir. 2002)............................................................4

*Grand Canyon Air. Tour Coal. v. FAA,*
   154 F.3d 455 (D.C. Cir. 1998)............................................................10

*In re Monroe Commc'ns Corp.,*
   840 F.2d 942 (D.C. Cir. 1988)............................................................10

*Prometheus Radio Project v. FCC,*
   373 F.3d 372 (3d Cir. 2004) ..........................................................8, 13

*Prometheus Radio Project v. FCC,*
   824 F.3d 33 (3d Cir. 2016) .............................................................3, 11

*In re Pub. Employees for Env. Responsibility,*
   957 F.3d 267 (2020)............................................................................5

# TABLE OF AUTHORITIES

**Page(s)**

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987)................................................................10

*Telecommunications Research & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)................................................5, 11, 15

*USW v. Rubber Mfrs. Ass'n*,
  783 F.2d 1117 (D.C. Cir. 1986)........................................................7, 9

**STATUTES**

5 U.S.C. § 706(1) ................................................................15

47 U.S.C. § 303 note ................................................................1, 3

Am. Rescue Plan Act of 2021, Pub. L. No. 117-2, § 7402, 135 Stat. 4, 109
  (codified at 47 U.S.C. § 254 note) ........................................................3

**OTHER AUTHORITIES**

1998 Biennial Regulatory Review, Notice of Inquiry,
  13 FCC Rcd 11276 (1998)................................................................7

*Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules
  for Digital Low Power Television and Television Translator Stations*,
  Fifth Report and Order, 2023 FCC LEXIS 2218 (2023)................................12

*Authorizing Permissive Use of the "Next Generation" Broadcast Television
  Standard*, Third Report and Order and Fourth Further Notice of Proposed
  Rulemaking, GN Docket No. 16-142, FCC No. 23-53 (2023)................................12

Brief for Petitioners, *FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021), No. 19-1231 ................................................................4

*Communications Marketplace Report*, 36 FCC Rcd 2945 (2020) ........................12

*Communications Marketplace Report*, 2022 FCC LEXIS 4232 (2022) .............8, 12

*Implementation of the Low Power Protection Act*, MB Docket No. 23-126,
  FCC No. 23-23 (2023) ................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

*Implementation of Section 1003 of the TV Viewer Prot. Act of 2019*,
Report and Order, 35 FCC Rcd 4961 (2020)......................................................12

*Media Bureau Seeks to Update the Record in the 2018 Quadrennial
Regulatory Review*, 86 Fed. Reg. 35089 (July 1, 2021) .......................................6

NAB Reply Comments, MB Docket No. 18-349 (filed Oct. 1, 2021),
https://tinyurl.com/2s2znead.................................................................................6

Petition for Writ of Certiorari, *FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021), No. 19-1231 ....................................................................9

*Protecting and Promoting the Open Internet,* 80 Fed. Reg. 19737
(Apr. 13, 2015).......................................................................................................7

*Revisions to Political Programming and Record-Keeping Rules,
Report and Order*, 37 FCC Rcd 1359 (2022)......................................................12

*Update of Parts 74 of the Commission's Rules Related to Low Power
Television and Television Translator Stations*, Report and Order,
2023 FCC LEXIS 1112 (2023)............................................................................12

*Update to Publication for Television Broadcast Station DMA
Determinations for Cable and Satellite Carriage*, Report and Order,
2022 FCC LEXIS 3762 (2022)............................................................................12

*Updating Broadcast Radio Technical Rules, Report and Order*,
37 FCC Rcd 2497 (2022)......................................................................................12

*Updating FM Broadcast Radio Service Directional Antenna Performance
Verification*, Report and Order, 2022 FCC LEXIS 1639 (2022) ........................12

## SUMMARY OF ARGUMENT

The Commission does not deny that the 2018 Quadrennial Review remains unfinished, nor does the Commission provide even a rough estimate as to when it might be completed.  Instead, the Commission's response is that Congress established "no specific deadline" for the review (FCC Br. 2), and that the agency "fulfilled its statutory mandate" by doing nothing more than "initiating the 2018 review cycle in December 2018 and refreshing the record in 2021" (FCC Br. 10). Essentially, the Commission argues it is subject to no statutory deadline *at all*.  That answer disintegrates in light of the statutory text and compels mandamus.

In Section 202(h) of the Telecommunications Act of 1996, Congress, using the mandatory term "shall," directed the Commission "quadrennially" to "review" "its ownership rules" and "determine" whether to keep them.  47 U.S.C. § 303 note. That language provides a crystal-clear timeline: "Quadrennially" means every four years.  That Congress did not list particular days in a month/date/year format for each review in perpetuity does not mean the deadline is optional.  Given the Commission's concession (at 2) that mandamus is proper where Congress set a "concrete statutory deadline," that ends this case.

Moreover, the Commission must "determine" whether to retain the rules, not just invite comment and then seek more comment when the record becomes stale due to the agency's own inaction.  The Commission's contrary position is a recipe

1

for eternal stasis, and would allow the agency to avoid judicial review completely. The Commission's various and sundry excuses for why it has still not taken final action in the 2018 review are equally weak—especially when viewed against the backdrop of the FCC's habitual tardiness under Section 202(h).

Nearly six years have passed since the FCC last took final action on a quadrennial review, and the clock is still ticking. Considering that some of the Commission's most "contentious" (FCC Br. 13) discretionary rules in the past decade were adopted in less than a year, and that the Media Bureau continues to churn out other, purely elective rulemakings, there is no good reason for the Commission to not have completed the 2018 review by now.

This Court should grant relief to enforce Congress's clear command.

## ARGUMENT

### I.  The Commission Has Violated a Crystal-Clear Duty.

The Commission concedes that it must "review its ownership rules … every four years," but argues that there is no "concrete deadline establishing a date by which [it] must act to complete its review."  FCC Br. 14-15 & n.6 (quotation marks omitted).  That argument fails under the plain terms of Section 202(h).  Congress commanded that the Commission "shall review" its broadcast rules, "shall determine whether any such rules are necessary in the public interest as a result of competition," and "shall repeal or modify any regulation it determines to be no longer in the public

interest"—and it shall do that "quadrennially." 47 U.S.C. § 303 note. By ordering the Commission to review the rules "quadrennially," *id.*, Congress set an unequivocal deadline, even if the deadline is not provided in a month/date/year format: the "designated time frame" (FCC Br. 16) for the reviews is every four years. Because Section 202(h) imposes an ongoing obligation, it makes sense that Congress provided a temporal timeframe rather than focusing on particular calendar dates. Indeed, it would have been absurd for Congress to list each such date, for every four-year period, in perpetuity. The Commission itself (at 15-16) characterizes statutes that use timeframes—*e.g.*, "not later than 60 days" after enactment, *see* Am. Rescue Plan Act of 2021, Pub. L. No. 117-2, § 7402, 135 Stat. 4, 109 (codified at 47 U.S.C. § 254 note), or "at least 18 months prior to the beginning of [a vehicle] model year," *see In re Ctr. for Auto Safety*, 793 F.2d 1346, 1348 (D.C. Cir. 1986)—as providing "specific deadline[s]." It is hard to see how "every four years" differs from these time periods.

Moreover, the action that Congress told the Commission to take was to "review" the rules *and* "determine" whether to modify or retain them. 47 U.S.C. § 303 note. Thus, merely initiating a review every four years does not satisfy Section 202(h). Nor may the Commission satisfy its obligation by skipping ahead to the 2022 review (as it has already done), and then combining the 2018 and 2022 proceedings (whether formally or as a practical matter). *See Prometheus Radio*

*Project v. FCC*, 824 F.3d 33, 50-51 (3d Cir. 2016) ("*Prometheus III*") (concluding that rolling the 2010 review into the 2014 review did not cure unlawful delay).

Any other reading of the statute would upend the entire process, resulting in overlapping quadrennial reviews. "Section 202(h) establishes an iterative process that requires the FCC to keep pace with industry developments and to regularly reassess how its rules function in the marketplace." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1156 (2021) ("*Prometheus IV*"); *see also Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042 (D.C. Cir. 2002) (FCC has a "statutory mandate" "promptly — that is, by revisiting the matter [quadrennially] — to 'repeal or modify' any rule that is not 'necessary in the public interest.'"). As the Commission itself recently told the Supreme Court, the "iterative process" requires it to "evaluate[] the public interest in light of the available data, *revise[] its rules accordingly*, and *then* monitor[] the effects of the amended rules until the *next* quadrennial review." Pet. Br. 17, *Prometheus IV* (emphases added). The Supreme Court agreed that Section 202(h) "directs the FCC to review its ownership rules every four years *to determine* whether those rules remain 'necessary.'" *Prometheus IV*, 141 S. Ct. at 1155 (emphasis added).

The Commission's failure to complete 2018 review is a violation of the "crystal clear legal duty" Congress has imposed, for which mandamus is the appropriate relief. *In re Ctr. for Bio. Diversity*, 53 F.4th 665, 673 (D.C. Cir. 2022).

## II.    The Commission's Delay Is Egregious.

Although the FCC's violation of its clear obligations under Section 202(h) more than justifies mandamus, the Commission's continued inaction on the 2018 review is independently "so egregious as to warrant mandamus." *Telecommunications Research & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984).

***Rule of Reason.***  The "timetable" Congress set "suppl[ies] content for th[e] rule of reason." *Id.* at 80.  As detailed above, Section 202(h) provides an unmistakable timetable:  the Commission must complete a review of its ownership rules once every four years.  Yet the Commission last finished a review in November 2017—*nearly six years ago*.  This Court has repeatedly warned agencies that "a reasonable time for agency action is typically counted in weeks or months, not years." *In re Pub. Employees for Env. Responsibility*, 957 F.3d 267, 274 (2020) (quotation marks omitted).  There is no good reason for the Commission's delay.

The Commission's chief excuse is that the 2017 order (which finished not just the 2014 review, but also the 2010 review) was challenged in court; thus, the Commission contends (at 11), "it made little sense for the FCC to have gone forward with the 2018 Quadrennial Review."  Even assuming the Commission was justified in not completing the 2018 review during that litigation, there is no reason the Commission could not have continued *making progress* on the review.  Indeed, the

Commission would have had no reason to initiate the 2018 review *while the litigation was pending*—as it did—if litigation actually prevented the Commission from even working on the proceeding. It is unreasonable for the Commission to have sat on its hands for years.

The Commission's actions following the Supreme Court's decision further demonstrate that it made no effort to meet Congress's deadline. While one could argue that it was not unreasonable to seek additional comments after *Prometheus IV*,[1] it took more than two months after that decision for the Commission to issue a notice that did not even fill three pages of the Federal Register. *Media Bureau Seeks to Update the Record in the 2018 Quadrennial Regulatory Review*, 86 Fed. Reg. 35089 (July 1, 2021). And because the Supreme Court *upheld* the Commission's 2017 order, those comments were only to address "the same three structural rules on which the Commission sought comment in the *2018 Quadrennial Review NPRM*." *Id.* at 35090. The Commission merely needed to pick up where it left off. Furthermore, the volume of comments received—38 comments totaling less than 1000 pages, which is hardly overwhelming in the universe of agency rulemaking—cannot justify the ongoing delay. *See* FCC Br. 12.

---

[1] The Commission asserts that NAB did not object to refreshing the record, but NAB expressly stated that the Commission "already should have completed its 2018 review." NAB Reply Comments, MB Docket No. 18-349 (filed Oct. 1, 2021), at 6, *available at* https://tinyurl.com/2s2znead.

In assessing the reasonableness of an agency's delay, this Court "must consider the agency's performance record." *USW v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1119 n.* (D.C. Cir. 1986) (per curiam).  The Commission has shown that it can move quickly when it desires.  For example, the Commission released a proposed "net neutrality" rule—one of its most significant and "contentious" rules (*see* FCC Br. 13) in the past decade, and one that was entirely discretionary—in May 2014; by the comment period close in September 2014, the Commission had received over 3.7 *million* comments.  *Protecting and Promoting the Open Internet,* 80 Fed. Reg. 19737, 19746 (Apr. 13, 2015).  The Commission promulgated its final rule in April 2015—less than a year after the proposal.  This timeline for an *elective* action shows that the Commission has no excuse for not concluding its *mandatory* 2018 review in a timely manner.

The Commission nevertheless complains (at 12) that its "task" is "complex." But Congress was aware of the nature of the Commission's task when setting a two-year deadline, and it subsequently afforded the Commission four years instead of two to complete its review cycles after the Commission failed to keep up with the two-year schedule.  *See* Pet. 5-6.  And there are only three ownership rules left for it to examine—substantially less than the Commission originally had on its plate.  *See* 1998 Biennial Regulatory Review, Notice of Inquiry, 13 FCC Rcd 11276 (1998) (identifying nine rules within the biennial review's scope).  This should not be a

difficult task.  The Commission has had media ownership rules in place since the Franklin Roosevelt administration, *see FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 780 (1978) (observing that the Commission adopted rules restricting broadcast station ownership "[i]n the early 1940's"), and has been (albeit belatedly) conducting ownership reviews since 1998.  The Commission also continually analyzes "the state of competition across the broader communications marketplace" for its biennial Communications Marketplace Report to Congress.  *Communications Marketplace Report*, 2022 FCC LEXIS 4232, at *1, para. 1 (2022).  The Commission has a worn path for completing its review in a timely fashion.

In any event, the Commission never identifies what exactly is so complex that requires a seemingly endless delay following the close of the 2021 post-*Prometheus-IV* refresh.  Instead it quotes (at 12) Judge Scirica's dissent *in Prometheus I*:  "The Commission's task … is 'complicated by the unpredictable impact of emerging technologies on the media marketplace' and 'by the inherent uncertainty regarding the prospective effects of structural rules.'"  *See Prometheus Radio Project v. FCC*, 373 F.3d 372, 436 (3d Cir. 2004).  But Judge Scirica's point was that those factors are exactly why the iterative, "ongoing review process" was "statutorily-prescribed" by Congress.  *Id.* at 438.  As the Commission told the Supreme Court, "[t]he frequency of the required reviews is critical.  If the agency waits too long between rule appraisals, the dynamic media marketplace—which has undergone

unprecedented changes in recent decades—will quickly outpace the existing regulatory structure." Cert. Pet. 29, *Prometheus IV*. The dynamism of the media market is no defense for a snail's pace; it is the *very reason* why delay is egregious.

The Commission's contrary approach is a recipe for eternal stasis and antithetical to iterative review that swiftly responds to a changing market. It would justify perpetual delay: refresh the record after an initial delay following the submission of comments; take two-plus years to review the refreshed record; request supplemental comments again in light of the passage of time; take time to review the supplemented record; rinse and repeat.

The Commission does not deny that it has done *nothing* on the 2018 review since the supplemental comment period closed at the beginning of October 2021. Conspicuously, the Commission has not even offered this Court an update on the status of the proceeding, much less a "proposed timetable for completing its work." *USW*, 783 F.2d at 1119 n.*. If anything, the Commission brazenly suggests there is no timetable whatsoever. The Commission notes (at 13) that each of the past ownership orders were adopted by a 3-2 vote; "[a]nd since January 2021, the five-member Commission has been operating with just four Commissioners." The notion that political deadlock is to blame cannot be taken seriously. The Media Bureau (the division of the agency responsible for the reviews) has not even circulated a draft order for the Commissioners' consideration, so *there has been nothing on which to*

*deadlock*. Moreover, the assumption that Commissioners would vote a certain way based on nothing more than their political party is a dangerous concept that should not be credited by this Court. *Cf. Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 590 (D.C. Cir. 1970) (commissioners violate due process if they "prejudge cases").

The Commission's undisputed inaction, the iterative nature of Congress's command, and the Commission's inability to articulate the supposed complexity posed by its task easily distinguish this case from the few precedents the Commission cites. *See Grand Canyon Air. Tour Coal. v. FAA*, 154 F.3d 455, 476-77 (D.C. Cir. 1998) (FAA required to issue, but not implement, "a regulatory plan"; completion of Congress's goal would "require a multitude of agency actions, including" "conversion to quieter aircraft"; and FAA had already issued one final rule); *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 943-45 (D.C. Cir. 1988) (agency had already issued multiple decisions in licensing adjudication, and Commission "assured [the Court] that the outstanding issues will be resolved expeditiously"); *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) (there was "no statutory command that EPA assign this rulemaking a higher priority than any of its other priorities," and EPA had taken multiple concrete steps toward finalization).

If this were the first time the Commission had failed to complete its ownership review on time, the agency might conceivably be entitled to the benefit of the doubt

as to whether the dog really did eat its homework, setting aside the plain terms of Section 202(h).  But it is not.  From the time Congress first required periodic review of the broadcast ownership restrictions, the agency has made a habit of sitting on reviews, finishing them late, or skipping them altogether—a pattern that has only grown worse over time.  *See* Pet. 6-8.  That history colors the current delay and the excuses proffered for it.  As the Third Circuit found in 2016, the Commission has failed "to provide a cogent response" "for the delay."  *Prometheus III*, 824 F.3d at 51.

      ***Effect on Agency Priorities.***    The Commission also asserts (at 18) that ordering it to complete the 2018 review would intrude on "agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  Congress has already made clear that the *ownership review* is a top priority.  *See Prometheus III*, 824 F.3d at 50 (Section 202(h) uses "unmistakably mandatory language" that "creates an obligation impervious to … discretion" (quotation marks omitted)).    Regardless, the Commission does not identify a single competing priority, mandatory or otherwise, that has caused it to delay the 2018 review.  That is because there are none.  To NAB's knowledge, since the Commission's December 13, 2018 notice of proposed rulemaking, the Commission's Media Bureau has been involved in only four mandatory proceedings.  Two were completed before the supplemental comment

period closed and a third in December 2022; only one remains pending. [2]
Meanwhile, the Media Bureau has started and completed at least seven *discretionary*
rulemakings since the Supreme Court issued *Prometheus IV*.[3] Respectfully, the
Commission should have finished its statutorily-prescribed homework before
embarking on extracurricular activities.

The 2018 review, which should have been done by now, must at least be first
on the agency's to-do list, regardless of other interests. That review certainly must
be given priority over the 2022 review, which the Commission somehow found the
time to initiate. Congress intentionally structured the quadrennial reviews as an

---

[2] *Implementation of Section 1003 of the TV Viewer Prot. Act of 2019*, Report and
Order, 35 FCC Rcd 4961 (2020); *Communications Marketplace Report*, 36 FCC Rcd
2945 (2020); *Communications Marketplace Report*, 2022 FCC LEXIS 4232 (2022);
*Implementation of the Low Power Protection Act*, MB Docket No. 23-126, FCC No.
23-23 (2023).

[3] *Amendment of Parts 73 and 74 of the Commission's Rules to Establish Rules for
Digital Low Power Television and Television Translator Stations*, Fifth Report and
Order, 2023 FCC LEXIS 2218 (2023); *Authorizing Permissive Use of the "Next
Generation" Broadcast Television Standard*, Third Report and Order and Fourth
Further Notice of Proposed Rulemaking, GN Docket No. 16-142, FCC No. 23-53
(2023); *Update of Parts 74 of the Commission's Rules Related to Low Power
Television and Television Translator Stations*, Report and Order, 2023 FCC LEXIS
1112 (2023); *Update to Publication for Television Broadcast Station DMA
Determinations for Cable and Satellite Carriage*, Report and Order, 2022 FCC
LEXIS 3762 (2022); *Updating FM Broadcast Radio Service Directional Antenna
Performance Verification*, Report and Order, 2022 FCC LEXIS 1639 (2022);
*Updating Broadcast Radio Technical Rules, Report and Order*, 37 FCC Rcd 2497
(2022); *Revisions to Political Programming and Record-Keeping Rules, Report and
Order*, 37 FCC Rcd 1359 (2022).

iterative undertaking, where each review "serve[s] as an important point of reference in an ongoing review process." *Prometheus I*, 373 F.3d at 436 (Scirica, C.J., dissenting). The Commission attempts to assure the Court (at 20) that it "has no intention of combining the Quadrennial Reviews for 2018 and 2022; nor does it plan to allow the 2022 review to 'cut in front of' the 2018 review." Be that as it may, what the Commission has *not* said is far more compelling: it has offered this Court no update on the timing of the 2018 review; indeed, the Commission is not even willing to say that anyone is actually working on the 2018 review.

**Prejudice from Delay and Harm to Welfare.** The Commission's unlawful delay of the 2018 review has and continues to prejudice NAB, its members, and other stakeholders. *See* Pet. 24. Stakeholders have scrambled to develop meaningful comments in the 2022 review without knowing the conclusion of the 2018 review. If the 2018 review repeals or modifies any of the rules at issue, the comments the parties submitted in the 2022 review may be mooted. The Commission pooh-poohs this by noting that it can always allow supplemental comments in the 2022 review after completing the 2018 review. But that would just mean *more* delay for the 2022 review. It also ignores that the resources spent on those comments may have been completely wasted.

The interest of NAB, its members, and stakeholders is not just in avoiding a waste of resources on comments that are never considered. NAB has urged the

Commission to make specific deregulatory decisions in the 2018 review to help the broadcast industry keep pace with its online video and audio competitors, which are unencumbered by comparable ownership restrictions.  That competitive harm impairs the viability of our nation's free, over-the-air broadcast services, which provide vital local news, information, and emergency alerts for millions of Americans, including in smaller communities that increasingly lack other local journalism outlets. *See* Pet. 22, 24.  Contrary to the Commission's assertion (at 18), this is much more than mere "economic" injury.  Delay does real harm to the public's welfare.

And it remains more likely than ever the Commission will never complete the 2018 review, given that 2018 and 2022 reviews are already proceeding in parallel. The Commission again claims (at 21) that NAB's concern is "baseless," yet the Commission refuses to take that option off the table.  A similar scenario is that the Commission may allow the 2018 review to drag on without resolution.  The longer the Commission takes, the staler the record becomes, which is precisely what the Commission supposedly sought to avoid by refreshing the record in 2021.  Absent mandamus, nothing is stopping the Commission from refreshing the record in the 2018 proceeding once again, at the expense of concluding not just the 2018 review but also the 2022 review.

The Commission dismisses the clear prejudice to NAB from the delayed adoption of deregulation by arguing (at 22) that NAB has an "adequate alternative remedy" because it can challenge the Commission's final order *if and when* the 2018 review concludes. But the availability of a cause of action to challenge final agency action cannot cure the failure to reach final agency action. That position, if accepted, would effectively immunize agencies from suits seeking to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). This Court should not tolerate this "administrative law shell game" to avoid judicial review where the Commission "fears the [unlawful delay] cannot withstand judicial scrutiny." *AT&T Co. v. FCC*, 978 F.2d 727, 731-32 (D.C. Cir. 1992).

**Agency Impropriety.** To grant NAB's petition, this Court "need *not* find any impropriety" underlying the Commission's delay. *TRAC*, 750 F.2d at 80 (emphasis added). Nevertheless, the Commission's conduct raises serious concerns. As NAB has explained, delay may provide the Commission strategic advantages that help it avoid Section 202(h)'s deregulatory purpose, or allow those who oppose deregulation to achieve the same result by simply doing nothing. Pet. 25-26. In response, the Commission merely repeats (at 23) its assertions that refreshing the record after the Supreme Court's *Prometheus IV* decision was reasonable and that the two years that have passed are "an entirely reasonable period of time given the

complexity and potential contentiousness of the issues." Those arguments founder for the reasons already given.

Notably, the reference to "potential contentiousness" reveals the Commission's pretext. The Commission cannot know there is partisan deadlock because it has not even circulated a proposed order for consideration. *See supra* 9-10. Moreover, Section 202(h) contains no exception to the normal four-year schedule for "contentious" issues.

Just as troubling is the agency's insistence that Section 202(h) merely requires it to initiate a review every four years. That tortured interpretation, which the Third Circuit already squarely rejected seven years ago in *Prometheus III*, is indefensible. *See supra* 2-4. The Commission's position on the meaning of Section 202(h) amounts to "utter indifference to a congressional deadline," which "manifest[s] bad faith." *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

## CONCLUSION

For these reasons, this Court should grant this Petition and instruct the Commission to complete the 2018 review within 90 days of this Court's decision. This Court also should retain jurisdiction solely for the purpose of monitoring the Commission's compliance.

August 16, 2023                          Respectfully submitted,

   /s/ Helgi C. Walker

Rick Kaplan                              Helgi C. Walker
Jerianne Timmerman                       *Counsel of Record*
NATIONAL ASSOCIATION                     GIBSON, DUNN & CRUTCHER LLP
OF BROADCASTERS                          1050 Connecticut Avenue, N.W.
1 M Street, S.E.                         Washington, D.C.  20036
Washington, D.C.  20003                  Telephone: (202) 887-3599
Telephone: (202) 429-5430                Facsimile:  (202) 530-9595
                                         hwalker@gibsondunn.com

*Counsel for Petitioner National Association of Broadcasters*

17

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this reply brief complies with the applicable typeface, type-style, and type-volume limitations.  This reply brief was prepared using a proportionally spaced type (Times New Roman, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this reply brief contains 3,851 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this reply brief.

August 16, 2023                        Respectfully submitted,

                                         /s/ Helgi C. Walker
                                        Helgi C. Walker
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
                                        Telephone: (202) 887-3599
                                        Facsimile:  (202) 530-9595
                                        hwalker@gibsondunn.com

18

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 16, 2023, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

August 16, 2023                    Respectfully submitted,

                                   /s/ Helgi C. Walker
                                  Helgi C. Walker
                                  GIBSON, DUNN & CRUTCHER LLP
                                  1050 Connecticut Avenue, N.W.
                                  Washington, D.C.  20036
                                  Telephone: (202) 887-3599
                                  Facsimile:  (202) 530-9595
                                  hwalker@gibsondunn.com