No. 23-1120

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE NATIONAL ASSOCIATION OF BROADCASTERS, PETITIONER.

# PETITION FOR WRIT OF MANDAMUS
# TO THE FEDERAL COMMUNICATIONS COMMISSION

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION
OF BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
Telephone: (202) 429-5430

Helgi C. Walker
    *Counsel of Record*
Jacob T. Spencer
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 887-3599
Facsimile:  (202) 530-9595
hwalker@gibsondunn.com

*Counsel for Petitioner National Association of Broadcasters*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A)     Parties and Amici**

Petitioner is the National Association of Broadcasters ("NAB").  Respondent is the Federal Communications Commission (the "Commission").  There are no intervenors or amici at the time of the filing of this petition.

**(B)     Ruling Under Review**

This is an original action challenging the Commission's unlawful withholding of action on its 2018 quadrennial broadcast ownership review, as mandated by Section 202(h) of the Telecommunications Act of 1996.  NAB seeks a writ of mandamus compelling the Commission to complete the 2018 review within 90 days of this Court's decision.  Because the Commission has not issued a decision on the 2018 review, no citation to the Federal Register or otherwise exists.

**(C)     Related Cases**

This case was not previously before this Court or any other court.  There are no other related cases currently pending in this Court or in any other court of which counsel is aware.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, NAB states as follows:

The National Association of Broadcasters is a nonprofit, incorporated association of radio and television stations.  It has no parent company, and has not issued any shares or debt securities to the public; thus, no publicly held company owns ten percent or more of its stock.  As a continuing association of numerous organizations operated for the purpose of promoting the interests of its membership, NAB is a trade association for purposes of D.C. Circuit Rule 26.1.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ......................................................... ii

INTRODUCTION ................................................................................................1

STATEMENT OF JURISDICTION..........................................................................3

RELIEF SOUGHT ................................................................................................3

ISSUE PRESENTED .............................................................................................4

STATUTORY PROVISION INVOLVED....................................................................4

STATEMENT OF THE CASE.................................................................................5

    I.    The Statutory Requirement to Conduct Quadrennial Reviews.............5

    II.    The Commission's Long History of Delaying and Failing to Complete Biennial and Quadrennial Reviews Leading Up to the 2018 Review........................................................................................6

    III.    The Commission's Initiation of the 2018 Quadrennial Review. ..........9

    IV.    The Commission's Initiation of the 2022 Quadrennial Review. ........10

ARGUMENT .....................................................................................................12

    I.    The Commission Has Violated a Crystal-Clear Legal Duty..............13

    II.    NAB Has No Other Adequate Means to Obtain Relief. ....................15

    III.    The Commission's Delay Is Egregious..............................................16

CONCLUSION ..................................................................................................27

CERTIFICATE OF COMPLIANCE .......................................................................28

CERTIFICATE OF SERVICE ...............................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016)..............................................................13, 23, 26

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004).........................................................................12

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000)........................................................................4

*In re Center for Auto Safety*,
  793 F.2d 1346 (D.C. Cir. 1986)......................................................................19

*In re Core Comm'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008).................................................................12, 16

*In re Ctr. for Bio. Diversity*,
  53 F.4th 665 (D.C. Cir. 2022)...............................................4, 13, 16, 18, 21, 23

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)........................................................................................25

*FCC v. Prometheus Radio Project*,
  141 S. Ct. 1150 (2021).............................................................................6, 9, 18

*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999) ......................................................................21

*Fox Television Stations, Inc. v. FCC*,
  280 F.3d 1027 (D.C. Cir. 2002)...........................................................19, 22, 25

*In re Int'l Chem. Workers Union*,
  958 F.2d 1144 (D.C. Cir. 1992).......................................................................3

  * *Authorities upon which we chiefly rely are marked with asterisks.*

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1998) .................................................................................13

*Nat'l Sci. and Tech. Network, Inc. v. FCC*,
    397 F.3d 1013 (D.C. Cir. 2005) ..........................................................21

*In re People's Mojahedin Org. of Iran*,
    680 F.3d 832 (D.C. Cir. 2012) ....................................................19, 26

*Prometheus Radio Project v. FCC*,
    824 F.3d 33 (3d Cir. 2016) ...................................... 2, 3, 8, 11, 13, 14, 18, 21, 26

*In re Pub. Emps. for Env. Resp.*,
    957 F.3d at 273 .....................................................................................17

*In re Pub. Emps. for Env't Resp.*,
    957 F.3d 267 (D.C. Cir. 2020) ......................................................3, 13, 22

*Sinclair Broadcast Group, Inc. v. FCC*,
    284 F.3d 148 (D.C. Cir. 2002) ............................................................19

*South Carolina v. United States*,
    907 F.3d 742 (4th Cir. 2018) ..............................................................21

*Telecomm. Research and Action Ctr. v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ......................................................3, 12, 17, 18, 25

STATUTES

5 U.S.C. § 706(1) .........................................................................................12

28 U.S.C. § 2343 ...........................................................................................3

47 U.S.C. § 402(a) .........................................................................................3

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 5003, 113 Stat.
    1501, 1501A-593 (1999) ........................................................................6

Consolidated Appropriations Act, 2004, Pub. L. No. 108-109 § 629, 118 Stat. 3,
    99-100 (2004)..........................................................................................6

Telecommunications Act of 1996, Pub. L. No 104-104, § 202, 110 Stat. 56, 110-12
    (1996) ..............................................................................................1, 4, 5, 13

## OTHER AUTHORITIES

*1998 Biennial Regulatory Review*, Biennial Review Report, 15 FCC Rcd 11058 (2000) ................................................................................6

*1998 Biennial Regulatory Review*, Notice of Inquiry, 13 FCC Rcd 11276 (1998) ...6

*2000 Biennial Regulatory Review*, Report, 16 FCC Rcd 1207 (2001) ......................7

*2002 Biennial Regulatory Review*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620 (2003) ............................................................7

*2006 Quadrennial Regulatory Review,* Report and Order and Order on Reconsideration, 23 FCC Rcd 2010 (2008) ..........................................................8

*2014 Quadrennial Regulatory Review*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371 (2014) .................................................8

*2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802 (2017) .................................................9

*2014 Quadrennial Regulatory Review*, Second Report and Order, 31 FCC Rcd 9864 (2016) .................................................................................8

*2018 Quadrennial Regulatory Review*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111 (2018) ................................................................................9

*Amendment to the Commission's Rules Concerning Effective Competition*, Report and Order, 30 FCC Rcd 6574 (2015) ................................................................20

Comments of NAB, MB Docket No. 18-349 (Apr. 29, 2019) ...............................22

Comments of NAB, MB Docket No. 22-459 (Mar. 3, 2023) .................................11

*Cross-Ownership of Broadcast Stations and Newspapers*, Notice of Proposed Rulemaking, 16 FCC Rcd 17283 (2001) ............................................................7

*Establishing Emergency Connectivity Fund to Close the Homework Gap*, Report and Order, 36 FCC Rcd 8696 (2021) ................................................................20

H.R. Rep. No. 104-204 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10 .......................5

*Media Bureau Announces Agenda and Participants for Initial Media Ownership Workshops and Seeks Comment on Structuring of the 2010 Media Ownership Review Proceeding*, Public Notice, 24 FCC Rcd 12584 (2009)...........................8

*Media Bureau Opens Docket and Seeks Comment for 2022 Quadrennial Review of Media Ownership Rules*, Public Notice, MB Docket No. 22-459, DA 22-1634 (Dec. 22, 2022) ................................................................10, 11, 15, 24

*Media Bureau Seeks to Update the Record in the 2018 Quadrennial Regulatory Review*, MB Docket No. 18-349, DA 21-657 (June 4, 2021) .............................9

NAB, *Request to Toll the 2022 Quadrennial Regulatory Review and to Expeditiously Conclude the 2018 Quadrennial Regulatory Review*, MB Docket Nos. 22-459, 18-349 (Feb. 1, 2023).............................................................11, 15

NAB, *Supplemental Submission Regarding Request*, MB Docket Nos. 22-459, 18-349 (Mar. 29, 2023) ...................................................................................12, 16

Reply Comments of NAB, MB Docket No. 18-349 (Oct. 1, 2021) ..................10, 15

## INTRODUCTION

One might favor more regulation as a policy matter. One might favor less. But one thing should be common ground when it comes to the Commission's broadcast ownership rules: the agency must adhere to the mandatory statutory deadline Congress set in Section 202(h) of the Telecommunications Act of 1996 for periodically reviewing those rules to ensure they keep pace with competition. Adhering to that deadline not only respects the schedule set by Congress, but also ensures that decisions about the rules are made and explained, and thus can be understood and tested by regulated entities and interested parties alike.

This petition is about the Commission's undisputed failure to conduct its most recent review on time. Under Section 202(h), the Commission is required to complete a review of its broadcast ownership rules once every four years. The Commission last concluded a review in 2017, when it granted a reconsideration petition regarding a quadrennial review order issued in 2016. The Commission initiated its next review in 2018. It has been ***more than four years*** since the 2018 review began, ***nearly five and a half years*** since the 2017 reconsideration order, and ***over six and a half years*** since the 2016 order (which had belatedly addressed a combined 2010/2014 review). The record for the 2018 review has long been complete. Despite all of that, the agency still has not taken any final action. Instead, the Commission has left the 2018 review in a state of regulatory limbo while moving

1

onto the 2022 review without any indication about when—or even *whether*—the 2018 proceeding will conclude.

The Commission's noncompliance with respect to the 2018 review is part of a disturbing trend. From the time Congress first required periodic review of the broadcast ownership restrictions, the agency has made a habit of sitting on reviews, finishing them late, or skipping them altogether. That pattern has only grown worse over time. Since finishing the 2006 quadrennial review, the Commission has completed only one ownership review—just *one*—when it was obligated by statute to complete nearly *four*. The agency's inaction and delay is now a chronic problem. The problem is so bad that *both* media groups and certain public advocacy groups— who don't agree on much when it comes to the underlying rules—have been forced to seek judicial relief from the Commission's dilatory pattern. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 37 (3d Cir. 2016) ("*Prometheus III*") (concluding, in response to public advocacy groups, "that the FCC has unreasonably delayed action on its definition of an 'eligible entity'" used for promoting minority and female broadcast ownership, and, in response to media parties, that it was "[e]qually troubling . . . that nearly a decade has passed since the Commission last completed a review of its broadcast ownership rules").

This Court's intervention is necessary to put a stop to the agency's perpetual slow-roll. Although mandamus relief is extraordinary, so too is the Commission's

long-standing, flagrant refusal to perform its statutory obligation within the timeframe Congress expressly prescribed. There comes a point where a "court must let the agency know, in no uncertain terms, that enough is enough." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1150 (D.C. Cir. 1992) (internal quotation marks omitted). That point is now.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over mandamus petitions alleging agency inaction or unreasonable delay "whenever a statute commits review of the relevant action to the courts of appeals." *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 271 (D.C. Cir. 2020). Because Section 402(a) of the Communications Act of 1934 commits review of the Commission's orders to the courts of appeals, this Court has jurisdiction to compel the Commission to complete the 2018 review. 47 U.S.C. § 402(a); *see also Prometheus III*, 824 F.3d at 39; *Telecomm. Research and Action Ctr. v. FCC*, 750 F.2d 70, 75–77 (D.C. Cir. 1984) ("*TRAC*"). Venue is also proper in this Court because the Hobbs Act provides that a petitioner may seek review of agency action in the D.C. Circuit. 28 U.S.C. § 2343.

## RELIEF SOUGHT

NAB seeks an order granting this Petition and instructing the Commission to complete the 2018 review within 90 days of this Court's decision. NAB also asks this Court to retain jurisdiction over the matter solely to ensure the Commission's

compliance. *See In re Ctr. for Bio. Diversity*, 53 F.4th 665, 673 (D.C. Cir. 2022) (ordering EPA to take action by a specified date and "retain[ing] jurisdiction" to monitor the agency's progress); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (ordering Coast Guard to undertake prompt action and "retain[ing] jurisdiction over the case until final agency action" was issued).

## ISSUE PRESENTED

Whether this Court should issue a writ of mandamus compelling the Commission to comply with its express statutory obligation to complete the 2018 review.

## STATUTORY PROVISION INVOLVED

Section 202(h) of the Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111–12 (1996), *as amended by* Pub. L. No. 108-199, § 629, 118 Stat. 3, 99–100 (2004), provides:

SEC. 202.   BROADCAST OWNERSHIP.

* * *

(h) FURTHER COMMISSION REVIEW.—The Commission shall review its rules adopted pursuant to this section and all of its ownership rules quadrennially as part of its regulatory reform review under section 11 of the Communications Act of 1934 and shall determine whether any of such rules are necessary in the public interest as the result of competition.  The Commission shall repeal or modify any regulation it determines to be no longer in the public interest.

## STATEMENT OF THE CASE

### I.    The Statutory Requirement to Conduct Quadrennial Reviews.

In the mid-1990s, Congress decided that substantial regulatory reform was needed to ensure that the broadcast industry could compete effectively in a changed marketplace.  *See* H.R. Rep. No. 104-204, at 54–55 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 18–19 ("House Report").  To that end, Congress enacted the Telecommunications Act of 1996 ("1996 Act").  Pub. L. No 104-104, 110 Stat. 56 (1996).  Section 202 of the 1996 Act accomplished Congress's goal "to preserve and to promote the competitiveness" of broadcast stations in two ways.  House Report at 48.  First, it relaxed or eliminated a series of decades-old rules restricting the number of television stations and radio stations a single entity could own and banning the common ownership of broadcast stations with certain non-broadcast media outlets.  *See* 1996 Act, § 202(a)-(f), (i), 110 Stat. at 110–12.  Second, it directed the Commission to "review" all its remaining broadcast ownership rules "biennially" to "determine" whether any of them continue to be "necessary in the public interest as the result of competition," and to "repeal or modify" those that are not.  *Id.* § 202(h), 110 Stat. at 111–12.  In 2004, Congress amended Section 202(h) to require that the Commission's periodic reviews take place every four years instead of every two because the agency had already failed to keep up with the statutory

deadline.  *See* Consolidated Appropriations Act, 2004, Pub. L. No. 108-199 § 629, 118 Stat. 3, 99–100 (2004).

Section 202(h) established an "iterative process" requiring the Commission "to keep pace with industry developments and to regularly reassess how its rules function in the marketplace."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1156 (2021).  Congress thus contemplated that the Commission would finish each review in a timely fashion so that it can assess how its rules, including any modified ones, function in the real world before initiating the next required review.

## II.    The Commission's Long History of Delaying and Failing to Complete Biennial and Quadrennial Reviews Leading Up to the 2018 Review.

Although Section 202(h) of the 1996 Act clearly instructs the Commission to conduct recurring reviews of its ownership rules on the timetable set by Congress, the agency has repeatedly failed to do so.

The Commission failed to finish its very first broadcast ownership review on time.  The agency started that review in 1998.  *See 1998 Biennial Regulatory Review*, Notice of Inquiry, 13 FCC Rcd 11276 (1998).  But by November 1999, that inaugural review was still not done, drawing a direct congressional rebuke: Congress instructed the Commission to complete it within 180 days.  Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 5003, 113 Stat. 1501, 1501A-593 (1999).  The Commission finally released the review in mid-2000.  *See 1998*

6

*Biennial Regulatory Review*, Biennial Review Report, 15 FCC Rcd 11058 (2000) ("Report").

The 1998 review was even more belated than these dates suggest. Because that proceeding began with a notice of inquiry rather than a rulemaking notice, the 1998 biennial Report could not effectuate any ownership rule changes. Further delays ensued as the Commission subsequently initiated several rulemakings to consider the Report's proposals, with one of these rulemaking notices not even being *released* until months *after* the next (*i.e.*, 2000) biennial review had been concluded. *See Cross-Ownership of Broadcast Stations and Newspapers*, Notice of Proposed Rulemaking, 16 FCC Rcd 17283 (2001); *2000 Biennial Regulatory Review*, Report, 16 FCC Rcd 1207 (2001).[1]

With another review of its ownership rules due, the Commission made two rulemakings still pending from the *1998* biennial part of the *2002* review. *See 2002 Biennial Regulatory Review*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13712, 13747–48 (2003). That 2002 biennial was not resolved until mid-2003. *Id*.

Congress responded by amending the law to require quadrennial, instead of biennial, reviews. *See supra* 5–6. Even with additional time, the 2006 quadrennial

---

[1] In this intervening 2000 ownership review, the Commission, in relevant part, issued a report merely summarizing its recent actions and proposals relating to its ownership rules. 16 FCC Rcd at 1217–18.

review was not completed until 2008.  *See 2006 Quadrennial Regulatory Review,* Report and Order and Order on Reconsideration, 23 FCC Rcd 2010 (2008).

Then, despite initiating the 2010 review in 2009, *Media Bureau Announces Agenda and Participants for Initial Media Ownership Workshops and Seeks Comment on Structuring of the 2010 Media Ownership Review Proceeding*, Public Notice, 24 FCC Rcd 12584 (2009), the Commission not only failed to timely complete that review but also failed ever to properly finish it.  Instead, the agency chose to disregard the long-completed 2010 record, start the 2014 review, and just roll the unfinished 2010 review into the 2014 proceeding.  *See 2014 Quadrennial Regulatory Review*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371 (2014).  The Commission then delayed the 2014 review—which, of course, was *further* delay of the 2010 review.  When NAB and other media parties challenged the agency's inaction as contrary to Section 202(h), the Third Circuit Court of Appeals found that the Commission had not complied with the "mandatory language" or the "very purpose" of the statute, stressing the "need for timeliness" in conducting Section 202(h) reviews.  *Prometheus III*, 824 F.3d at 50.

The Commission finally released an order addressing the combined 2010/2014 review in late summer 2016, three months after the Third Circuit's decision.  *See 2014 Quadrennial Regulatory Review*, Second Report and Order, 31 FCC Rcd 9864 (2016).  The Commission subsequently reconsidered that order in

response to NAB's and other media parties' requests, taking measured and long-overdue deregulatory action. *See 2014 Quadrennial Regulatory Review*, Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802 (2017). Court challenges to the reconsideration decision followed, and the Supreme Court unanimously upheld the Commission's deregulatory order. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150 (2021).

**III.    The Commission's Initiation of the 2018 Quadrennial Review.**

In December 2018, the Commission released a rulemaking notice kicking off the 2018 review. *See* Add. 1 (*2018 Quadrennial Regulatory Review*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111 (2018)). Many stakeholders filed comments in April 2019 and reply comments in May 2019, with some, including NAB, submitting extensive data and studies by economists and industry analysts as the Commission urged. The Commission took no further action on the 2018 review until after the Supreme Court's April 2021 decision in *Prometheus*. Following the Supreme Court's decision, the Commission sought to update its record, and interested parties filed another round of comments and reply comments on September 2 and October 1, 2021, respectively. *See* Add. 57 (*Media Bureau Seeks to Update the Record in the 2018 Quadrennial Regulatory Review*, MB Docket No. 18-349, DA 21-657 (June 4, 2021)). NAB again submitted extensive comments,

data, and studies, and asked the Commission to expeditiously conclude the 2018 review.  Reply Comments of NAB, MB Docket No. 18-349, at 6 (Oct. 1, 2021).

The Commission has now been sitting on the record since 2019 and even on its updated record for more than 18 months.  It has been nearly ***five and a half years*** since the 2017 reconsideration order that ended the combined 2010/2014 review—and more than ***six and a half years*** since the 2016 order that had initially concluded the 2010/2014 review.  Despite those undisputable facts, the Commission to date has taken no further action on the 2018 review and has announced no plans to do so. The Commission has chosen to leave the 2018 review in limbo and instead begin its 2022 review.

## IV.    The Commission's Initiation of the 2022 Quadrennial Review.

On December 22, 2022, the Commission's Media Bureau released a Public Notice opening the 2022 proceeding and seeking comment on the three rules that remain subject to periodic review.  *See* Add. 64 (*Media Bureau Opens Docket and Seeks Comment for 2022 Quadrennial Review of Media Ownership Rules*, Public Notice, MB Docket No. 22-459, DA 22-1364 (Dec. 22, 2022)) ("Public Notice").[2] In explaining its decision to initiate the 2022 review before it had finished the 2018

---

[2] As with the 1998 review, *see supra* 7, the Commission cannot modify or repeal any ownership rules without first issuing a notice of proposed rulemaking.  Accordingly, the Public Notice refers to "next steps in the 2022 proceeding, such as any subsequent Notice of Proposed Rulemaking," Add. 67, but the Commission has not said when and if it will take those "next steps."

review, the Public Notice observed that the Commission had "similarly initiated" the 2014 review before completing the 2010 review. Add. 64 n.2. But the Public Notice ignored the Third Circuit's ruling that the 2010 review was *unlawfully delayed* notwithstanding the fact that it had been rolled into the 2014 review. *Prometheus III*, 824 F.3d at 50–51.

On February 1, 2023, NAB asked the Commission to hold the 2022 review in abeyance until it expeditiously concluded the 2018 review (i.e., by the end of the first quarter of 2023). *See* Add. 69 (NAB, *Request to Toll the 2022 Quadrennial Regulatory Review and to Expeditiously Conclude the 2018 Quadrennial Regulatory Review*, MB Docket Nos. 22-459, 18-349 (Feb. 1, 2023)) ("Request"). NAB explained that the Commission's failure to timely complete the 2018 review violates Section 202(h), and that the initiation of the 2022 review prior to concluding the 2018 review upends the iterative process Congress established. Add. 70–76. NAB also pointed out that stakeholders cannot provide specific and relevant comments or studies for purposes of the 2022 review on rules still subject to potential modification or repeal in the pending 2018 review. Add. 74–77. Receiving no answer, NAB submitted comments in response to the Public Notice on March 3, 2023.[3] On March 29, 2023, NAB notified the Commission that if it did not act on NAB's Request by

---

[3] NAB's comments focused on issues it had previously commented on in the pending 2018 review, attaching several earlier filings it had submitted for the record in the 2018 proceeding. *See* Comments of NAB, MB Docket No. 22-459 (Mar. 3, 2023).

April 12, NAB would deem that Request denied and reserved its right to seek judicial relief.  *See* Add. 79 (NAB, *Supplemental Submission Regarding Request*, MB Docket Nos. 22-459, 18-349 (Mar. 29, 2023)).  The Commission did not act on the Request, leaving NAB with no choice but to file this petition for mandamus.

## ARGUMENT

The Administrative Procedure Act ("APA") requires courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  This Court has repeatedly held that a writ of mandamus is the appropriate mechanism for carrying out that directive.  *See, e.g.*, *In re Core Comm'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (noting that the court's "jurisdiction and authority" to provide mandamus relief in these circumstances is "undisputed"); *TRAC*, 750 F.2d at 77 (noting that the APA "indicate[s] a congressional view that agencies should act within reasonable time frames and that courts . . . may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed").  Ordering mandamus relief not only protects the Court's future jurisdiction to review the agency action in question, but also ensures that agencies comply with the statutory obligations Congress established.  *See TRAC*, 750 F.2d at 76; *see also In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (explaining that an agency's "unreasonable delay" presents the type of "extraordinary circumstances" justifying mandamus relief).  Accordingly, this Court

has held that a writ of mandamus should issue if (1) the agency's delay violates a clear legal duty, (2) the petitioner has no other adequate means to obtain relief, and (3) the agency's delay is "egregious." *In re Ctr. for Bio. Diversity*, 53 F. 4th at 670. Each of those prerequisites is satisfied here.

## I.    The Commission Has Violated a Crystal-Clear Legal Duty.

The Commission's failure to complete the 2018 review violates the "crystal-clear legal duty" Congress has imposed. *In re Ctr. for Bio. Diversity*, 53 F. 4th at 670. Section 202(h) uses "unmistakably mandatory language" in describing the Commission's obligation to complete a review of its broadcast ownership rules every four years. *Prometheus III*, 824 F.3d at 50. The provision states that the Commission "shall" review its ownership rules "quadrennially"; "shall" determine whether any of those rules remain necessary in the public interest as a result of competition; and "shall" repeal or modify those that are not. 1996 Act, § 202(h), as amended. By repeatedly using the word "shall," Congress created "'an obligation impervious to . . . discretion.'" *Prometheus III,* 824 F.3d at 50 (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)).

Because Section 202(h) constitutes a "clear command," the agency may not simply ignore it. *In re Pub. Emps. For Env't Resp.*, 957 F.3d at 273; *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016) (explaining that "shall" is "typically mandatory"). Although the Commission has openly acknowledged "its

'statutory obligation to review the broadcast ownership rules every four years,'" *Prometheus III*, 824 F.3d at 51 (internal citation omitted), the agency has repeatedly ignored it. The 2018 review commenced in December 2018. Yet, the agency has not taken *any* substantive action on the extensive record in that proceeding, which essentially has been gathering dust since May 2019. In fact, there has been no final action by the Commission regarding the broadcast ownership rules since its reconsideration of the belated 2010/2014 review order in 2017—*five and a half years ago*. The Commission has not said anything about when, if ever, it might close out the 2018 review.

Rather than issuing a decision based on the 2018 proceedings, the Commission has instead skipped ahead to the 2022 review. But it may not satisfy its statutory obligation to conduct a "quadrennial" review by combining the 2018 and 2022 proceedings or otherwise considering them contemporaneously. The iterative process in Section 202(h) contemplates "review cycles" that build on one another, not collapse into each other. *See Prometheus III*, 824 F.3d at 50–51. The law says "quadrennially," not "octennially" or "at the Commission's convenience." That is why the Third Circuit concluded that the Commission's decision to roll the 2010 review into the 2014 review did not save it from being unlawfully delayed. *Id.* By beginning the 2022 proceeding before completing the delayed 2018 review, the

Commission repeats its past errors.  Each review must be done every four years and be timely in its own right.  The 2018 review plainly is not.[4]

## II.    NAB Has No Other Adequate Means to Obtain Relief.

A petition for mandamus is NAB's only means for obtaining relief.  NAB has already *thrice* implored the Commission to complete the 2018 review, but these efforts have been unsuccessful.  First, in October 2021, NAB requested in its supplemental reply comments in the 2018 proceeding that the Commission expeditiously conclude the 2018 review, which at that time had already been underway for three years.  Reply Comments of NAB, MB Docket No. 18-349, at 6.  Second, NAB filed a Request with the Commission on February 1, 2023, asking the agency to toll the newly commenced 2022 review until it concluded the 2018 review expeditiously.  Add. 69 (NAB, *Request to Toll the 2022 Quadrennial Regulatory Review and to Expeditiously Conclude the 2018 Quadrennial Regulatory Review*, MB Docket Nos. 22-459, 18-349).  Third, after receiving no response, NAB notified

---

[4] Recognizing this problem, the Public Notice tries to distinguish the Commission's 2022 action from its 2014 action, stating that in 2014, the "Commission incorporated the existing 2010 record into the 2014 review[,] [but] [h]ere, the Media Bureau is creating a new docket" for the 2022 review.  Add. 64 n.2.  That point is inaccurate and irrelevant.  The agency did create a new docket for the 2014 review (MB 14-50) that differed from the docket for the 2010 review (MB 09-182).  In any event, whether or not the Commission incorporates an earlier review's record into a later review, the Commission's initiation of the 2022 review without timely completing the 2018 review violates Section 202(h)'s core command that the agency review the rules and determine whether they remain in the public interest every four years.

the Commission on March 29 that, unless the agency acted on NAB's Request by April 12, NAB would be forced to seek judicial relief. Add. 79 (NAB, *Supplemental Submission Regarding Request*, MB Docket Nos. 22-459, 18-349). The Commission did not respond by that time (or indeed as of the date of this filing) to any of NAB's requests, thereby constructively denying them.

The statutory framework does not provide a more formal mechanism for urging the Commission to comply with its statutory duty. NAB is out of options. The only relief it can seek is from this Court. *See In re Ctr. for Bio. Diversity*, 53 F. 4th at 671 (concluding that mandamus relief was the only way the petitioner could compel the agency "to perform its clear duties"); *In re Core Commc'ns*, 531 F.3d at 860 (explaining that petitioner's appeal to the agency was "not an adequate means to attain the relief it seeks").[5]

## III. The Commission's Delay Is Egregious.

For 25 years, the Commission has played fast and loose with its obligation to review its broadcast ownership rules according to the clear timetable prescribed in Section 202(h). The Commission is well aware that its dilatory ways are unlawful; indeed, both Congress and the Third Circuit have admonished the agency for not

---

[5] If the Court concludes that the Commission's failure to respond to NAB's February 2023 Request constitutes reviewable final agency action, NAB asks that the Court treat this filing as a petition for review in addition, or in the alternative, to a petition for mandamus.

heeding the statutory deadline.  The agency's continued inaction on the 2018 review—especially against the backdrop of its long history of chronic tardiness, *see supra* 6–9—is therefore egregious under any standard.  In *TRAC*, the Court listed six factors to guide its analysis of the reasonableness of an agency's delay in fulfilling its statutory duty:

> (1) "the time agencies take to make decisions must be governed by a 'rule of reason'";
>
> (2) "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason";
>
> (3) "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake";
>
> (4) "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority";
>
> (5) "the court should also take into account the nature and extent of the interests prejudiced by delay"; and
>
> (6) "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."

750 F.2d at 80 (citations omitted).  "No one factor is determinative, and each case must be analyzed according to its own unique circumstances."  *In re Pub. Emps. for Env't Resp.*, 957 F.3d at 273 (internal quotation marks omitted).

*Rule of Reason*.  As discussed above, Section 202(h) provides a clear timetable for the Commission to review its broadcast ownership rules.  This

timetable "suppl[ies] the content" for determining whether the agency's delay in completing the 2018 review is reasonable. *TRAC*, 750 F.2d at 80.

Both the Supreme Court and the Third Circuit have explained that in enacting Section 202(h), Congress intended to create an "iterative process" through which the Commission would "keep pace" with the industry and "regularly reassess" how its rules function in the market. *Prometheus*, 141 S. Ct. at 1156; *see also Prometheus III*, 824 F.3d at 50 (stating that Section 202(h) was designed as an "ongoing mechanism" to ensure that Commission rules "keep pace with the competitive changes in the marketplace") (internal quotation markets omitted). To accomplish that objective, the statute requires the agency to both start *and complete* a review of its broadcast ownership rules "quadrennially"—*i.e.*, every four years. This constitutes a "plain deadline." *In re Center for Bio. Diversity*, 53 F.4th at 671. Congress has shown it knows how to change the deadline if it so desires; it previously provided that the reviews should be completed "biennially." If Congress wanted to allow the Commission to complete a review every eight years, or whenever it was able to do so, it would have used "octennially" or "at the Commission's discretion."

Extending the review proceedings beyond that four-year period—as the Commission has done here—upends the statutory scheme. The Commission is *not* keeping pace with the industry or regularly reassessing its rules as Congress

18

intended.  The Commission last evaluated the broadcast ownership rules when it belatedly completed the 2010/2014 review, and the competitive landscape has changed dramatically since then.  But the industry and all those affected by it are held captive in a state of regulatory stasis while the Commission does nothing. Failing to comply with the statute's requirement to perform discrete and recurrent reviews has thus "eviscerat[ed] the very purpose" of Section 202(h).  *In re Center for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986); *see also In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012) (per curiam) (holding that a "failure to act" that "plainly frustrates the congressional intent . . . cuts strongly in favor of granting [a] mandamus petition").  As this Court found when explaining Section 202(h)'s directive, "[t]he Commission's wait-and-see approach cannot be squared with its statutory mandate *promptly*—that is, by revisiting the matter biennially [now, quadrennially]—to 'repeal or modify' any rule that is not 'necessary in the public interest.'"  *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042 (D.C. Cir. 2002) (emphasis added), *modified on reh'g on other grounds*, 293 F.3d 537 (D.C. Cir. 2002); *accord Sinclair Broadcast Group, Inc. v. FCC*, 284 F.3d 148, 164 (D.C. Cir. 2002).  That the Commission has *repeatedly* ignored the timeline in Section 202(h) only reinforces the unreasonableness of its conduct.  *See In re Center for Auto Safety*, 793 F.2d at 1354 & n.55 (finding agency delays

19

unreasonable in a case involving "statutorily-mandated" recurring rulemakings "beset with repeated delay").

Nor can the Commission contend that the litigation relating to the 2010/2014 review justifies its delay in completing the 2018 review. While that litigation may account for *some* of the delay, it cannot account for all of it. It has been more than two years since the Supreme Court rendered its opinion, and the supplemental comments the Commission sought following that opinion have been sitting with the agency since October 1, 2021—*over 18 months*. A year and a half (on top of the time the Commission has had with the record compiled in spring 2019) is more than enough time for the Commission to complete its work.[6]

The Commission, moreover, knows it must abide by congressional deadlines as a general matter, *see, e.g.*, *Amendment to the Commission's Rules Concerning Effective Competition*, Report and Order, 30 FCC Rcd 6574, 6575 ¶ 1, n.6 (2015) (acknowledging that Congress's direction that the Commission "shall" complete a designated rulemaking means the Commission "must" complete the rulemaking by the date specified in the statute), and has *admitted* that it bears a particular "'statutory obligation'" to conduct broadcast ownership reviews on a four-year schedule,

---

[6] The Commission can move quickly when it wants to. In 2021, the Commission sought comment and promulgated new rules in just 60 days to meet a congressional deadline. *See Establishing Emergency Connectivity Fund to Close the Homework Gap*, Report and Order, 36 FCC Rcd 8696 (2021) (adopting rules on May 10, 2021, following legislation passed on March 11, 2021).

*Prometheus III*, 824 F.3d at 51 (internal citation omitted).  It should not be allowed to pick and choose which statutory deadlines it meets, respecting some but disregarding others.  As this Court observed in upholding the Commission's application of its deadlines against a dilatory licensee, "'rules is rules.'"  *Nat'l Sci. and Tech. Network, Inc. v. FCC*, 397 F.3d 1013, 1015 (D.C. Cir. 2005).

It is not only long past time for the Commission to act on the belated 2018 review, but continued delay also will make a properly conducted and even remotely timely 2022 review virtually impossible.  The Commission has finished only a single review—the improperly combined 2010/2014 review—since February 2008.  One completed "quadrennial" review in over 15 years undoubtedly qualifies as egregious.

The Commission's failure to meet the clear statutory deadline is the "most important" consideration in determining whether mandamus is appropriate to remedy agency inaction or delay.  *In re Ctr. for Bio. Diversity*, 53 F. 4th at 671 (internal quotation markets and citation omitted).  And in some courts, that failure alone provides the basis for awarding relief.  *See South Carolina v. United States*, 907 F.3d 742, 760 (4th Cir. 2018) (holding that judicial relief is non-discretionary when an agency fails "to meet a hard statutory deadline"); *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999) ("[W]hen an entity governed by the APA fails to comply with a statutorily imposed absolute deadline, it has unlawfully

withheld agency action and courts, upon proper application, must compel the agency to act."). Accordingly, this factor weighs heavily in favor of mandamus.

*Human Health & Welfare.* "Though this is not a case where inaction risks life and limb," *In re Pub. Emps. For Env't Resp.*, 957 F.3d at 274, Congress requires the Commission to conduct quadrennial reviews so that it can "promptly" repeal or modify regulations no longer in the "public interest." *Fox Television Stations*, 280 F.3d at 1042. Indeed, NAB in its 2018 review submissions recommended that the Commission adopt measured deregulatory reforms that would serve the public. *See* Comments of NAB, MB Docket No. 18-349, at 29–35, 70–79 (Apr. 29, 2019) (urging elimination or loosening of numerical caps on radio station ownership, especially in economically struggling small markets, and supporting removal of across-the-board *per se* bans on local TV station ownership that ignore competitive differences between local markets). The Commission's failure to even consider NAB's proposals results in more than mere "economic" harm to regulated entities. That failure harms competition in markets across the country, impairing the continuing viability of our nation's free, over-the-air broadcast services, which provide vital local news, information, and emergency alerts for millions of Americans, including in smaller communities that increasingly lack other local journalism outlets.

22

*Effect on Agency Priorities*.  Requiring the Commission to complete the 2018 review will neither "reorder" the agency's priorities nor facilitate the type of "line-jumping" this Court has cautioned against.  *In re Ctr. for Bio. Diversity*, 53 F. 4th at 672.  Here, *Congress has already set the Commission's priorities* by not only mandating reviews of its broadcast ownership rules but also requiring those reviews every four years; thus, Congress has placed these quadrennial reviews ahead of discretionary matters before the agency that lack a specific statutory directive or timetable.  Mandatory duties should come first: "congressionally imposed mandates and prohibitions trump discretionary decisions."  *Am. Hosp. Ass'n*, 812 F.3d at 193.

Moreover, the 2018 review, which the Commission should have *already* completed, must be at the front of the ownership review line.  NAB merely asks that the Commission not allow the 2022 review to cut in front of it, or to make either or both superfluous.  In addition, by initiating the 2022 review—and refusing NAB's request to hold off until the 2018 review is promptly completed—the Commission already has made clear that examining the ownership rules *is* one of its own priorities and that it has the resources to do so.  In all events, completing the 2018 review, rather than proceeding with the 2022 review, will not prevent the Commission from dedicating resources to other important agency initiatives.  The record for the 2018 review is already complete and more than ripe for review, which means that ruling on it would require *less* work than facilitating the 2022 proceedings.

23

***Prejudice from Delay.***  Allowing the Commission's inaction on the 2018 review to continue would severely prejudice NAB, its members, and other stakeholders in at least three ways.  First, an incomplete but pending 2018 review—the outcome of which might change the ownership rules—seriously hampers stakeholders' efforts to submit meaningful comments or studies in the 2022 review because the relevant rules are a moving target.  Second, the longer the Commission delays completing the 2018 review, the more likely the Commission will be effectively "forced" into skipping it altogether and/or unlawfully combining it into the 2022 review (as with the 2010 and 2014 reviews).  That would impose substantial harm on parties that expended time and resources submitting comments, data, and studies for the 2018 record and, in turn, undermine public participation in the review process.  Third, as described above, NAB urged the Commission to make specific deregulatory decisions in the 2018 review to help the broadcast industry keep up with its burgeoning online video and audio competitors, which are unencumbered by any comparable ownership restrictions.  Every day that broadcasters must fight this lop-sided competitive battle harms them and the local communities they serve.  Even the Public Notice commencing the 2022 review recognized that the "media marketplace can change dramatically" between periodic reviews, Add. 64, highlighting the importance of their timely completion.

*Agency Impropriety*.  This Court "need not find any impropriety" underlying the Commission's delay to grant NAB relief.  *TRAC*, 750 F.2d at 80.  Late is late, no matter the reason.  Nevertheless, impropriety may be present here, given that the Commission stands to gain an unfair advantage by withholding the 2018 review.  If the Commission wanted to retain certain rules or even try to adopt new ones but had no basis to do so on the 2018 record, then the Commission would have every incentive to delay releasing a final (and judicially reviewable) order and bypass the 2018 review to attempt to generate a more favorable record for its preferred (but currently unsupported) outcomes through the 2022 proceeding.

Similarly, if stakeholders made proposals during the 2018 review that the Commission had no basis to reject on the 2018 record, the Commission would be required under the APA to adopt them.  And, if the Commission decided to undo that action during the 2022 review, it would have to provide a reasoned explanation to justify its decision.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  But if the Commission avoids ruling on the 2018 proposals and then leverages the 2022 record to reject them in the first instance, it could avoid this hurdle altogether.  Thus, opening the 2022 review before completing the 2018 review could aid in sidestepping not just Section 202(h)'s timetable, but also its deregulatory purpose.  *See Fox Television Stations*, 280 F.3d at 1033 (stating that Congress "instructed" the Commission in Section 202(h) to review its ownership

25

rules periodically "in order to continue the process of deregulation").  Whether the Commission's inaction is motivated by these strategic advantages or not, a decision denying mandamus relief will give the agency an opportunity to bypass the limitations Congress has placed on its rulemaking authority and to achieve by sheer inaction what it might not be able to do directly.

Accordingly, the Commission should be compelled to complete the 2018 review so its decision will be based on the record it has compiled in that proceeding, and so that any future rule changes comply with the APA's requirements.  It is critical to Section 202(h) and administrative law principles more generally that the Commission be required to complete an existing review before embarking on a new one.  *See Prometheus III*, 824 F.3d at 51–52 (stating that the Commission's failure to conclude the 2010 review while commencing the 2014 review kept its ownership rules "in limbo" and "hamper[ed] judicial review because there is no final agency action to challenge").

*        *        *

This case presents the "compelling equitable grounds" that justify mandamus relief.  *Am. Hosp. Ass'n*, 812 F.3d at 189 (internal quotation marks omitted).  The Commission cannot hold the broadcast industry and interested parties in "administrative limbo" any longer.  *In re People's Mojahedin Org. of Iran*, 680 F.3d at 837.  It must make a decision on the proposals that have been presented in the

26

2018 review to meet its admitted statutory duties and to avoid rendering the 2022 review a meaningless exercise.  In light of the Commission's past sluggish practices, the Court should not accept any promises the agency might make regarding its intent to complete the 2018 review.

## CONCLUSION

For these reasons, this Court should grant this Petition and instruct the Commission to complete the 2018 review within 90 days of this Court's decision. This Court also should retain jurisdiction solely for the purpose of monitoring the Commission's compliance.

April 24, 2023                                    Respectfully submitted,

                                                    /s/ Helgi C. Walker
                                                  Helgi C. Walker
                                                    *Counsel of Record*
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  1050 Connecticut Avenue, N.W.
                                                  Washington, D.C. 20036
                                                  Telephone: (202) 887-3599
                                                  Facsimile:  (202) 530-9595
                                                  hwalker@gibsondunn.com

                                                  *Counsel for National Association of Broadcasters*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this mandamus petition complies with the applicable typeface, type style, and type-volume limitations. This petition was prepared using a proportionally spaced type (Times New Roman, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this petition contains 6,370 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this petition.

April 24, 2023                                    Respectfully submitted,

                                                   /s/ Helgi C. Walker
                                                  Helgi C. Walker
                                                  GIBSON, DUNN & CRUTCHER LLP
                                                  1050 Connecticut Avenue, N.W.
                                                  Washington, D.C. 20036
                                                  Telephone: (202) 887-3599
                                                  Facsimile:  (202) 530-9595
                                                  hwalker@gibsondunn.com

28

## CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2023, I electronically filed the foregoing mandamus petition with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing petition to be served by FedEx overnight service and by electronic mail on the Commission as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C.  20554
litigationnotice@fcc.gov

April 24, 2023                                      Respectfully submitted,

   /s/ Helgi C. Walker_____
Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-3599
Facsimile:  (202) 530-9595
hwalker@gibsondunn.com

No. 23-___

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

IN RE NATIONAL ASSOCIATION OF BROADCASTERS, PETITIONER.

———————————

## ADDENDUM TO PETITION FOR WRIT OF MANDAMUS
## TO THE FEDERAL COMMUNICATIONS COMMISSION

———————————

Rick Kaplan
Jerianne Timmerman
NATIONAL ASSOCIATION
OF BROADCASTERS
1 M Street, S.E.
Washington, D.C. 20003
Telephone: (202) 429-5430

Helgi C. Walker
  *Counsel of Record*
Jacob T. Spencer
Andrew G.I. Kilberg
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 887-3599
Facsimile:  (202) 530-9595
hwalker@gibsondunn.com

*Counsel for Petitioner National Association of Broadcasters*

# TABLE OF CONTENTS

Page

*2018 Quadrennial Regulatory Review*, Notice of Proposed Rulemaking,
    33 FCC Rcd 12111 (2018)..........................................................................Add. 1

*Media Bureau Seeks to Update the Record in the 2018 Quadrennial
    Regulatory Review*, MB Docket No. 18-349, DA 21-657
    (June 4, 2021).........................................................................................Add. 57

*Media Bureau Opens Docket and Seeks Comment for 2022 Quadrennial
    Review of Media Ownership Rules*, Public Notice,
    MB Docket No. 22-459, DA 22-1634 (Dec. 22, 2022)............................Add. 64

NAB, *Request to Toll the 2022 Quadrennial Regulatory Review and to
    Expeditiously Conclude the 2018 Quadrennial Regulatory Review*,
    MB Docket Nos. 22-459, 18-349 (Feb. 1, 2023)......................................Add. 69

NAB, *Supplemental Submission Regarding Request*,
    MB Docket Nos. 22-459, 18-349 (Mar. 29, 2023)...................................Add. 79

Federal Communications Commission                    FCC 18-179

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | **)** |
| | **)** |
| 2018 Quadrennial Regulatory Review – Review of | **)**     MB Docket No. 18-349 |
| the Commission's Broadcast Ownership Rules and | **)** |
| Other Rules Adopted Pursuant to Section 202 of | **)** |
| the Telecommunications Act of 1996 | **)** |

**NOTICE OF PROPOSED RULEMAKING**

**Adopted:  December 12, 2018**                    **Released:  December 13, 2018**

**Comment Date:  [60 days after publication in the Federal Register]**
**Reply Comment Date:  [90 days after publication in the Federal Register]**

By the Commission: Chairman Pai and Commissioners O'Rielly and Carr issuing separate statements; Commissioner Rosenworcel approving in part, dissenting in part and issuing a statement

**TABLE OF CONTENTS**

Heading                                                                                    Paragraph #

I.    INTRODUCTION ................................................................................................................1
II.   BACKGROUND ................................................................................................................6
III.  MEDIA OWNERSHIP RULES ........................................................................................9
      A.  Local Radio Ownership Rule .....................................................................................9
      B.  Local Television Ownership Rule ............................................................................40
      C.  Dual Network Rule ...................................................................................................77
IV.   DIVERSITY-RELATED PROPOSALS ..........................................................................93
V.    PROCEDURAL MATTERS ...........................................................................................122
VI.   ORDERING CLAUSES ..................................................................................................129
      APPENDIX – Initial Regulatory Flexibility Analysis

**I.      INTRODUCTION**

        1.       With this Notice of Proposed Rulemaking (NPRM), we initiate the Commission's 2018 quadrennial review of its media ownership rules.  We launch this proceeding pursuant to the statutory requirement set forth in Section 202(h) of the Telecommunications Act of 1996 that we review our media ownership rules every four years to determine whether they remain "necessary in the public interest as the result of competition."[1]  The three rules subject to review under Section 202(h) are the Local Radio Ownership Rule,[2] the Local Television Ownership Rule,[3] and the Dual Network Rule.[4]  We seek comment

---

[1] Telecommunications Act of 1996, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996) (1996 Act); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act).  In 2004, Congress revised the then-biennial review requirement to require such reviews quadrennially.  *See* Appropriations Act § 629, 118 Stat. at 100.

[2] 47 CFR § 73.3555(a).

[3] *Id.* § 73.3555(b).

[4] *Id.* § 73.658(g).

herein on whether, given the current state of the media marketplace, we should retain, modify, or eliminate any of these rules.

2.        As the Commission has observed, the media marketplace has seen dramatic changes since the Commission began conducting its periodic media ownership reviews in the late 1990s—an evolution that continues to this day.[5]  Most notably, the growth of broadband Internet and other technologies has given consumers access to more content on more platforms than ever before.  For instance, an overwhelming majority of Americans now have access to broadband Internet service, and they are increasingly using it to access online audio and video programming for entertainment and news content.[6]  Data show that consumers today are watching more online video than ever.[7]  In fact, nearly three in ten U.S. adults say that online streaming now constitutes their primary means of watching television,[8] and the largest audio and video streaming services count their users in the tens of millions.[9]  Moreover, 43 percent of U.S. adults say they often get their news online, with online news consumption

---

[5] *See, e.g., 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802, 9811-16, paras. 16-25 (2017) (*2010/2014 Quadrennial Review Order on Reconsideration*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Second Report and Order, 31 FCC Rcd 9864, 9865, para. 1 (2016) (*2010/2014 Quadrennial Review Order*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4373, para. 5 (2014) (*2010/2014 Quadrennial Review FNPRM*); *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Notice of Proposed Rulemaking, 26 FCC Rcd 17489, 17490-91, paras. 2-4 (2011) (*2010 Quadrennial Review NPRM*); *2010 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Inquiry, 25 FCC Rcd 6086, 6087-91, paras. 4-13 (2010) (*2010 Quadrennial Review NOI*); *2006 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, Report and Order and Order on Reconsideration, 23 FCC Rcd 2010, 2014-15, paras. 6-8 (2008) (*2006 Quadrennial Review Order*); *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13647-48, paras. 86-88 (2003) (*2002 Biennial Review Order*).

[6] *See Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion*, 2018 Broadband Deployment Report, 33 FCC Rcd 1660, 1675, para. 50 (2018) (finding that, as of year-end 2016, 92.3 percent of all Americans had access to fixed terrestrial broadband at speeds of 25 Mbps download/3 Mbps upload).

[7] Estimates indicate that U.S. adults now watch more than one hour of online video per day.  *See, e.g., Time Flies: U.S. Adults Now Spend Nearly Half a Day Interacting with Media*, Nielsen (July 31, 2018), https://www.nielsen.com/us/en/insights/news/2018/time-flies-us-adults-now-spend-nearly-half-a-day-interacting-with-media.html (*Time Flies*) (finding that U.S. adults watch one hour and eleven minutes of video per day via a smartphone, tablet, computer, or TV-connected device); *U.S. Time Spent with Media*, eMarketer (Oct. 5, 2017), https://www.emarketer.com/Report/US-Time-Spent-with-Media-eMarketers-Updated-Estimates-2017/2002142 (finding that U.S. adults watch one hour and seventeen minutes of digital video per day).

[8] *About 6 in 10 Young Adults in U.S. Primarily Use Online Streaming to Watch TV*, Pew Research Center (Sept. 13, 2017), http://www.pewresearch.org/fact-tank/2017/09/13/about-6-in-10-young-adults-in-u-s-primarily-use-online-streaming-to-watch-tv/ (finding that 28 percent of all U.S. adults—and 61 percent of those between ages 18 and 29—say an online streaming service is the primary way they watch television).

[9] *See, e.g., Q4'17 top US video provider rankings*, S&P Global Market Intelligence (Apr. 2, 2018); Anne Steele, *Apple Music on Track to Overtake Spotify in U.S. Subscribers*, Wall Street Journal (Feb. 5, 2018).

2

Add.2

increasing among every age group in recent years.[10]  In addition, two-thirds of Americans are now getting at least some of their news through social media platforms.[11]

3.        In the face of these trends, however, broadcast television and radio stations remain important fixtures in local communities.  Despite new technologies competing for viewers' attention, the amount of video Americans watch has actually been on the rise—approaching six hours a day in 2018—with a majority continuing to consist of live or time-shifted traditional television viewing.[12]  Similarly, more than 90 percent of Americans still listen to the radio each week.[13]  Total broadcast industry revenues have appeared fairly stable in recent years.[14]  Moreover, television remains a common place for Americans to get their news,[15] and some evidence suggests that broadcast television outlets produce a significant portion of the video news content published on websites and social media platforms.[16]

4.        Last year, the Commission concluded its combined 2010/2014 Quadrennial Review proceeding by adopting an Order on Reconsideration that relaxed or eliminated outdated rules.[17]  In doing so, the Commission recognized the dynamic nature of the media marketplace and the wealth of information sources now available to consumers.[18]  The changes the Commission adopted in the

---

[10] Jeffrey Gottfried and Elisa Shearer, *Americans' Online News Use Is Closing in on TV News Use*, Pew Research Center (Sept. 7, 2017), http://www.pewresearch.org/fact-tank/2017/09/07/americans-online-news-use-vs-tv-news-use/ (*Americans' Online News Use*).

[11] Katerina Eva Matsa and Elisa Shearer, *News Use Across Social Media Platforms 2018*, Pew Research Center (Sept. 10, 2018), http://www.journalism.org/2018/09/10/news-use-across-social-media-platforms-2018/.

[12] Nielsen, *Time Flies* (finding that U.S. adults watch five hours and fifty-seven minutes of video per day, including four hours and forty-six minutes of live and time-shifted television).

[13] *Id.* (finding that radio reaches 92 percent of U.S. adults on a weekly basis).

[14] *See, e.g., U.S. TV Station Industry Total Revenue Projections, 2008-2023 (Jun. 2018)*, S&P Global Market Intelligence (showing that total industry revenue for broadcast television stations declined only slightly (0.5 percent) from 2016 to 2017); *Radio's 2017 Revenue. Was It Up or Down?*, Radio Ink (Apr. 5, 2018), https://radioink.com/2018/04/05/radios-2017-revenue-was-it-up-or-down/ (citing BIA/Kelsey estimates that total industry revenue for radio stations declined just 0.2 percent from 2016 to 2017).  These figures are particularly notable given that political election cycles, both federal and local, have a significant positive impact on broadcast advertising revenue, with even numbered years bringing in more revenue than odd numbered years.

[15] Pew Research Center, *Americans' Online News Use* (finding that 50 percent of U.S. adults often got news from television in 2017); *see also* Katerina Eva Matsa, *Fewer Americans Rely on TV News; What Type They Watch Varies by Who They Are*, Pew Research Center (Jan. 5, 2018), http://www.pewresearch.org/fact-tank/2018/01/05/fewer-americans-rely-on-tv-news-what-type-they-watch-varies-by-who-they-are/ (finding that 37 percent of all U.S. adults—and 57 percent of those 65 and older—often get news from local television).

[16] *See, e.g.*, Knight Foundation, Local TV News and the New Media Landscape:  Part 1:  The State of the Industry at 27 (Apr. 5, 2018) (finding that approximately 40.6 percent of daily visitors to local news websites visited the websites of commercial television outlets); Knight Foundation, Local TV News and the New Media Landscape: Part 3:  The Future of Local News Video at 3 (Apr. 5, 2018) (concluding that "[t]raditional broadcasters are responsible for a significant portion of the news video published on social media, especially on Facebook"), https://knightfoundation.org/reports/local-tv-news-and-the-new-media-landscape.

[17] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9803, paras. 1-2.  Additionally, earlier this year, the Commission created an incubator program to foster new entry into the broadcasting industry pursuant to the Commission's decision on reconsideration to adopt such a program.  *See Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, Report and Order, FCC 18-114 (Aug. 3, 2018) (*Incubator Order*).

[18] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9811-16, 9826-29, 9833-34, paras. 16-25, 55-60, 71-72.

**Add.3**

2010/2014 proceeding were based on a record it had begun compiling as far back as 2009 (and had subsequently refreshed with the 2014 Quadrennial Review proceeding).[19]

5.     Today, as required by Congress, we start a new proceeding to take a fresh look at our rules in light of the media landscape of 2018 and beyond. Accordingly, as discussed below, we seek comment on whether the three remaining rules subject to quadrennial review continue to be necessary in the public interest in their current forms or whether any of them should be modified or eliminated. Additionally, in the *2010/2014 Quadrennial Review Order*, the Commission committed to further examination of several proposals offered in the record of that proceeding as potential pro-diversity initiatives.[20]  As described more fully below, these proposals include extending cable procurement requirements to broadcasters, adopting formulas aimed at creating media ownership limits that promote diversity, and developing a model for market-based, tradeable "diversity credits" to serve as an alternative method for setting ownership limits.  Consistent with the Commission's previous commitment to explore these ideas, we seek comment on these proposals and related issues below.

## II.    BACKGROUND

6.     The three rules under review in this proceeding—the Local Radio Ownership Rule, the Local Television Ownership Rule, and the Dual Network Rule—each have their roots in media ownership restrictions going back decades.[21]  Pursuant to the 1996 Act, Congress requires the Commission to review these rules every four years to determine whether they are "necessary in the public interest as the result of competition" and to "repeal or modify any regulation [the Commission] determines to be no longer in the public interest."[22]  The most recent of these statutorily required reviews was the combined 2010/2014 Quadrennial Review Proceeding.

7.     On August 10, 2016, the Commission adopted the *2010/2014 Quadrennial Review Order*, which largely retained the then-existing media ownership rules with only minor modifications.[23]  In addition, the Order adopted a requirement that commercial television stations file shared services agreements (SSAs) with the Commission but declined to make SSA relationships attributable.[24]  The Order also reinstated the revenue-based eligible entity standard, as well as associated measures to encourage small business participation in the broadcast industry, but declined to implement diversity-related regulatory treatment preferences based on race- or gender-conscious definitions.[25]  Several parties, including the National Association of Broadcasters (NAB), Nexstar Broadcasting, Inc. (Nexstar), and Connoisseur Media, LLC (Connoisseur), sought reconsideration of the *2010/2014 Quadrennial Review*

---

[19] *See 2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4373-74, paras. 6-7; *2010 Quadrennial Review NPRM*, 26 FCC Rcd at 17491-94, paras. 5-9.

[20] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10006-07, paras. 330-32.

[21] *See, e.g., Amendment of Sections 73.35, 73.240, and 73.636 of the Commission's Rules Relating to Multiple Ownership of Standard, FM and Television Broadcast Stations*, 45 F.C.C. 1476 (1964) (prohibiting common ownership of television stations with intersecting Grade B contours); *Amendment of Sections 3.35, 3.240 and 3.636 of the Rules and Regulations Relating to Multiple Ownership of AM, FM and Television Broadcast Stations*18 F.C.C. 288, 290, para. 4 n.3 (1953) (citing 5 Fed. Reg. 2384 (1940), 6 Fed. Reg. 2284 (1941), and 8 Fed. Reg. 16065 (1943)) (stating that the Commission adopted multiple ownership rules for FM radio stations in 1940, television stations in 1941, and AM radio stations in 1943); *Amendment of Part 3 of the Commission's Rules*, 11 Fed. Reg. 33 (1946) (adopting a dual network rule for television networks).

[22] 1996 Act § 202(h); Appropriations Act § 629.

[23] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9865, para. 3.

[24] *Id.* at 9866, para. 5.

[25] *Id.* at 9866, para. 4.

*Order* by the Commission.[26]  Multiple parties also sought judicial review, which remains pending with the Third Circuit.[27]

      8.      On November 16, 2017, the Commission adopted an Order on Reconsideration that reversed certain elements of the earlier *2010/2014 Quadrennial Review Order*, most notably by repealing the Newspaper/Broadcast Cross-Ownership Rule and the Radio/Television Cross-Ownership Rule and revising the Local Television Ownership Rule.[28]  Specifically, on reconsideration, the Commission revised the Local Television Ownership Rule by eliminating the requirement that, in order to own two stations in a market, eight independent voices must remain in the market post-transaction.[29]  The Commission found that the Eight-Voices Test was unsupported by the record or reasoned analysis and was no longer necessary in the public interest.[30]  In addition, pursuant to the revised Local Television Ownership Rule, the Commission concluded that it would consider, on a case-by-case basis, combinations that would otherwise be barred by the prohibition on ownership of two top-four ranked stations in a market.[31]  Finally, the *2010/2014 Quadrennial Review Order on Reconsideration* eliminated attribution for television joint sales agreements (JSAs) and retained the disclosure requirement for television SSAs.[32]  Several parties sought judicial review of the *2010/2014 Quadrennial Review Order on Reconsideration*, which, like the judicial challenges to the *2010/2014 Quadrennial Review Order*, remains pending before the Third Circuit.[33]  That court, however, rejected an emergency petition for writ of mandamus filed by Prometheus Radio Project and Media Mobilizing Project seeking to block the *2010/2014 Quadrennial Review Order on Reconsideration* from taking effect.[34]  On reconsideration, the Commission also found that, while the record in the 2010/2014 Quadrennial Review Proceeding supported adoption of an incubator program to foster the entry of new and diverse voices in the broadcasting industry, the structure and implementation of such a program required further exploration.[35]  Accordingly, the Commission sought comment on these issues, and on August 2, 2018, adopted a Report and Order establishing an incubator program to foster new entry into the broadcasting industry.[36]  Under the program, an established broadcaster (i.e., incubating entity) will provide a new entrant or small broadcaster (i.e., incubated entity) with training, financing, and access to resources that would be otherwise inaccessible to these entities.[37]  In return for this support, the incubating entity can receive a waiver of the applicable Local Radio Ownership Rule that it can use either in the incubated market or in a comparable market within three years of the successful conclusion of a qualifying incubation

---

[26] *See* Petition for Reconsideration of Connoisseur Media, LLC, MB Docket. No. 14-50 (filed Dec. 1, 2016); Petition for Reconsideration of NAB, MB Docket. No. 14-50 (filed Dec. 1, 2016); Petition for Reconsideration of Nexstar Broadcasting, Inc., MB Docket. No. 14-50 (filed Dec. 1, 2016).

[27] Judicial challenges to the *2010/2014 Quadrennial Review Order* have been consolidated in the Third Circuit with challenges to the *2010/2014 Quadrennial Review Order on Reconsideration* and the *Incubator Order.  See infra* n.40.

[28] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9803, para. 2.

[29] *Id.* at 9834-36, paras. 73-77.

[30] *Id.* at 9834, para. 73.

[31] *Id.* at 9836-39, paras. 78-82.

[32] *Id.* at 9848-54, 9855-57, paras. 101-13, 117-20.

[33] *See infra* n.40.

[34] Order, *Prometheus Radio Project et al. v. FCC et al.*, Nos. 17-1107 and 18-1092, Document No. 003112846874 (3rd Cir. Feb. 7, 2018).

[35] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9857, 9859, paras. 121, 126.

[36] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9859-64, paras. 126-45; *Incubator Order* at 1-2, para. 1.

[37] *Incubator Order* at 3, para. 6.

relationship.[38]  One petitioner has sought reconsideration of the *Incubator Order* by the Commission.[39]  In addition, several parties, including Prometheus Radio Project and Media Mobilizing Project, jointly, and MMTC and NABOB, jointly, have sought judicial review of the *Incubator Order*.[40]  The Third Circuit has consolidated the petitions with pending challenges to the *2010/2014 Quadrennial Review Order* and the *2010/2014 Quadrennial Review Order on Reconsideration*.[41]

## III.      MEDIA OWNERSHIP RULES

### A.      Local Radio Ownership Rule

#### 1.      Introduction

9.          In this section, we examine whether the Commission's current Local Radio Ownership Rule continues to be necessary in the public interest consistent with the statutory mandate of Section 202(h).[42]  The Local Radio Ownership Rule limits both the total number of radio stations an entity may own within a local market and the number of radio stations within the market that the entity may own in the same service (AM or FM).  The current radio ownership limits were set by Congress in 1996,[43] and the courts have upheld the Commission's retention of the rule in prior quadrennial reviews.[44]  The Commission's primary rationale for maintaining the rule has been to promote competition among radio stations within a local market.[45]  In addition, the Commission has recognized that the rule helps to promote viewpoint diversity and localism and is consistent with its policy goal of promoting minority and female ownership.[46]

10.          We seek comment below on all aspects of the rule's implementation and on whether the current version of the rule remains necessary in the public interest as a result of competition and to support our other policy goals in today's radio marketplace.  In addition, we consider how to apply the rule to Nielsen Audio Metro markets that are embedded within larger Nielsen Audio Metro markets, a question the Commission explored in the *2010/2014 Quadrennial Review Order on Reconsideration* and

---

[38] *Id.* at 3, para. 6.

[39] *See* Petition for Reconsideration of Red Brennan Group, MB Docket No. 17-289 (filed Sept. 27, 2018).

[40] *See* Petition for Review of Prometheus Radio Project and Media Mobilizing Project, *Prometheus Radio Project and Media Mobilizing Project v. FCC*, No. 18-2943, Document No. 003113024980 (3rd Cir. Aug. 31, 2018); Petition for Review of Multicultural Media, Telecom and Internet Council, Inc. and National Association of Black Owned Broadcasters, *Multicultural Media, Telecom and Internet Council et al. v. FCC*, No. 18-1268, Document No. 1753058 (D.C. Cir. Sept. 27, 2018).

[41] Order, *Multicultural Media, Telecom, and Internet Council, Inc. v. FCC*, Nos. 17-1109 and 18-3335, Document No. 003113067217 (3rd Cir. Oct. 22, 2018); Order, *Prometheus Radio Project et al. v. FCC et al.*, Nos. 17-1107, 18-1092, and 18-2943, Document No. 003113028065 (3rd Cir. Sept. 7, 2018).

[42] *See* 1996 Act § 202(h).

[43] 1996 Act § 202(b)(1).  Initially, only commercial radio stations were counted when determining the total number of radio stations in a market for purposes of the 1996 limits, but the Commission subsequently decided that noncommercial radio stations also should be included in those totals.  *See 2002 Biennial Review Order*, 18 FCC Rcd at 13734, para. 295.

[44] *See, e.g.*, *Prometheus II*, 652 F.3d at 462-63.

[45] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13712-13, para. 239; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2069, para. 110.

[46] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13738, 13739, paras. 303, 305-06; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2075, 2077, paras. 124, 127.

committed to address further in this proceeding.[47]  We ask commenters to explain in detail and to support with evidence the reasons for any rule changes they recommend.

## 2.  Background

11.     The Local Radio Ownership Rule allows an entity to own:  (1) up to eight commercial radio stations in radio markets with at least 45 radio stations, no more than five of which may be in the same service (AM or FM); (2) up to seven commercial radio stations in radio markets with 30-44 radio stations, no more than four of which may be in the same service (AM or FM); (3) up to six commercial radio stations in radio markets with 15-29 radio stations, no more than four of which may be in the same service (AM or FM); and (4) up to five commercial radio stations in radio markets with 14 or fewer radio stations, no more than three of which may be in the same service (AM or FM), provided that the entity does not own more than 50 percent of the radio stations in the market unless the combination comprises not more than one AM and one FM station.[48]  When determining the total number of radio stations within a market, only full-power commercial and noncommercial radio stations are counted for purposes of the rule.[49]  Radio markets are defined by Nielsen Audio Metros where applicable, and the contour-overlap methodology is used in areas outside of defined and rated Nielsen Audio Metro markets.[50]

12.     As it has in the past, the Commission concluded in its most recent media ownership review that local radio ownership limits promote competition,[51] and it found that public interest benefit to be a sufficient basis for retaining the current rule.[52]  Additionally, the Commission affirmed its previous findings that competitive local radio markets help promote viewpoint diversity and localism, and it deemed the rule consistent with the Commission's goal of promoting minority and female broadcast ownership.[53]  Accordingly, the Commission retained the rule without modification, although it provided several clarifications regarding the rule's implementation.[54]  The Commission subsequently, on reconsideration, adopted a presumption in favor of waiving the rule for qualifying radio stations within embedded markets (i.e., smaller markets, as defined by Nielsen Audio, that are contained within the boundaries of a larger Nielsen Audio Metro market) where the parent market currently has multiple embedded markets (i.e., New York and Washington, DC).[55]  Such a waiver would permit the applicant to

---

[47] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9841-46, paras. 86-95.

[48] 47 CFR § 73.3555(a).  Overlap between two stations in different services is allowed if neither of those stations overlaps a third station in the same service.

[49] *Id.*

[50] *See 2002 Biennial Review Order*, 18 FCC Rcd at 13724-30, paras. 273-86 (replacing the contour-overlap methodology with Arbitron Metro—now Nielsen Audio Metro—market definitions, where available, and retaining a modified contour-overlap methodology on an interim basis for areas not defined by Nielsen Audio); *2006 Quadrennial Review Order*, 23 FCC Rcd at 2013, 2070-71, 2071-72, paras. 4, 111-12, 114 (affirming the use of Nielsen Audio Metro markets to define geographic markets); *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9898, para. 85 n.234 (finding no basis on which to revisit as part of its ownership review the interim contour-overlap methodology for non-Nielsen Audio Metro areas).  An exception to this market definition approach is Puerto Rico, where the contour-overlap methodology applies even though Puerto Rico is a Nielsen Audio Metro market. *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9907, paras. 111-12.

[51] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13712-13, para. 239; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2069, para. 110.

[52] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, paras. 82, 87.

[53] *Id.*; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13738, 13739, paras. 303, 305-06; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2075, 2077, paras. 124, 127.

[54] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9897, 9898-99, 9905-07, paras. 82, 87, 107-12.

[55] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9841, 9845-46, paras. 86, 94-95. Stations would qualify under two conditions:  (1) compliance with the numerical ownership limits using the Nielsen

7

**Add.7**

comply with ownership limits determined by examining only the embedded market, and not both the embedded and parent markets. The Commission stated that the presumption would apply pending further consideration of embedded market transactions in this 2018 quadrennial review.[56]

13.     In anticipation of this 2018 review, NAB submitted a letter to the Chief of the Media Bureau recommending that the Commission relax its radio ownership limits in light of today's audio marketplace in which, it argues, radio stations compete for both listeners and advertisers with a host of other services, including streaming services, satellite radio, podcasts, Facebook, and YouTube.[57] NAB suggests allowing an entity in the top 75 Nielsen Audio Metro markets to own or control up to eight commercial FM stations and unlimited AM stations in any of those markets.[58] NAB also proposes that entities in those markets should be permitted to own up to two additional FM stations if they participated in the Commission's incubator program.[59] Finally, NAB proposes eliminating all limits on FM and AM ownership in all other markets.[60] Below we describe NAB's arguments and the counterarguments made in response thereto,[61] and we invite interested parties to comment and to put forth other ideas and proposals.

**3.     Discussion**

14.     As an overarching matter, we seek comment on whether the current Local Radio Ownership Rule remains necessary in the public interest as the result of competition. We seek comment specifically on whether there have been any changes in the marketplace since the Commission's *2010/2014 Quadrennial Review Order* that would affect our consideration of whether the Local Radio Ownership Rule remains necessary in the public interest to promote competition. We also seek comment on whether the Local Radio Ownership Rule is necessary to promote localism or viewpoint diversity.

15.     In the event that we decide to retain the Local Radio Ownership Rule, we will analyze the relevant parts of the rule to examine whether each particular part remains necessary in the public interest as a result of competition or whether it should be modified or eliminated. To that end, as in prior quadrennial reviews, we seek comment on each of the specific aspects of the rule's operation, including the relevant product market, market size tiers, numerical limits, and AM/FM subcaps, in order to assess whether these subparts remain necessary or whether any or all of them should be modified or eliminated.[62]

16.     Furthermore, in the event that the rule is retained but modified, we seek comment on

(Continued from previous page) ━━━━━━━━━━━━━━━
Audio Metro methodology in each embedded market, and (2) compliance with the ownership limits using the contour-overlap methodology applicable to undefined markets in lieu of the Commission's current parent market analysis. *Id.* at 9842, para. 90 n.262; *see also id.* at 9841, para. 86 n.251.

[56] *Id.* at 9841, 9845-46, paras. 86, 95.

[57] Letter from Rick Kaplan et al., Legal and Regulatory Affairs, NAB, to Michelle Carey, Chief, Media Bureau, FCC, at 1-4 (filed June 15, 2018) (NAB June 15, 2018 Letter). We will add to the public docket of this proceeding this submission and the other submissions to the Commission or its staff that are referenced in regard to the Local Radio Ownership Rule.

[58] *Id.* at 2.

[59] *Id.*; *see also Incubator Order.*

[60] NAB June 15, 2018 Letter at 2.

[61] *See* Letter from Edward G. Atsinger, Chief Executive Officer, and David P. Santrella, President Broadcast Media, Salem Media Group, to Hon. Ajit Pai, Chairman, FCC, at 1 (filed June 29, 2018) (Salem Media June 29, 2018 Letter) (arguing that relaxing FM subcaps would have a harmful effect on AM radio); Eric Rhoads, *Radio's Weak Argument to the FCC Reveals a Deeper Problem*, Radio Ink (Aug. 2, 2018), https://radioink.com/2018/08/02/radios-weak-argument-to-the-fcc-reveals-a-deeper-problem/ (challenging NAB's stance that radio stations compete for advertising with Internet companies like Google and Facebook).

[62] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9899-912, paras. 88-128.

**Add.8**

whether and how the rule changes should apply to any pending applications.  We also seek comment on whether to make permanent the interim contour-overlap methodology used to determine ownership limits in areas outside the boundaries of defined Nielsen Audio Metro markets.  In addition, we seek comment on the issue of embedded market transactions.  Finally, we seek comment on what effect, if any, our action might have on minority and female ownership.  We ask commenters to support their claims and proposals with as much data and empirical evidence as possible and to discuss both the potential costs and potential benefits of any suggested rule revisions.

17.    In the *2010/2014 Quadrennial Review Order*, the Commission concluded that the broadcast radio listening market remains the relevant product market for purposes of the Local Radio Ownership Rule.[63]  Accordingly, the Commission declined to expand its definition of the market to include non-broadcast audio sources, such as satellite radio and online audio services.[64]  The Commission reached its determination by assessing whether alternate sources of audio programming provide a meaningful substitute for local broadcast radio stations.[65]  The Commission's analysis centered on the fact that broadcast radio stations provide "free, over-the-air programming tailored to the needs of the stations' local markets."[66]  In contrast, satellite radio is a subscription service, online audio requires an Internet connection, and neither typically provides programming responsive to local needs and interests.[67]

18.    In its recent letter proposing a relaxed radio rule, NAB argues that current ownership limits constrain the ability of radio broadcasters to compete on a level playing field in the digital audio world of 2018, particularly in smaller markets.[68]  NAB suggests that the dominance of broadcast radio has faded alongside streaming services such as Pandora and Spotify, satellite radio, podcasts, Facebook, and YouTube.[69]  NAB posits that the tailoring of needs and interests "now occurs on the basis of specific listeners, not just on the basis of local radio markets."[70]  It suggests that the pertinent fact for consumers is not where providers of audio services like Sirius XM, Spotify, and Pandora are headquartered but where their services are accessible, which is in the same spaces where consumers can listen to AM/FM radio (e.g., their cars, homes, and offices).[71]  NAB claims that allowing radio station owners to achieve economies of scale and scope would enable them to improve the quality of their informational and entertainment programming.[72]  It argues that "the Commission cannot continue to ignore multiple major sources of competition for both listeners and advertisers in the audio marketplace."[73]  Connoisseur and Townsquare Media, Inc. additionally assert that significant changes in the advertising market have caused considerable harm to local radio.  They claim that "digital competitors like Google and Facebook have significantly affected the local advertising markets, capturing significant shares of local advertising

---

[63] *Id.* at 9899-901, paras. 90-94.

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*  Not only does an Internet subscription involve a monthly charge, but the Commission observed that a significant portion of U.S. households at the time lacked access to a fixed Internet connection capable of streaming audio programming.  *Id.* at n.253.

[68] NAB June 15, 2018 Letter at 1.

[69] *Id.*

[70] *Id.* at 2.

[71] *Id.* at 2-3.

[72] *Id.* at 3-4.

[73] *Id.* at 3.

dollars in every radio market."[74]  They contend that such Internet services enjoy perceived advantages in selling advertising in that they can target advertising to individuals and do need not employ local sales forces.[75]  According to these broadcasters, the appearance of these online competitors has drastically changed the advertising landscape, to the detriment of local broadcast radio.

19.    The Chairman of Radio Ink Magazine responded to NAB's proposal by arguing that allowing radio broadcasters to buy more stations would not affect their ability to compete with Internet services like Google and Facebook.[76]  He claims that advertisers do not view radio and Internet services as comparable outlets because their approaches to advertising are "so utterly different."[77]  He attributes any loss in radio revenues to the failure of station owners to persuade advertisers that the distinctive benefits of radio advertising can enhance and supplement online advertising campaigns.[78]  Likewise, iHeartMedia Inc. asserts that "the size of individual station portfolios has little, if any, relationship to the total dollars that an advertiser allocates to free, over-the-air broadcast radio."[79]  iHeartMedia touts the resilience of the broadcast radio industry and observes that radio remains the preferred audio medium for entertainment and local news and information because "its focus is local and its impact is personal."[80]

20.    The Commission received several comments in response to its request for information regarding the status of competition in the marketplace for the delivery of audio programming.[81]  While we examined those comments within the context of our preparation of a biennial marketplace report for Congress, we also hereby incorporate those comments into the record of this proceeding and invite commenters to review and respond to those comments.  For example, NAB provides information and statistical data purporting to show how fragmented the listening market has become.[82]  A coalition of radio broadcasters agrees with NAB that new marketplace entrants have disrupted the traditional radio market and claims that, despite data showing that 93 percent of Americans still listen to AM and FM radio weekly, the amount of their radio listening has shrunk as they divide their time among other audio providers, which, it notes, are not subject to the same regulatory burdens as radio licensees.[83]  In addition, other radio station owners assert that the Commission's ownership limits prevent them from achieving the scale and scope they need to compete with satellite and online audio services.[84]  On the other hand, coalitions representing musicians, recording artists, and representatives of the music industry argue in that proceeding that AM/FM radio continues to dominate the audio marketplace and that history shows that

---

[74] Letter from David D. Oxenford and Danielle K. Thumann, Wilkinson, Barker, Knauer, LLP, Counsel for Connoisseur Media, LLC, and Townsquare Media, Inc., to Marlene Dortch, Secretary, FCC, in MB Docket No. 18-227 (filed Nov. 13, 2018) at 1.

[75] Connoisseur et al. Comments in MB Docket No. 18-227 at 8-11.

[76] Rhoads at 1-4.

[77] *Id.* at 2.

[78] *Id.* at 2-4.

[79] Letter from Jessica Marventano, Senior Vice President, Government Affairs, iHeartMedia Inc., to Michelle Carey, Chief, Media Bureau, FCC, at 3-4 (filed Oct. 9, 2018) (iHeartMedia Oct. 9, 2018 Letter) (claiming that "innovation, ideas, relationships, compelling programming and data solutions" are what attracts advertisers).

[80] *Id.* at 2.

[81] *See Media Bureau Seeks Comment on the Status of Competition in the Marketplace for Delivery of Audio Programming*, MB Docket No. 18-227, Public Notice, DA 18-761 (July 23, 2018).

[82] NAB Comments in MB Docket No. 18-227 at 5-16; *see also* NAB Reply Comments in MB Docket No. 18-227 at 4 (arguing that "local radio stations now operate in a vastly expanded and highly competitive audio market providing unprecedented choices for consumers and advertisers and that continuing technological change will create still more options for audiences in the future").

[83] Connoisseur et al. Comments in MB Docket No. 18-227 at 3.

[84] Local Community Broadcasters Comments in MB Docket No. 18-227 at 1-2.

**Add.10**

consolidation in the radio industry harms small broadcasters and leads to the homogenization of programming.[85] REC Networks claims that unlike free, over-the-air radio, online audio services are unavailable to many Americans due to cost or lack of broadband coverage.[86]

21.     We seek comment on these different perspectives of the state of the audio marketplace and on whether and how they should affect our understanding of the market for purposes of the Local Radio Ownership Rule.  In November 2017, the Department of Justice concluded that "[m]any local and national advertisers consider English-language broadcast radio to be a particularly effective or important means to reach their desired customers, and do not consider advertisements on other media, including non-English-language broadcast radio, digital music streaming services (such as Pandora), and television, to be reasonable substitutes."[87]  Should we take this finding into account and, if so, how?

22.     *Market Definition.*  We seek comment on whether we should continue to consider only local broadcast radio stations for purposes of the Local Radio Ownership Rule or whether we should revise our market definition to include other audio sources.  Do local radio stations face direct competition today from satellite radio and online audio services?  To what extent has radio's ability to attract listeners and advertisers been affected by satellite radio and online audio?  Do advertisers view satellite radio and audio streaming services as substitutes for advertising on broadcast radio?  How should the impact of Internet services like Google and Facebook on local advertising markets factor into our consideration of the Local Radio Ownership Rule?  Do consumers view non-broadcast audio services as meaningful substitutes for local radio stations?  Do non-broadcast audio services provide programming that responds to the needs and interests of local markets?  Does radio's free, over-the-air availability make it unique or non-substitutable in the audio marketplace?  To what extent, if any, should we take into account the deployment of In Band On Channel (IBOC) digital radio technology and its role in enabling station owners to expand their program offerings and increase their economies of scale and scope?  If we were to revise our market definition, what non-broadcast sources should we include, and how should we count them or otherwise factor them into our rule for purposes of determining market size tiers and numerical limits?  Could or should we subtract from any consideration of non-broadcast sources the amount of online audio that listeners in a local market stream from over-the-air radio broadcasts?  How would an expanded definition better serve our policy goals, if at all?

23.     *Market Size Tiers.*  In the *2010/2014 Quadrennial Review Order*, the Commission retained the Local Radio Ownership Rule's longstanding approach of imposing numerical ownership limits based on market size tiers and of determining market size by counting the number of commercial and noncommercial radio stations within the market.[88]  The Commission declined to modify the rule to treat embedded markets as separate markets,[89] but it later eased its position by adopting a presumptive waiver standard to apply in the interim until it could examine the issue further in this 2018 quadrennial

---

[85] musicFIRST Coalition and Future of Music Coalition Comments in MB Docket No. 18-227 at 7-13; *see also* musicFIRST Coalition and Future of Music Coalition Reply Comments in MB Docket No. 18-227 at 6-10 (claiming that innovation and investment help radio broadcasters compete, as opposed to consolidation, which is achieved at the expense of small and independent radio broadcasters).

[86] REC Networks Comments in MB Docket No. 18-227 at 1-2.

[87] *U.S.A. v. Entercom Communications Corp. and CBS Corp.*, Complaint (D.C. Dist. Ct.) (filed Nov. 1, 2017) at 4, para. 12, https://www.justice.gov/atr/case-document/file/1008371/download (stating that the acquisition of CBS Radio, Inc. by Entercom Communications Corporation would substantially lessen competition for the sale of radio advertisements targeting English-language listeners in the Boston, Sacramento, and San Francisco markets).

[88] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9901-04, paras. 95-103.

[89] *Id.* at 9903-04, paras. 101-03.  Embedded markets are smaller Nielsen Audio Metro markets located within the boundaries of a larger Nielsen Audio Metro market (i.e., the parent market).

review.[90]  We address the issue of embedded markets below.

24.    In addition to retaining the rule's approach of using market size tiers, the Commission also kept in place the demarcations of the current rule's four tiers, which draw the lines among Nielsen Audio Metro markets at 45 plus, 30-44, 15-29, and 14 or fewer radio stations.[91]  These same demarcations have existed since Congress established them in 1996,[92] although it was not until the *2002 Biennial Review Order* that the Commission included noncommercial radio stations in a market's station totals.[93]  We seek comment on whether the Commission should retain its approach of using market size tiers, and if so, also on whether the current demarcations should remain in place.  We also seek comment on whether there is any reason to discontinue including noncommercial radio stations in market counts.  How well has the rule's tiered structure served the rule's purposes, and does it promote the policy goals of competition, localism, and viewpoint diversity in today's radio marketplace?  NAB's proposal would divide radio markets into only two tiers—the top 75 Nielsen Audio Metro markets and all other markets (i.e., Nielsen Audio Metro markets outside of the top 75 and all undefined markets).[94]  What would be the advantages and disadvantages of creating a different number of tiers, including moving from a four-tiered to a two-tiered approach?  If we were to collapse four tiers into two, should we draw the line where NAB proposes?  We invite commenters to offer alternative proposals for a tiered approach or for a different type of approach altogether.  For example, if we were to change from tiers based on station counts, as first set by Congress, would it make more sense to consider tiers based on advertising revenue, or some other factor, rather than use Nielsen's Audio market rankings as NAB proposes, which are based on population?  Would advertising revenue provide a sufficiently stable measurement and how would it fit with a view of the broadcast radio listening market as the relevant product market?  How would the Commission and potential applicants obtain reliable advertising revenue data for all radio stations?  We also reiterate our request in the preceding section for comment on whether and how we should factor non-broadcast audio sources in any tiered approach.  For example:  (1) if we modify our current tiers or create new tiers, should we account for variations across markets in broadband access and adoption rates; (2) should we treat fixed and mobile or wired and wireless broadband as the same; and (3) how granularly can and should we measure listening rates for satellite radio and online audio services?

25.    In addition, should any modifications to the current tiered approach affect how we apply the rule to areas outside the boundaries of defined Nielsen Audio Metro markets, and if so, how?  NAB proposes that we remove all radio ownership limits for undefined areas.[95]  We seek comment on whether NAB's proposed approach would be consistent with our policy goals or would lead to excessive consolidation in those areas, and what alternative approach we could take in areas of the country that are undefined by Nielsen Audio.  When it adopted the Arbitron Metro (now Nielsen Audio Metro) market definition for purposes of the radio rule in the *2002 Biennial Review Order*, the Commission stated at the time that the contour-overlap methodology, with slight revisions, would continue to apply to undefined markets on an interim basis.[96]  That methodology remains in place today and has been employed successfully for years.  Although the Commission was critical of the methodology in 2002, it declined to examine or revise the methodology in its most recent ownership review and saw no reason to revisit its

---

[90] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9841, 9845-46, paras. 86, 94-95.

[91] *See* 47 CFR § 73.3555(a)(1).

[92] 1996 Act § 202(b)(1).

[93] *2002 Biennial Review Order*, 18 FCC Rcd at 13734, para. 295.

[94] NAB June 15, 2018 Letter at 2.

[95] *Id.*

[96] *2002 Biennial Review Order*, 18 FCC Rcd at 13729-30, paras. 282-86.

approach in that proceeding.[97]  The Commission found insufficient grounds for an argument that the interim methodology permitted too much consolidation in certain markets.[98]  It pointed to the Commission's initial position that the interim approach was well-understood and that a case-by-case analysis would produce uncertainty.[99]  We seek comment on whether our current approach is in fact the most effective and practical approach, and to that end, whether we therefore should make permanent the interim contour-overlap methodology long used to determine ownership limits in areas outside the boundaries of defined Nielsen Audio Metro markets.  Any commenters opposed to our adopting the contour-overlap methodology on a permanent basis for undefined areas should explain their reasoning fully and propose a detailed alternative that is supported by evidence.

26.    *Numerical Limits*.  If the Commission decides that the rule is still necessary, are existing limits restricting the number of radio stations an entity may own within a radio market set appropriately for each of the market size tiers?  In the *2010/2014 Quadrennial Review Order*, the Commission declined to relax the rule's numerical limits.[100]  Nor did the Commission tighten the limits.[101]

27.    We seek comment on whether it is necessary as a result of competition to maintain the numerical limits for any or all of the market size tiers.  Do the current limits adequately prevent a radio broadcaster from amassing excessive local market power?  Conversely, do they permit sufficient growth to enable radio broadcasters to obtain the additional assets they may need to improve the quality of their service?  Commenters should provide concrete, actual examples of markets where the current limits are either too restrictive or too lenient, explain how those examples typify other markets in that tier, and specify the benefits to those markets that would be gained by revising the limits.

28.    We also seek comment on whether we should account for the different signal strengths of radio stations by weighing different classes of radio stations differently for purposes of applying the numerical limits.  For example, we could consider a Class A AM station to be worth two stations, whereas a Class D AM station could be counted as one half a station.  What would be the costs and benefits of such an approach?  What values should we accord the different classes of radio stations if we were to adopt such an approach?  We note that the Commission has previously considered a proposal to assign different values to radio stations of different classes for purposes of determining market size tiers.[102]  We seek comment on the idea of assigning varying weights to different classes of radio stations when applying the numerical limits.

29.    In addition, we seek comment on NAB's suggestion to maintain the eight-station limit for the largest markets, but to apply it only to FM stations, thereby allowing unlimited AM ownership.[103]  NAB further proposes allowing an owner in the largest markets to acquire up to two additional FM stations if it participates in the Commission's recently adopted incubator program.[104]  NAB would identify the largest markets as the top 75 Nielsen Audio Metro markets.[105]  For all other markets, NAB urges the

[97] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9898, para. 85 n.234.

[98] *Id.*

[99] *Id.*

[100] *Id.* at 9904, para. 105; *see also 2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4409, para. 92 & n.235.

[101] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9905, para. 106.

[102] *Id.* at 9902-03, paras. 97-100.

[103] NAB June 15, 2018 Letter at 2.

[104] *Id.*  Under the Commission's incubation program, adopted after NAB submitted its proposal, the reward of a rule waiver is contingent upon successful completion of the program.  *Incubator Order* at paras. 86-88.  We presume that NAB's proposed reward waiver also would require the completion of a successful incubation.

[105] NAB June 15, 2018 Letter at 2.

elimination of numerical limits for both FM and AM services.[106]  We seek comment on all aspects of NAB's recommended changes to the rule's numerical limits and invite commenters to offer any alternative ideas or proposals.  What would be the likely effects of removing FM limits in most markets?  What would be the likely effects of allowing unlimited AM ownership across all markets?  Would such action, on balance, promote competition by enabling owners to increase their assets, or would it harm competition and/or ownership diversity by driving smaller broadcasters, including minority and women owners, from the marketplace?  How would viewpoint diversity and localism be affected?  The reward for successfully incubating a radio station under the Commission's recently adopted program is a waiver to exceed the applicable ownership limit by one radio station, and participants may use no more than one reward waiver per market.[107]  Regarding NAB's proposal with respect to the top 75 markets, it is unclear whether NAB is suggesting that the successful incubation of one station should result in a waiver for two stations or that the successful incubation of two stations should entitle an owner to acquire two stations above the limit within the same market.[108]  Either way, we seek comment on NAB's suggestion, noting that NAB submitted its proposal before the Commission had adopted the incubator program and established the final terms of the reward waiver.

30.      *AM/FM Subcaps.*  Relatedly, we seek comment on whether it is necessary to retain the rule's AM/FM subcaps, which limit the number of radio stations from the same service (i.e., AM or FM) that an entity may own in a single market.  Currently, a broadcaster may not own more than five AM or five FM stations in markets in the largest market tier, four AM or four FM stations in markets in the two middle-sized tiers, or three AM or three FM stations in markets in the smallest tier.[109]  The Commission deemed it appropriate to retain the existing subcaps in the *2010/2014 Quadrennial Review Order.*[110]

31.      We seek comment on whether the Commission's previous reasons for maintaining subcaps are still valid.  For example, have subcaps promoted market entry?  Are subcaps still necessary given the Commission's efforts to revitalize AM radio?  In other words, has the disparity between the FM and AM services been narrowed to an extent that we could consider relaxing or eliminating the subcaps?  Since its 2010/2014 ownership review, the Commission has granted over 1,000 applications to acquire and relocate FM translators to rebroadcast AM stations.[111]  Should the expanded and improved coverage of those AM stations affect our analysis of subcaps?  Conversely, data from the 2010/2014 review indicated that the transition to digital radio actually exacerbated the divide between the services because AM stations have been slower to adopt digital radio technology.[112]  What is the import of the current status of the digital radio transition for purposes of the subcap issue?  If subcaps continue to promote competition or ownership diversity, or otherwise serve the public interest, are they currently set at the appropriate levels?

32.      If we adopt any revisions to the rule, should the modified rule include AM or FM subcaps, and if so, how should they be applied?  NAB's proposed changes to the rule essentially would

---

[106] *Id.*

[107] *Incubator Order* at paras. 66, 70.

[108] *See* NAB June 15, 2018 Letter at 2.

[109] 47 CFR § 73.3555(a)(1).

[110] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9908, para. 114.

[111] *See Revitalization of the AM Radio Service*, Second Report and Order, 32 FCC Rcd 1724, 1724, para. 1 (2017); *see also Revitalization of the AM Radio Service*, First Report and Order, 30 FCC Rcd 12145, 12148-54, paras. 7-17 (2015) (opening two filing windows exclusively for AM licensees and permittees for applications to acquire and relocate FM translator stations).

[112] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9910, para. 120 n.314.

eliminate AM subcaps in all markets and retain FM subcaps in only the top 75 markets.[113]  NAB does not explain why it would distinguish the FM service for restricted ownership in the top markets rather than limit the total number of radio stations in those markets irrespective of service,[114] and we seek comment on whether the proposal is supported by technical or marketplace differences between the services.  In a letter filed shortly after NAB submitted its proposal, the owner of a network of AM stations argues that removing and/or relaxing FM subcaps would harm the AM service by facilitating the migration of content to the FM service.[115]  Concurring with that view, iHeartMedia urges the Commission to loosen restrictions on AM ownership while retaining the existing FM subcaps.[116]  It argues that doing so would be consistent with the Commission's efforts to revitalize AM radio.[117]  Taking into consideration these competing positions, we seek comment on what limits, if any, should apply to AM and FM ownership, whether or not we retain the current market size tiers and numerical limits, and on whether and how any proposed revisions to the rule should include such limits.

33.      *Embedded Markets*.  To the extent that the Local Radio Ownership Rule is retained, how should it apply on a going-forward basis to radio stations in markets that contain multiple embedded markets?  Multiple embedded markets currently exist only in the New York and Washington, DC markets.[118]  Owners of radio stations in embedded markets must comply with the rule's numerical limits for both the embedded market and the parent market.

34.      In response to the *2010/2014 Quadrennial Review FNPRM*, Connoisseur proposed that where a parent market encompasses multiple embedded markets, the ownership analysis for an acquisition in one embedded market should not include stations owned in the other embedded markets within the same parent market.[119]  Connoisseur argued that embedded markets within the same parent market should be treated separately because they may reach different populations and the radio stations within different embedded markets have little or no contour overlap.[120]  Citing its longstanding reliance on the market analysis of Nielsen Audio (formerly Arbitron), the Commission initially declined to adopt Connoisseur's proposal but stated that it would entertain market-specific waiver requests under Section 1.3 when the BIA listings in a parent market are not an accurate reflection of competition by embedded market stations.[121]  On reconsideration, the Commission affirmed its earlier decision not to adopt an across-the-board change to its embedded market methodology.[122]  However, it adopted a waiver standard whereby embedded market transactions in markets that then had multiple embedded markets (i.e., New York and Washington, DC) would be presumed to be in the public interest if they met a two-prong test that Connoisseur proposed on reconsideration.[123]  First, as with the Commission's current methodology for embedded markets, a radio station owner seeking a rule waiver must comply with the applicable

---

[113] *See* NAB June 15, 2018 Letter at 2.

[114] *But see* Letter from Rick Kaplan, General Counsel and Executive Vice President, Legal and Regulatory Affairs, NAB, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 18-349 et al., at 2 (filed Dec. 7, 2018) (noting that NAB's comments regarding audio competition in MB Docket No. 18-227 discuss the "particular financial hardships and declining position of AM stations").

[115] Salem Media June 29, 2018 Letter at 1.

[116] iHeartMedia Oct. 9, 2018 Letter at 3.

[117] *Id.* at 2-4.

[118] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9845, para. 94 n.279.

[119] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9902-03, paras. 97, 101.

[120] *Id.* at 9903, para. 101; *see also 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9842, 9843-44, paras. 90, 92.

[121] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9903-04, paras. 102-03.

[122] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9843-45, paras. 91-93.

[123] *Id.* at 9841, 9845-46, paras. 86, 94-95.

numerical ownership limit in each embedded market using the Nielsen Audio Metro methodology.[124] Second, instead of then also demonstrating compliance with the applicable numerical ownership limit based on the Commission's parent market analysis, the applicant must show that it also complies with the ownership limits as determined by the contour-overlap methodology ordinarily applicable in undefined markets.[125] If the applicant can demonstrate compliance with the applicable ownership limits under both prongs of this test, then there is a presumption that a waiver of the Local Radio Ownership Rule serves the public interest.[126]

35.        The Commission adopted this presumptive waiver standard on an interim basis pending the outcome of this 2018 ownership review.[127] Accordingly, we seek comment on how to address the issue of embedded market transactions going forward. Should we make this presumptive waiver standard permanent? Should we modify it in any way? Should it apply to all current and future markets that contain multiple embedded markets, or should we limit its application to the two existing parent markets with multiple embedded markets? How do competition, diversity, and localism considerations affect the question? We note that embedded market designations can be updated and modified by Nielsen Audio as market conditions change, and that Nielsen Audio's radio station customers can request the designation of a new embedded market.[128] How could we guard against purchasers taking advantage of an anticipated designation of a new embedded market in a manner that would thwart the purpose of the rule's ownership limits?[129] For example, in the event that Nielsen Audio creates new, additional situations with multiple embedded markets within a larger parent market, should there be a waiting period before applicants can take advantage of that change in circumstance, similar to the waiting period applicable to changes in the stations reported as "home" to a Nielsen Audio Metro market? If we adopt any change to our approach to embedded markets, should we apply it also to markets with a single embedded market? Is there a distinction between markets with one embedded market and markets with multiple embedded markets such that we should vary our approach between those situations?

36.        In the *2010/2014 Quadrennial Review Order on Reconsideration*, the Commission expressed its intent to consider also in this proceeding an alternate proposal previously set forth by NAB.[130] NAB suggests that stations licensed in embedded markets with signal coverage of less than 50 percent of the parent market's population not be considered part of the parent market for purposes of local ownership limit calculations.[131] We seek comment on whether we should adopt such an approach or any other across-the-board rule changes regarding embedded markets. Is there a need to implement a rule change that carves out a blanket exception to our current methodology given that there are only two parent markets containing multiple embedded markets? Or is a permanent presumptive waiver standard an adequate solution given how narrow its use is likely to be? We seek comment on the potential advantages and disadvantages of these various approaches and invite proposals for other ways to address embedded market transactions.

37.        *Minority and Female Ownership.*  In the *2010/2014 Quadrennial Review Order*, the

---

[124] *Id.* at 9842, para. 90 n.262; *see also id.* at 9841, para. 86 n.251.

[125] *Id.* at 9842, para. 90 n.262; *see also id.* at 9841, para. 86 n.251.

[126] *Id.* at 9845-46, para. 95.  The Commission found that this approach, and the presumptive waiver, would apply only in existing parent markets with multiple embedded markets, i.e., New York and Washington, DC.

[127] *Id.* at 9841, 9845-46, paras. 86, 95.

[128] *See id.* at 9845, para. 94 n.279.

[129] *See id.* at 9845-46, para. 95 n.281 (restricting the application of the interim presumptive waiver standard to New York and Washington, DC in order to avoid potential manipulation of embedded markets in other Nielsen Audio Metro markets).

[130] *Id.* at 9842, para. 90 n.264.

[131] *Id.*

Commission found the current Local Radio Ownership Rule to be consistent with its goal of promoting minority and female ownership of broadcast radio stations.[132]  The Commission observed that the rule, while competition-based, indirectly promotes viewpoint diversity by facilitating "the presence of independently owned broadcast radio stations in the local market, thereby increasing the likelihood of a variety of viewpoints and preserving ownership opportunities for new entrants."[133]  It pointed to AM/FM subcaps, and in particular AM subcaps, as elements of the rule that foster new entry.[134]  However, the Commission chose not to tighten the rule because, among other reasons, available data did not show that stricter limits would increase minority and female radio ownership.[135]  Similarly, the Commission found no indication of a causal link between Congress' loosening of local radio limits in 1996 and the increase in ownership diversity since then that would justify loosening the rules.[136]  We seek comment on whether any new information has become available that would cause us to reevaluate the Commission's conclusions in the *2010/2014 Quadrennial Review Order*.  We also seek comment on how retaining or modifying the Local Radio Ownership Rule might affect broadcast radio ownership and entry by small business owners, if at all.

38.    *Cost-Benefit Analysis*.  Finally, we seek comment on how to compare the benefits and costs associated with retaining, modifying, or eliminating the Local Radio Ownership Rule.  We seek comments that explain the anticipated economic impact of any proposed action and, where possible, quantify benefits and costs of proposed actions and alternatives.  Does the current Local Radio Ownership Rule create benefits or costs for any segment of consumers?  Does the rule create benefits or costs for any segment of the industry that should be counted as social benefits or costs rather than transfers from one segment of the industry to another?  How does the rule create these benefits and costs, and what evidence supports this explanation?  How can the value of these benefits and costs be measured for parties receiving them?  What factors create uncertainty about the existence or size of these benefits and costs, and how should the Commission's economic analysis take these uncertainties into account?

39.    How would elimination of the Local Radio Ownership Rule alter any benefits and costs resulting from the current rule?  What are the comparative benefits and costs of modifying the rule rather than eliminating it entirely?  For instance, would loosening the current local radio ownership restrictions lead to any consumer benefits, such as increased competition, choice, innovation, or investment in programming?  What amount of additional scale above the current ownership limit would be required to realize such benefits?  Would these benefits conflict with, or come at a cost to, our traditional policy goals of competition, localism, or viewpoint diversity, and if so, how should we measure and evaluate these tradeoffs?  What are the comparative benefits and costs of tightening the current restrictions?  We seek comments that support claims about benefits and costs with relevant economic theory and evidence, including empirical analysis and data.

B.    **Local Television Ownership Rule**

1.    **Introduction**

40.    The Local Television Ownership Rule limits the number of full power television stations an entity may own within the same local market.   We seek comment below on all aspects of the rule's implementation and on whether the current version of the rule is necessary to serve the public interest in the current television marketplace.  We seek comment on whether the rule continues to foster competition, the stated primary goal of the rule, and thus should be retained or whether the promotion of localism or viewpoint diversity also provides justification for retaining the rule.  Further, we seek

---

[132] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9911, para. 125.

[133] *Id.*

[134] *Id.*

[135] *Id.* at 9911-12, paras. 126-27.

[136] *Id.* at 9911-12, paras. 126, 128.

comment on whether and how the rule should be modified to take into account changes in both the broadcast television marketplace and the video programming distribution industry. If the rule is modified, we seek comment on whether and how the rule changes should apply to any pending applications. We ask commenters to explain in detail and to support the reasons for any proposed modification to the Local Television Ownership Rule with evidence and data.

### 2.    Background

41.    The Local Television Ownership Rule provides that an entity may own up to two television stations in the same Nielsen Designated Market Area (DMA)[137] if: (1) the digital noise limited service contours (NLSCs) of the stations (as determined by Section 73.622(e) of the Commission's rules) do not overlap; or (2) at the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top-four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.[138] With respect to the latter provision—the Top-Four Prohibition—an applicant may request that the Commission examine the facts and circumstances in a market regarding a particular transaction, and based on the showing made by the applicant in a particular case, make a finding that permitting an entity to directly or indirectly own, operate, or control two top-four television stations licensed in the same DMA would serve the public interest, convenience, and necessity.[139] The Commission considers showings that the Top-Four Prohibition should not apply due to specific circumstances in a local market or with respect to a specific transaction on a case-by-case basis.[140]

42.    The Commission concluded in its most recent media ownership review that local television ownership limits remained necessary to promote competition but found on reconsideration that the rule required modification to ensure that television stations were not prevented from achieving efficiencies that might improve their ability to serve their local markets in the face of an evolving video marketplace.[141] In particular, the Commission repealed the previous provision of the rule requiring at least eight independently owned television stations to remain in a DMA after any station acquisition in the DMA.[142] The Commission found that this Eight-Voices test was unsupported by the record or reasoned analysis and was no longer necessary in the public interest.[143] The Commission also added flexibility to the application of the Top-Four Prohibition by adopting the aforementioned case-by-case analysis.[144]

### 3.    Discussion

43.    As an initial matter, we seek comment on whether the current version of the Local Television Ownership Rule is necessary in the public interest as a result of competition. We note that the

---

[137] The Nielsen Company assigns each broadcast television station to a designated market area (DMA). The DMA boundaries and DMA data are owned solely and exclusively by Nielsen. Nielsen, *Nielsen DMA Maps*, http://www.nielsen.com/intl-campaigns/us/dma-maps.html (last visited Aug, 8, 2018). Each DMA is a group of counties that form an exclusive geographic area in which the home market television stations hold a dominance of total hours viewed. There are 210 DMAs, covering the entire continental United States, Hawaii, and parts of Alaska.

[138] 47 CFR § 73.3555 (b)(1).

[139] *Id.* § 73.3555 (b)(2).

[140] *Id.*

[141] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9833-34, paras. 71-72.

[142] *Id.* at 9834, para. 73.

[143] *Id.*

[144] *Id.* at 9836, para. 78.

video marketplace continues to evolve rapidly.[145]  Broadcasters in earlier quadrennial review proceedings have argued that local television ownership restrictions prevent them from competing effectively in the current video programming marketplace.[146]  However, other commenters have supported retention of the restrictions because of the asserted need to prevent excessive consolidation of television stations and the unique nature of free, over-the-air broadcast television stations operating on spectrum licensed by the Commission for the benefit of the public.[147]  We seek comment on how developments in the video programming industry that have emerged or continued since the last quadrennial review have affected whether the Local Television Ownership Rule is necessary as a result of competition and to promote localism and viewpoint diversity among local broadcast television stations.

44.    The Commission stated in the *2010/2014 Quadrennial Review Order on Reconsideration* that, based on the record in that proceeding, a rule focused on preserving competition among local broadcast television stations was still warranted.[148]  In particular, the Commission found that the rule remained necessary to promote competition among broadcast stations in local television viewing markets.[149]  The Commission has found that such competition leads stations to invest in better and more locally tailored programming and to compete for advertising revenue and retransmission consent fees.[150]  We seek comment on whether promoting competition among television stations in local viewing markets continues to be the proper framework within which to consider the rule, and if so, what forms of competition we should take into account under such a framework.  For instance, how, if at all, should we consider competition among television stations for:  viewers, advertisers, retransmission consent fees, network affiliation, the provision of local news or other programming, the production or acquisition of programming, innovation, or any other form of competition?

45.    We also seek comment on whether the Local Television Ownership Rule is necessary to promote localism or viewpoint diversity.  The Commission has previously stated that a competition-based rule, while not designed specifically to promote localism or viewpoint diversity, may still have such an effect.[151]  Has our prior reliance on competition as the primary policy goal of the Local Television Ownership Rule concomitantly served as a proxy for preserving a certain level of localism or viewpoint diversity in local television markets that might otherwise be lost were we to find the rule no longer necessary for competition purposes?

46.    In particular, we seek comment on whether a competition-based Local Television Ownership Rule promotes the production or provision of local programming.  Localism has been a cornerstone of the Commission's broadcast regulation for decades.[152]  The Commission has consistently found that broadcast licensees have an obligation to air programming that is responsive to the needs and

---

[145] *Id.* at 9833-34, para. 72 (noting that consumers increasingly can access video programming delivered via MVPDs, the Internet, and mobile devices and that the online video distributor (OVD) industry continues to grow and evolve).

[146] *Id.* at 9871-72, para. 20.

[147] *Id.* at 9872, para. 21.

[148] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9833, para. 71.  *See also 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9872-75, paras. 23-30.

[149] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9833, para. 71; *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9872-73, para. 23.

[150] *2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4381, para. 22.

[151] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9870-71, para. 17.

[152] *Deregulation of Radio*, 84 FCC 2d 968, 994, para. 58 (1981) ("The concept of localism was part and parcel of broadcast regulation virtually from its inception.").

19

interests of their communities of license.[153]  Does promoting competition among broadcast stations incentivize stations to produce and improve local programming?  Could or does competition from non-broadcast video sources, which have no local programming requirements, create the same incentives to produce and improve local programming?

47.    In the event that the Commission decides to retain the Local Television Ownership Rule, we will analyze the relevant parts of the rule to examine whether each particular provision similarly remains necessary in the public interest as a result of competition or whether it should be modified or eliminated.  To that end, we seek comment on specific aspects of the rule's operation, including the relevant product market, numerical limits, and the Top-Four Prohibition, in order to assess whether these subparts remain necessary or whether any or all of them should be modified or eliminated.  We also seek comment on whether developments in the video programming industry involving multicasting, satellite stations, low power stations, and the next generation transmission standard have any implications on the Local Television Ownership Rule or its subparts.

48.    *Market Definition*.  We seek comment on the appropriate product market and market participants to consider, including whether the market for review of the Local Television Ownership Rule should include more than broadcast video programming.[154]  The Commission stated in the *2010/2014 Quadrennial Review Order on Reconsideration* that finding a rule focused on preserving competition among local broadcast television stations was still warranted did not mean that changes outside the local broadcast television market should not factor into the Commission's assessment of the Local Television Ownership Rule or prevent the Commission from making adjustments to account for marketplace changes.[155]  We seek comment on relevant marketplace changes and whether and how we should take such changes into account.

49.    We also seek comment on whether and to what extent non-broadcast sources of video programming should be considered competitors to broadcast television stations.  The Commission concluded in the previous quadrennial review proceeding that non-broadcast video offerings do not serve as meaningful substitutes for local broadcast television.[156]  The Commission noted that video programming delivered by multichannel video programming distributors (MVPDs) is generally uniform across all markets, as is programming provided by online video distributors (OVDs).[157]  Unlike local broadcast stations, MVPDs and OVDs were deemed not likely to make programming decisions based on conditions or preferences in local markets.[158]  The Commission emphasized, however, that these conclusions could change in a future proceeding with a different record.[159]

50.    In light of the evolving video marketplace, we seek comment on these prior findings.  Do consumers consider broadcast television to be interchangeable with other sources of programming?  If so, what other sources of video programming should be included in the analysis of a local product market?  What factors should the Commission consider in analyzing non-broadcast sources of video programming?  Should the Commission distinguish between linear and non-linear distributors of video?[160]  In which

---

[153] *Broadcast Localism*, Notice of Inquiry, 19 FCC Rcd 12425, 12425, para. 1 (2004).

[154] For instance, the Commission has previously concluded that the video programming market is distinct from the radio listening market.  *2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4380, para. 21.

[155] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9833-34, para. 72.

[156] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9874-75, paras. 27-28, 30.

[157] *Id.* at 9874, para. 27.

[158] *Id.*

[159] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9833, para. 71.

[160] A linear channel is one that distributes programming at a scheduled time.  Non-linear programming, such as video-on-demand (VOD), is available at a time of the viewer's choosing.  *Annual Assessment of the Status of*

product markets, if any, do non-broadcast video programmers compete with broadcast television programmers? Does broadcast television offer any programming for which there is no substitute available from non-broadcast video programmers? To what extent do consumers rely on broadcast television as their primary, or only, source of video programming?[161] Is the availability of non-broadcast video comparable to that of broadcast television?[162] Do viewers rely on or consume programming from local broadcast stations in a manner different from other sources of, potentially non-local, video programming? In addition, do any non-broadcast video programmers make programming decisions based on local markets or the actions of individual local television stations?[163]

51.     We also seek comment on how advertisers select between local broadcast and non-broadcast sources. We seek studies and data that we can use to assess substitutability in local advertising among all sources of video in a DMA. The Commission previously found that the record data did not support arguments by broadcasters that advertisers no longer distinguish local broadcast television from non-broadcast sources of video programming when choosing how to allocate spending for local advertising.[164] We seek comment and new data about whether and how various video programming providers compete for local advertising revenue.

52.     The Commission has stated that competition within a local market motivates a broadcast television station to invest in better programming and to provide programming tailored to the needs and interests of the local community in order to gain market share.[165] Viewers in the local market benefit from such competition among rival broadcast television stations in the form of higher quality programming.[166] Given how local programming has factored into our previous ownership analysis, we seek comment on whether, in evaluating the Local Television Ownership Rule, we should consider sources of local news and other local programming as a relevant product market. What are the most prominent sources of local news and local programming beyond broadcast television? Should non-video providers of news and information—such as radio, newspapers, Internet websites, and social media

---

(Continued from previous page) ———————————

*Competition in the Market for the Delivery of Video Programming*, Notice of Inquiry, 29 FCC Rcd 1597, 1603, para. 15 n.23 (2014).

[161] In the most recent Video Competition Report, the Commission noted that number of households relying on over-the-air broadcast service exclusive of any MVPD service increased since the last report. *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Eighteenth Report, 32 FCC Rcd 568, 571, para. 7 (2017) (*18th Video Competition Report*). Nielsen reports that this figure increased from 11.4 million television households in 2014 to 12.4 million television households in 2015, representing an increase from approximately 10 percent to 11 percent of all television households. *Id.* Figures from the National Association of Broadcasters (NAB) indicate that 26.7 million television households, or approximately 23 percent of all television households, rely exclusively on over-the-air television service on at least one television in the home. *Id.*

[162] For example, previously, the Commission has noted that the level of penetration of broadband service remains relevant when considering the extent to which online platforms may be meaningful substitutes for local broadcast television stations. *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9875, para. 30 n.68.

[163] For example, a cable operator deciding to carry a local sports event that is not being covered by the local broadcast stations may demonstrate how local broadcast stations' actions affect programming decisions by non-broadcast programmers.

[164] *Id.*; *see also United States v. Nexstar Broadcasting Group, Inc., et al.*, Complaint, 81 FR 63206, 63207-08, paras. 12-21 (Sept. 14, 2016) (*DOJ Nexstar-Media General Complaint*) (stating that media buyers often buy advertising on non-broadcast platforms alongside broadcast advertising as a supplement to, rather than a substitute for, broadcast advertising).

[165] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9875, para. 26.

[166] *Id.*

**Add.21**

Federal Communications Commission                                            FCC 18-179

platforms—be examined in the product market analysis?[167]  To what extent do potential viewers rely for local news on these alternative sources?  Furthermore, are these sources originators of local programming, or do they simply aggregate or utilize content generated by traditional local news sources?[168]  Are non-broadcast sources of local programming available in all DMAs?  Is the depth of any coverage of local issues by non-broadcast platforms consistent across DMAs?[169]  We seek comment on the availability and the variety of local video programming in each Nielsen DMA.  We seek comment on how the Commission would, and whether the Commission should, evaluate local programming for purposes of any programming-based analysis.[170]  We seek comment on whether defining the local product market for our television ownership rules to include specific types of programming would raise First Amendment concerns.

53.      We seek comment too on what measures the Commission could use to assess competition among sources of local video programming or other local content.  What data sources might the Commission use to determine which sources consumers consider substitutes?  How should the Commission account for various providers of news, information, and video programming to the extent that some entities, such as OVDs and websites, may lack an industry standard for measuring viewership and engagement?[171]

54.      We also seek comment on the relationship between the Commission's market definition for the Local Television Ownership Rule, and any changes thereto, and the market definition and analysis used by the Department of Justice (DOJ).[172]  The Commission has stated that its market definition for

---

[167] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9895-96 (Statement of Commissioner O'Rielly) (listing Internet sites and social media platforms as competitors to local broadcasters).

[168] We note that the Knight Foundation recently reported, among other findings, that traditional broadcasters produce a significant amount of news consumed online and that online-only local news websites are having a limited impact.  *See generally* Knight Foundation, *Local TV News and the New Media Landscape*, (Apr. 5, 2018), https://knightfoundation.org/reports/local-tv-news-and-the-new-media-landscape.

[169] *See, e.g.*, Knight Foundation, *Local TV News and the New Media Landscape: Part 1:  The State of the Industry*, at 18 (Apr. 5, 2018), https://knightfoundation.org/reports/local-tv-news-and-the-new-media-landscape (finding that online-only local news websites are "primarily a major market phenomenon").

[170] We note that the Commission has examined broadcast television programming for localism purposes in other proceedings.  For example, the Commission's rules on market modification for purposes of MVPD carriage evaluate whether television stations provide "news coverage of issues of concern" or "carriage or coverage of sporting and other events of interest" to the local community at issue as one of the factors for determining if market modification is appropriate.  47 U.S.C. § 534(h)(1)(C)(ii)(I)-(V).  Also, the Commission examined programming in several DMAs as part of a case study in its STELA Reauthorization Act Section 109 Report to Congress.  *Designated Market Areas: Report to Congress Pursuant to Section 109 of the STELA Reauthorization Act of 2014*, Report, 31 FCC Rcd 5463 (MB 2016).

[171] Various firms, including Nielsen, are working to collect data on OVD viewership.  *18th Video Competition Report*, 32 FCC Rcd at 640, para. 176.  However, as yet, there is no single standard accepted and used industry-wide to the same extent that Nielsen is considered the industry standard for measuring television viewership.  *Id.* at 624, 640, paras. 134, 176.

[172] The Department of Justice specifically examines local television broadcasters competing in the spot advertising market.  *See, e.g.*, Complaint at paras. 14-22, *United States v. Gannett Co., Inc., et al.*, No. 1:13-cv-01984 (D.D.C. Dec. 16, 2013) (finding the relevant markets for analysis to be broadcast television spot advertising (product market) in the St. Louis DMA (geographic market)); Complaint at paras. 38-44, *United States v. Comcast Corp.*, No. 1:11-cv-00106 (D.D.C. Jan. 18, 2011) (excluding broadcast television from the "video programming distribution" market, which included MVPDs and Online Video Programming distributors ("OVDs")); *see also* DOJ February 20, 2014 *2010/2014 Quadrennial Review FNPRM Ex Parte* Comments at 5, 8 (confirming that the relevant markets for antitrust review are the broadcast television spot advertising market in the stations' specific geographic market); Timothy J. Brennan & Michael A. Crew, *Gross Substitutes vs. Marginal Substitutes: Implications for Market Definition in the Postal Sector, in* The Role of the Postal and Delivery Sector in a Digital Age 1-15 (Michael A.

**Add.22**

purposes of the Local Television Ownership Rule is similar to the market definition used by DOJ when evaluating broadcast television mergers in that the scope of the Commission's rule is similarly limited to local television broadcast stations.[173]  DOJ's analysis, however, has historically focused on competition for advertising, whereas the Commission's rule focuses on multiple factors, including audience share.[174]  Recently, DOJ has also looked at competition for retransmission consent licensing fees in local television markets.[175]  We seek comment on whether and how DOJ's analytical framework should inform our own, and vice versa.  Are there ways in which our current rule is either consistent or inconsistent with antitrust principles?  Do other public interest considerations support the rule?

55.    *Numerical Limit*.  Currently, a broadcast licensee can own up to two television stations (i.e., a duopoly) in a DMA, subject to the requirements of the Local Television Ownership Rule.[176]  If the Commission finds that retention of the local television rule remains in the public interest, should the Commission change the numerical limit on how many stations may be owned in a DMA?  The Commission concluded that the previous record did not support the conclusion that the local television marketplace has changed sufficiently to justify tightening the rule's current numerical limit.[177]  The Commission therefore declined to return to a single station per licensee television rule.[178]  Likewise, the Commission did not find sufficient changes to justify loosening the numerical limit to permit ownership of a third in-market station.[179]  We seek comment on whether changes in the video programming industry support modification of the numerical limit.

56.    *Top-Four Prohibition*.  If the Commission decides to retain the Local Television Ownership Rule, we seek comment on whether the Top-Four Prohibition should be retained or modified. The Commission found that the ratings data in the previous record generally supported the Commission's line drawing and the rule's focus on the top-four rated full power television stations in a market.[180]  The Commission found that there typically remains a significant "cushion" of audience share points that separates the top-four stations in a market from the fifth-ranked station and below.[181]  The Commission maintained that potential harms associated with top-four combinations also had support in the record.[182]  We seek comment on the applicability of these previous conclusions based on new, updated ratings data and/or examples of existing commonly owned top-four station combinations.

(Continued from previous page) ─────────────
Crew & Timothy J. Brennan eds. 2013) (arguing that the loss of customers to a new technology does not necessarily mean that the new technology should be included in the market definition of the existing technology).

[173] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9875, para. 29; *2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4383, para. 25 n.62; *see also DOJ Nexstar-Media General Complaint*, 81 FR at 63207-08, paras. 12-21 (stating that radio, newspapers, outdoor billboards, satellite and cable television networks, MVPD interconnects, and Internet-based media are not substitutes for broadcast television stations in the spot advertising market).

[174] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9875, para. 29.

[175] *See, e.g., DOJ Nexstar-Media General Complaint*, 81 FR at 63207, para. 12 (stating that "the licensing of broadcast television programming to MVPDs that retransmit the programming to subscribers in each of the DMA Markets" constitutes a relevant market under Section 7 of the Clayton Act); *see also Application of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc. to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd 183, 196-97, para. 35 (MB 2017) (finding that divestitures required by DOJ resolved any concerns about retransmission consent bargaining leverage within a local market).

[176] 47 CFR § 73.3555 (b)(1).

[177] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9878, para. 38.

[178] *Id.*

[179] *Id.* at 9878, para. 39.

[180] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9837, para. 79.

[181] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9880, para. 43.

[182] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9837, para. 79.

57.    In the *2010/2014 Quadrennial Review Order on Reconsideration*, the Commission recognized that rigid application of the Top-Four Prohibition in all DMAs may not be supported by the unique conditions present in certain DMAs or with respect to certain transactions.[183]  The Commission accordingly adopted a hybrid approach to allow applicants the ability to seek a case-by-case examination of a proposed combination that would otherwise be prohibited by the Top-Four Prohibition.[184]  The record of that proceeding suggested the types of information that applicants could provide to help establish that application of the Top-Four Prohibition is not in the public interest because the reduction in competition is minimal and is outweighed by public interest benefits.  Such information regarding the impacts on competition in the local market included (but was not limited to):  (1) ratings share data of the stations proposed to be combined compared with other stations in the market; (2) revenue share data of the stations proposed to be combined compared with other stations in the market, including advertising (on-air and digital) and retransmission consent fees; (3) market characteristics, such as population and the number and types of broadcast television stations serving the market (including any strong competitors outside the top-four rated broadcast television stations); (4) the likely effects on programming meeting the needs and interests of the community; and (5) any other circumstances impacting the market, particularly any disparities primarily impacting small and mid-sized markets.[185]

58.    We note that the Commission has observed previously that the justification for the Top-Four Prohibition does not apply in all markets or with respect to all transactions and recognized the need for increased flexibility in adopting the *2010/2014 Quadrennial Review Order on Reconsideration*.  We seek comment on whether flexibility in applying the Top-Four prohibition remains necessary and, if so, whether the case-by-case approach is the most effective way to achieve it.  If the Commission finds that a case-by-case analysis is the best approach, we seek comment on whether any of the examples of types of information suggested in the *2010/2014 Quadrennial Review Order on Reconsideration* serve as reliable factors in determining whether a top-four combination would serve the public interest.  If so, should some factors be weighed more heavily than others in the analysis?  Are there factors in addition to the examples provided in the *2010/2014 Quadrennial Review Order on Reconsideration* that the Commission should consider?  What kinds of data should licensees provide to support their showings?  Should the Commission adopt a more rigid set of criteria for its case-by-case determination?

59.    Alternatively, should the Commission avoid a case-by-case or hybrid approach and establish a bright-line test that would permit common ownership of two top-four stations in all cases, or in particular markets or circumstances?  For example, should we permit common ownership of the fourth-ranked station in a market and either the second-ranked station or third-ranked station in that same market?  Should we allow combinations between the second-ranked station or third-ranked station in the same market?  Should such combinations only be permitted in smaller markets where there is less advertising revenue available to support programming and station operations?  We also seek comment on whether the Commission should create a presumption for permitting common ownership of two top-four stations if certain conditions are met.  What conditions should the Commission consider to determine if a combination would not negatively impact competition?  For example, should the Commission presume that a combination is permissible if the combined stations' share of the audience and/or advertising market share does not exceed a certain threshold?

60.    If the Commission either retains the case-by-case approach or adopts a bright-line test, we seek comment on how to analyze competition in local television markets.  In considering the effect of top-four combinations on local advertising markets, we seek studies that estimate the elasticity of demand for local advertising.  In the absence of such studies, what data sources or types of data might the Commission use to assess substitutability in local advertising across dayparts, program types, and stations?  What measures, in addition to viewership share, could be used to assess competition between

---

[183] *Id.*, para. 78.

[184] *Id.*

[185] *Id.*

stations in local programming?  What data sources might we use to determine which programs or stations viewers consider substitutes?

61.    A top-four combination may have different effects on competition among broadcast stations for viewers of different types of programming, for instance, local programming, network programming, and syndicated programming.  Should the Commission weigh each competitive effect and, if so, how?  If we consider specific categories of programming, should we look at the viewership of each type of programming, the amount of revenue generated for the local station by each type of programming, both, or something else?  Top-four combinations may also affect the quantity or quality of local programming available in the market.[186]  Although intended primarily to promote competition, does the Top-Four Prohibition also preserve, as a byproduct, a sufficient level of localism or viewpoint diversity in local markets?  We seek comment on whether and how the Commission should consider elimination of an independent local news operation or a reduction in local news programming.

62.    We seek comment on whether and how the Commission should weigh any effect on retransmission consent negotiations in evaluating the competitive effects under the Commission's case-by-case approach of top-four station combinations.  Commenters in proceedings involving potential top-four station combinations consistently have raised the issue of potential retransmission consent fee increases as a result of reduced competition between stations and undue bargaining leverage for stations if commonly owned top-four stations are able to negotiate such fees jointly as a result of the combination.[187]  We therefore seek comment on whether and how the Commission should weigh the effect on retransmission consent negotiations in evaluating top-four station combinations under its case-by-case approach.[188]  Should the Commission maintain the Top-Four Prohibition for purposes of preventing any potential competitive harms caused by joint negotiation of retransmission consent fees by two commonly owned top-four stations in a DMA, and would such an approach be inconsistent with congressional intent in prohibiting joint negotiation only when conducted by non-commonly owned stations?[189]

63.    If the Commission retains the Top-Four Prohibition, or a similar rule that relies on the ranking of stations by audience share or viewership, we seek comment on whether specific provisions of the rule should be modified.  The rule currently determines a station's in-market ranking based on the

---

[186] For example, one study submitted in the National Television Multiple Ownership Rule docket examined the share of local news stories found in locally produced news programs and suggested that locally produced news programming often includes both local and national news stories, and that some station owners require nationally produced news and commentary segments to be aired on all owned stations.  Gregory J. Martin and Josh McCrain, *Local News and National Politics* (2018); Public Interest Commenters Reply, MB Docket No. 17-318, Exhibit A.

[187] *See* American Cable Association (ACA) Comments, MB Docket No. 17-179, at 3; American Civil Liberties Union (ACLU) Comments, MB Docket No. 17-179, at 8; American Television Alliance (ATVA) Comments, MB Docket No. 17-179, at 6; Attorneys General of the States of Illinois, Iowa, and Rhode Island Petition to Deny, MB Docket No. 17-179, at 15; Cinemoi et al. Petition to Deny, MB Docket No. 17-179, at 7; RIDE et al. Reply, MB Docket No. 17-179, at 4-5; NCTA-The Internet & Television Association Comments, File No. BALCDT-20180516AAY, at 2-3; ATVA Comments, File No. BALCDT-20180516AAY, at 5; NCTA-The Internet & Television Association, MB Docket No. 18-230, at 2-6.

[188] DOJ has previously recognized that common ownership of two major broadcast network affiliates can lead to diminished competition in the negotiation of retransmission agreements with MVPDs in local television markets.  *See DOJ Nexstar-Media General Complaint*, 81 FR at 63209, para. 29 (stating that a station owner's bargaining position with MVPDs would be significantly strengthened if it could simultaneously black out at least two major broadcast networks in a DMA).

[189] In the STELA Reauthorization Act of 2014, Congress permitted joint negotiation of retransmission consent by commonly owned stations.  At the time of the STELAR's passage, the Top-Four Prohibition prevented common ownership of more than one top-four station in a DMA.  As a provision of the Local Television Ownership Rule, the Top-Four Prohibition is subject to quadrennial review (and repeal) if it is found to not be in the public interest.  Subsequent to the STELAR's passage, the Commission created the ability for applicants to seek case-by-case examination of a top-four combination.

**Add.25**

most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research.[190]  We seek comment on whether this data point is still the most useful for accurately determining a station's ranking for purposes of the Top-Four Prohibition.  Have there been changes in the industry that necessitate examining different data?  We also seek comment on whether and how the Commission should account for instances where a station makes use of multicast streams, satellite stations, or translators.  Should the ratings of these stations or streams be combined with the ratings of the primary station or stream to determine the station's ratings in the DMA?  Why or why not?  Lastly, based on Commission staff review of Nielsen data, there are instances where noncommercial television stations have audience shares comparable to those of commercial stations.  Should the Commission distinguish between commercial and noncommercial stations for purposes of the Top-Four Prohibition?  Why or why not?

64.    We also seek comment on whether to provide clarification of the phrase "at the time the application to acquire or construct the station(s) is filed."  Should entities filing an application submit as support audience share data for the most recent month, week, or sweeps period in relation to the date when the application was submitted to the Commission?  Should the time frame for the submitted data be required to show a longer period of time?  For example, should the Commission require applicants to submit ratings data over a three-year period to demonstrate that a station truly is or is not ranked among the top-four stations in the DMA "at the time the application to acquire or construct the station(s) is filed"?[191]  If not, should the Commission take another approach to prevent circumvention of the Top-Four Prohibition's requirements based on anomalous data?  Should it rely on the most recent period solely as a presumption, which might be rebutted by interested parties?

65.    Given the longstanding nature of the Top-Four Prohibition, much of the discussion in this section focuses on the continued applicability of that rule and ways that it might be adjusted or clarified to apply in the current video marketplace.  We also seek comment, however, on alternatives to the Top-Four Prohibition.  Should common ownership of two stations in a market be permitted when at least one of the stations is not ranked among the top-three stations in the market, or among the top-two?  What economic data support establishing such a top-three approach, in light of the significant differences in national audience share between the top-four national networks and others?  Should the Commission distinguish between stations located in larger Nielsen DMAs and those in mid- to small-sized DMAs by adopting a tiered approach to application of any ranking-based prohibition?  Should common ownership be permitted when there is a certain number of non-broadcast local video programing sources in a DMA?  We seek comment on how these and any other proposals supported by the record would promote and protect competition in local television markets.

66.    *Multicasting*.  As a result of the digital television transition, all full-power television stations have the ability to use their available spectrum to broadcast not only their main program stream but also, if they choose, additional program streams—an activity commonly referred to as multicasting.  The Commission previously distinguished the ability to multicast from owning a separate broadcast station.[192]  Accordingly, the Commission has declined to impose restrictions on local television station ownership based on the ability to multicast.[193]  The Commission also declined to regulate dual affiliations through multicasting, even in instances where a licensee is affiliated with more than one of the Big Four networks (ABC, CBS, Fox, and NBC) by using multicast streams.  The record in the last quadrennial review indicated that dual affiliations involving two Big Four networks via multicasting were generally limited to smaller markets where there was an insufficient number of full-power commercial television

---

[190] 47 CFR § 73.3555 (b)(1)(ii).

[191] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9839, para. 82 (encouraging applicants to provide data over a substantial period (e.g. the past three years) similar to the requirement in the failing/failed station waiver test).

[192] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9892, para. 71.

[193] *Id.*

Federal Communications Commission                                    FCC 18-179

stations to accommodate each Big Four network or where other unique marketplace factors led to creating the dual affiliation.[194]  The Commission stated, however, that it would continue to monitor this issue and take action in the future, if appropriate.[195]

67.    We seek comment on how technical and other developments in the broadcast industry have affected multicasting.  Are some multicast streams functioning as the equivalent of separate broadcast stations?  We note that multicasting has enabled broadcasters to bring more programming to consumers, particularly in smaller, rural markets, by expanding the availability of the four major networks and newer networks.[196]  Based on Commission staff review of Nielsen data, there are at least several dozen DMAs where a single entity holds affiliations with two Big Four networks by using a multicast stream to carry the second signal.  We seek comment on the characteristics of DMAs where major network affiliations are carried on multicast streams.  Are there certain markets where this practice is more commonplace?  We seek comment on whether dual affiliations with major networks remains limited to smaller markets or if the practice has become more widespread.  We seek comment on whether and how the Commission should evaluate multicast streams for purposes of the Local Television Ownership Rule.

68.    *Satellite Stations*.  Television satellite stations are full-power terrestrial broadcast stations authorized under Part 73 of the Commission's rules that generally retransmit some or all of the programming of another television station, known as the parent station, which typically is commonly owned or operated with the satellite station.[197]  We seek comment on the use of television satellite stations, which are exempted from the Local Television Ownership Rule,[198] to carry two Big Four networks in a market.  For instance, how should we treat a situation in which a licensee utilizes multicasting to air two Big Four networks on a parent station (e.g., one on the primary stream and one on a multicast stream), and airs the same two Big Four networks on a satellite station?  How prevalent is this practice, and is it consistent with the purposes behind allowing television satellite stations in the first place, which are generally intended to bring over-the-air television service to unserved areas?  Are there benefits to allowing this practice that outweigh any potential harms?  We seek comment on whether this issue should be addressed through modification of the satellite exemption to the Local Television Ownership Rule or, alternatively, in the context of the satellite authorization process.

69.    *Low Power Television Stations*.  We note that changes in industry practice and technological advances may have extended the reach and enhanced the capabilities of classes of broadcast stations that are currently exempt from local television ownership limits.[199]  Based on a review of Nielsen data by Commission staff, there are a significant number of instances where a low power station is affiliated with a Big Four network.  By virtue of this affiliation, MVPDs are likely willing to carry the

---

[194] *Id.* at 9892, para. 72.

[195] *Id.* at 9892-93, para. 72.

[196] *18th Video Competition Report*, 32 FCC Rcd at 571, para. 8.

[197] *Streamlined Reauthorization Procedures for Assigned or Transferred Television Satellite Stations*, MB Docket Nos. 18-63, 17-105, Notice of Proposed Rulemaking, FCC 18-34, at 1, para. 2 (Mar. 23, 2018) (*Satellite TV Reauthorization NPRM*).

[198] 47 CFR § 73.3555 Note 5.  In order for the exception to apply, a television station must obtain authorization as a satellite from the Commission, and it must be reauthorized as a satellite at the time of assignment or transfer of control.  *Satellite TV Reauthorization NPRM* at 1, para. 1.  The Commission has a pending proceeding that proposes to streamline the process for reauthorizing television satellite stations when they are assigned or transferred in combination with their previously approved parent station.  *Id.*

[199] *See* 47 CFR § 74.732(b) (stating that low power TV and TV translator stations are not counted for purposes of the multiple ownership rules).

**Add.27**

low power stations despite their status as low power stations.[200] If low power stations can in this way become the functional equivalent of full power stations in certain instances, should the Commission account for the number of low power television stations as part of its Local Television Ownership Rule in some way, and if so, how? For instance, should a low power station that is ranked among the top four stations in audience share in a DMA be counted as a top-four station for purposes of the Top-Four Prohibition?

70.    *Next Generation Broadcast Television Transmission Standard*.  Currently, the broadcast television industry is developing a new transmission standard called Advanced Television Systems Committee (ATSC) 3.0 with the intent of merging the capabilities of over-the-air broadcasting with the broadband viewing and information delivery methods of the Internet, using the same 6 MHz channels presently allocated for DTV service.[201] According to ATSC 3.0 advocates, the new standard has the potential to improve broadcast signal reception greatly, particularly on mobile devices and television receivers without outdoor antennas.[202] ATSC 3.0 will enable broadcasters to offer enhanced and innovative new features to consumers, including Ultra High Definition (UHD) picture and immersive audio, more localized programming content, an advanced emergency alert system (EAS) capable of waking up sleeping devices to warn consumers of imminent emergencies, better accessibility options, and interactive services.[203]

71.    We seek comment on the implications, if any, of the new broadcast television transmission standard on the Local Television Ownership Rule. Conversely, we seek comment on whether any provisions of the Local Television Ownership Rule potentially could affect adoption and deployment of the new transmission standard. How, if at all, should the Commission consider in the context of local television ownership the decisions of television broadcasters to adopt voluntarily the ATSC 3.0 transmission standard going forward?

72.    *Minority and Female Ownership*.  We also seek comment on how retaining, modifying, or eliminating the local television rule would affect broadcast television ownership and entry by minority and female owners, if at all. The Commission has stated previously that, while the Local Television Ownership Rule promotes competition among broadcast television stations in local markets and is not meant to preserve or create specific amounts of minority and female ownership, the rule nevertheless promotes opportunities for diversity in local television ownership.[204] The competition-based rule helps to ensure the presence of independently owned broadcast television stations in the local market, thereby indirectly increasing the likelihood of a variety of viewpoints and preserving ownership opportunities for new entrants.[205] No data in the previous record indicated that the duopoly rule has reduced minority ownership or suggested that a return to the single station per licensee rule would increase ownership opportunities for minorities and women.[206] While the data did indicate an increase in minority ownership following relaxation of the Local Television Ownership Rule, there was no evidence in the record that established a causal connection.[207] We seek data and a new updated record on the effects of the Local Television Ownership Rule on minority and female broadcast ownership and entry. We also seek

[200] LPTV stations may qualify for must-carry on cable systems only under very limited circumstances set forth in section 614 of the Act.  47 U.S.C. § 534(c)(1); 47 U.S.C. § 534(h)(2).

[201] [201] *Authorizing Permissive Use of the "Next Generation" Broadcast Television Standard*, Notice of Proposed Rulemaking, 32 FCC Rcd at 1670, 1671, para. 1 (2017).

[202] *Id.*

[203] *Id.*

[204] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9893-94, para. 75.

[205] *Id.* at 9894, para. 75.

[206] *Id.* at 9895, para. 77.

[207] *Id.* at 9895, para. 78.

comment on how retaining or modifying the local television rule might affect broadcast television ownership and entry by small business owners, if at all.

73.    *Broadcast Spectrum Auction*.  In the *2010/2014 Quadrennial Review Order*, the Commission stated that it could not analyze yet the implications of the incentive auction for the Local Television Ownership Rule.  The Commission released a public notice on April 13, 2017, announcing the results of the reverse and forward auctions and the repacking of the broadcast television spectrum.[208] Pursuant to the Spectrum Act authorizing the incentive auction, the release of that Public Notice also marked the completion of the reverse and forward auctions and the start of the 39-month post-auction transition period.[209]  Given the completion of the reverse and forward auctions and the subsequent surrender of spectrum and/or initiation of channel-sharing agreements, we seek comment on whether the auctions' effects on local television ownership have any implication on retention or modification of the Local Television Ownership Rule.

74.    *Shared Service Agreements*.  In the *2010/2014 Quadrennial Review Order*, the Commission adopted a definition of shared service agreements (SSAs) and a requirement that commercial television stations disclose SSAs by placing them in their online public inspection files.[210]  The Commission found that lack of knowledge about the content, scope, and prevalence of SSAs impeded its ability to evaluate the impact of these agreements, if any, on the Commission's policy goals, particularly with respect to broadcast ownership.[211]  Broadcast commenters in the proceeding opposed the disclosure requirement based on concerns that disclosure would be unduly burdensome, discourage stations from entering into SSAs, and constitute intrusion into the day-to-day operations of broadcast stations.[212]  The *2010/2014 Quadrennial Review Order on Reconsideration* upheld the disclosure requirement, and the requirement became effective on March 23, 2018.[213]  We seek comment on what action, if any, the Commission should take on SSAs in the context of our review of the Local Television Ownership Rule.  Should we continue to require the filing of SSAs with the Commission or should that requirement be eliminated?  What, if anything, have commenters learned from the filing of these agreements so far?

75.    *Cost-Benefit Analysis*.  Finally, we seek comment on how to compare the benefits and costs associated with retaining, modifying, or eliminating the Local Television Ownership Rule, including the Top-Four Prohibition.  We seek comments supporting modification or elimination of the rule that explain the anticipated economic impact of any proposed action and, where possible, quantify benefits and costs of proposed actions and alternatives.  Does the current Local Television Ownership Rule create benefits or costs for any segment of consumers?  Does the rule create benefits or costs for any segment of the industry that should be counted as social benefits or costs rather than transfers from one segment of the industry to another?  How does the rule create these benefits and costs, and what evidence supports this explanation?  How can the value of these benefits and costs be measured for parties receiving them?  What factors create uncertainty about the existence or size of these benefits and costs, and how should the Commission's economic analysis take these uncertainties into account?

---

[208] *Incentive Auction Closing and Channel Reassignment Public Notice*, Public Notice, 32 FCC Rcd 2786, 2788, para. 1 (MB/WTB 2017).

[209] *Incentive Auction Closing and Channel Reassignment Public Notice*, 32 FCC Rcd at 2788, para. 1 (citing Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, §§ 6402 (codified at 47 U.S.C. §309(j)(8)(G)), 6403 (codified at 47 U.S.C. § 1452), 126 Stat. 156 (2012)).  The public notice also announced the broadcast television channel reassignments and reallocations of broadcast television spectrum for flexible use made in the repacking process.  *Incentive Auction Closing and Channel Reassignment Public Notice*, 32 FCC Rcd at 2788, para. 1.

[210] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10008, para. 338.

[211] *Id.* at 10009-10, para. 341.

[212] *Id.* at 10013, para. 351.

[213] *2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9854, para. 114.

76.    How would elimination of the Local Television Ownership Rule alter these benefits and costs? What are the comparative benefits and costs of modifying the rule rather than eliminating it entirely? For instance, would loosening the current local television ownership restrictions lead to any consumer benefits, such as increased competition, choice, innovation, or investment in programming? What amount of additional scale above the current ownership limit would be required to realize such benefits? Would these benefits conflict with, or come at a cost to, our traditional policy goals of competition, localism, or viewpoint diversity, and if so, how should we measure and evaluate these tradeoffs? What are the comparative benefits and costs of tightening the current restrictions? We seek comments that support claims about benefits and costs with relevant economic theory and evidence, including empirical analysis and data.

C.    **Dual Network Rule**

1.    **Introduction**

77.    In this section, pursuant to the statutory requirement imposed by Congress, we seek comment on whether the Dual Network Rule, which effectively prohibits a merger between or among the Big Four broadcast networks (ABC, CBS, Fox, and NBC), is necessary in the public interest as a result of competition or whether it should be modified or repealed. Specifically, we seek comment on whether the rule remains necessary to promote our goals of competition, viewpoint diversity and localism. In addition, we seek comment on whether the benefits of the rule continue to outweigh any costs.

2.    **Background**

78.    The Dual Network Rule provides: "A television broadcast station may affiliate with a person or entity that maintains two or more networks of television broadcast stations unless such dual or multiple networks are composed of two or more persons or entities that, on February 8, 1996, were 'networks' as defined in § 73.3613(a)(1) of the Commission's regulations (that is, ABC, CBS, Fox and NBC)."[214] Thus the rule permits common ownership of multiple broadcast networks, but effectively prohibits a merger between or among the Big Four networks, ABC, CBS, Fox and NBC. A version of the rule has existed since the 1940s, and had changed little prior to 1996, when the rule was modified in response to the Telecommunications Act of 1996.[215]

79.    The Commission most recently considered the Dual Network Rule in the *2010/2014 Quadrennial Review Order* and concluded that the rule continues to be necessary in the public interest to promote competition and localism.[216] With respect to competition, the Commission found the rule

---

[214] 47 CFR § 73.658(g). Section 73.3613(a)(1) in turn defines "network" as "any person, entity, or corporation which offers an inter-connected program service on a regular basis for 15 or more hours per week to at least 25 affiliated television licensees in 10 or more states; and/or any person, entity, or corporation controlling, controlled by, or under common control with such person, entity or corporation." 47 CFR § 73.3613(a)(1).

[215] In the Telecommunications Act of 1996 Congress permitted common ownership of two or more broadcast networks, but not a merger among ABC, CBS, Fox or NBC, or between one these networks and the two largest emerging networks, UPN or WB. 1996 Act, § 202(e); *see also* S. Rep. No. 230, 104th Cong., 2d Sess. at 163; *2002 Biennial Review Order*, 18 FCC Rcd at n. 1240. In 2001, after concluding in its 1998 Biennial Review that the rule as applied to UPN and WB might no longer be in the public interest (*1998 Biennial Regulatory Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 Of the Telecommunications Act of 1996,* Order, 15 FCC Rcd 11058, 11098, para. 77 (2000)), the Commission further modified the dual network rule to permit a Big Four network to merge with or acquire UPN or WB. *Amendment of Section 73.658(g) of the Commission's Rules—The Dual Network Rule*, Report and Order, 16 FCC Rcd 11114 (2001); *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13848, para. 594.

[216] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9952, 9954, 9958, 9959-60, paras. 216, 221, 229, 230-31.

necessary to promote both competition in the provision of primetime entertainment programming and the sale of national advertising.[217]

### 3. Discussion

80.    *Competition.*  We seek comment on whether the Dual Network Rule is necessary in the public interest as a result of competition.  In conducting its analysis of whether the Dual Network Rule remains necessary, the Commission traditionally has considered broadcast networks as participating in the video marketplace in two ways:  1) assembling and distributing a collection of programming suitable for large, national audiences, and 2) selling advertising based on this programming to large, national advertisers.  Does the Dual Network Rule continue to be relevant to competition or network behavior in either or both of these segments?  The Commission previously has concluded that "the primetime entertainment programming provided by the Big Four broadcast networks and national television advertising time are each a distinct product—the availability, price, and quality of which could be restricted, to the detriment of consumers, if two [Big Four broadcast networks] were permitted to merge."[218]  Does this conclusion remain valid?

81.    With respect to viewership, in the *2010/2014 Quadrennial Review Order,* based on Nielsen data, the Commission concluded that, "while certain cable networks have continued to air a discrete number of individual programs or episodes that have become increasingly capable of attracting primetime audiences on par with, or even greater than, the top-four broadcast networks, no one cable network – let alone several – has been able to consistently deliver such audiences beyond individual programs or episodes."[219]  The *18th Video Competition Report*, based on 2015 data, showed that broadcast affiliates still draw the largest share of total day and prime time viewing audiences in relation to independent stations and non-commercial and cable networks.[220]  With respect to advertising rates, based on SNL Kagan data, the *2010/2014 Quadrennial Review Order* found a continued wide disparity in advertising rates and revenue earned by the Big Four broadcast networks and other broadcast and cable networks.[221]  The *18th Video Competition Report* also showed that broadcast industry gross advertising revenue declined from $20,477,000 in 2014 to $18,879,000 in 2015 and from 75 percent to 69 percent as a share of total revenue, but that gross retransmission consent revenue increased.[222]  We seek more current data on these topics.  Do these, or other recent developments, have any implications for the Commission's competition rationale underlying the Dual Network Rule?

82.    In addition, the Commission previously has found that the Big Four networks operate as a "strategic group" in the national advertising market and that they largely compete among themselves for

---

[217] *Id*. at 9954, para. 221.

[218]*Id*. at 9958, para. 229.

[219] "Besides [a] few individual series or episodes, however, the highest-rated primetime entertainment programs on cable networks attracted, at most between 6 and 7 million viewers . . . .  By contrast for most of 2015 there were, at minimum, a dozen—and in a number of weeks around two dozen or so—primetime entertainment programs on the top-four broadcast networks that attracted more than 7 million viewers, with some of the highest-rated episodes attracting between 18 and 26 million viewers." (citations omitted)).  *Id*. at 9955, para. 225.  *See also id.* at 9954-57, paras. 225-26.

[220] *18th Video Competition Report*, 32 FCC Rcd at 614, para. 117, Table III.B.3.

[221] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9957, para. 227.  Specifically, between 2011-2014, the average of the four highest CPMs [cost per mille or cost per thousand views] among non-sports cable networks (MTV, Bravo, Discovery Channel and Food Network) was approximately $12.43, or approximately 44 percent less than the average CPM among the Big Four broadcast networks, which was approximately $22.31.  The four cable networks with the highest net advertising revenue totals in 2014, TNT, USA, TBS and Nickelodeon/Nick at Nite, were projected to average approximately $1.04 billion in 2015 net advertising revenues, less than a third of the average revenues of $3.31 billion projected for the Big Four broadcast networks.  *Id*. at 9957-9959, paras. 227-28.

[222] *18th Video Competition Report*, 32 FCC Rcd at 615, Table III.B.4.

31

the most significant portion of the national advertising market, namely, advertisers that seek to reach national mass audiences.[223] Does the Commission's "strategic group" finding still hold true? The Commission further has found that the programming provided by the Big Four networks was a distinct product that, when compared to other broadcast and cable programming, had a unique ability to regularly attract large prime-time audiences and thus command higher advertising rates.[224] Given the increasing number of video programmers in today's market, as well as the increasing popularity of their programming, is network broadcast programming still a distinct product? Does nightly network news programming, or any other programming, distinguish the broadcast networks, or are consumers now turning to other news or programming sources that remove this distinction? Are there other producers of mass audience programming such that a merger between two of the Big Four broadcast networks would no longer harm competition for national advertising? In the past, the Commission reviewed programming audience shares and the advertising rates and revenues of various programmers in making this determination.[225] Should the Commission continue to rely on these data, or are there other data or metrics it should consider? Are there better sources of relevant data than the Commission has considered in the past?

83.     One of the biggest changes in the video programming market has been online distribution of programming from a variety of sources. Today, OVDs—including linear multichannel streaming services, both those from social media companies and other online platforms, and direct-to-consumer offerings by broadcast networks themselves—reach millions of consumers. Digital advertising on these or other online platforms is steadily increasing in market share and revenue share. How, if at all, have these changes affected competition for national broadcast television advertising? We seek comment on whether and how any such changes should affect our Dual Network Rule.

84.     Finally, we seek comment on whether recent developments in the video programming and national advertising markets suggest that the Dual Network Rule should be modified to promote competition or eliminated. If the rule is modified, what changes should we make? Should networks be removed from or added to the rule? If so, which networks? What would be the basis for eliminating the rule? If the rule were eliminated, would antitrust statutes or any other statutes, rules, or policies serve as a sufficient backstop to prevent undue consolidation between or among the Big Four networks? Why or why not?

85.     *Localism*. We seek comment on whether, consistent with the Commission's previous findings, the Dual Network Rule remains necessary to promote localism; in particular, by maintaining a balance of power between the Big Four networks and their local affiliates. To reach the largest possible national audience, the Big Four networks acquire their own broadcast stations, usually in the largest television markets, and enter into affiliation agreements with station owners throughout the rest of the country. Through affiliation, a model which has existed for more than fifty years, networks benefit through wide delivery of their programming, and network affiliates benefit by gaining access to high-quality programming. In the past, the Commission has found that the network-affiliate model balances competing interests: networks have an economic incentive to ensure that programming appeals to a mass, nationwide audience and is widely shown by affiliates. The Commission also concluded that affiliates, in contrast, have an economic incentive to gain viewers and attract advertising dollars by tailoring programming to their local audiences. The Commission has found that affiliates therefore have an incentive to influence network programming choices to ensure that the programming serves local needs

---

[223] *2002 Biennial Review* Order, 18 FCC Rcd at 13850, para. 601; *2006 Quadrennial Review Order*, 23 FCC Rcd at 2082, para. 140; *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9954, para. 221.

[224] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9952, 9954, 9958, paras. 216, 221, 229.

[225] *Id*. at 9954-9958, paras. 224-228.

Federal Communications Commission                                    FCC 18-179

and interests.[226]  Affiliates also may decide individually to preempt network programming if other programming that better serves the local audience is available.[227]  In previous reviews, the Commission has concluded that the Dual Network Rule is necessary to retain the balance of bargaining power between the Big Four networks and their affiliates, so that affiliates can ensure that the needs and interests of local viewers, or localism, is served.[228]  We seek comment on whether these prior conclusions remain true in today's video marketplace.

    86.    Evidence suggests that broadcast network affiliation remains sought after and critical to many local stations' success.[229]  For instance, while advertising revenue remains essential to broadcast stations, retransmission consent revenues now represent a much greater proportion of total revenue for many broadcast stations than they had previously, and stations with Big Four network affiliations often receive the lion's share of retransmission consent dollars from MVPDs in a local market.[230]  In addition, whereas local affiliates were once paid by networks to distribute network programming, today networks seek and receive compensation from their affiliates in the form of reverse compensation payments.[231]  According to one estimate, total industrywide reverse compensation payments paid by affiliates to broadcast networks have increased from roughly $300 million in 2010 to $2.9 billion in 2017.[232]  There is some evidence too that networks now exert leverage through oversight or approval of affiliate retransmission consent negotiations,[233] and although not common, there have been some instances in recent years where a network dropped or threatened to drop a local affiliate in order to launch a network O&O station in the same market.  To what extent do networks extract a share of retransmission consent payment received by their affiliates?  How, if at all, should the Dual Network Rule account for these or other recent changes to the network/affiliate relationship?

    87.    In addition, the rise of online video options in recent years also may have altered the

---

[226] *2002 Biennial Review Order*, 18 FCC Rcd at 13832, 13842, 13855, paras. 546-47, 578, 612-613; *see also Amendment of Section 73.355(e) of the Commission's Rules, National Television Multiple Ownership Rule*, Notice of Proposed Rulemaking, 32 FCC Rcd 10785, 10791-92, para. 14 (2017) (National Cap NPRM).

[227] *See* 47 C.F.R. § 73.658(e); *2002 Biennial Review Order*, 18 FCC Rcd at 13855, paras. 612-613.

[228] *2002 Biennial Review Order*, 18 FCC Rcd at 13855-56, paras. 611, 615; *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9959-60, paras. 230-31.  The Commission also has found that a national cap on the number of households nationwide that a broadcast station group reaches helps preserve this balance of bargaining power by preventing the excessive accumulation of audience reach by network-owned groups that are more likely to hold stations in multiple markets with large populations.  *2002 Biennial Review Order*, 18 FCC Rcd at 13842-43, paras. 578-81.

[229] *See, e.g., Applications of Comcast Corporation, General Electric Company, and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licenses*, Memorandum Opinion and Order, 26 FCC Rcd 4238, 4309-10, para. 170 (2011) (*Comcast-NBCU Order*) (noting that "the role of broadcast networks in the retransmission consent process is changing").

[230] Retransmission consent fees now account for roughly a quarter of broadcast revenues industrywide.  *See 18th Video Competition Report*, 32 FCC Rcd at 618-19, paras. 124-26.  These fees have increased from approximately $215 million in 2006 to $9.3 billion in 2017.  SNL Kagan, Media Census (June 2017).  *See Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992*, Report on Cable Industry Prices, 31 FCC Rcd 11498, 11512 (MB 2016) (stating that the "average annual total amount paid for retransmission consent by a cable system was nearly $7.8 million in 2013 and $12.7 million in 2014, an increase of 63.2 percent").

[231] *See 18th Video Competition Report*, 32 FCC Rcd at 618, para. 124.

[232] SNL Kagan, Media Census (June 2017).

[233] *See, e.g., Implementation of Section 103 of the STELA Reauthorization Act of 2014, Totality of the Circumstances Test*, Notice of Proposed Rulemaking, 30 FCC Rcd 10327, 10338-39, para. 14 (2015) (describing network negotiation for retransmission consent on behalf of affiliates); *Amendment of the Commission's Rules Related to Retransmission Consent*, Notice of Proposed Rulemaking, 26 FCC Rcd 2718, 2730-31, para. 22 (2011) (describing networks' rights to review or approve affiliates' retransmission consent contracts with MVPDs).

33

**Add.33**

network-affiliate dynamic. As stated above, OVDs now reach millions of consumers, creating new opportunities for networks to achieve widespread distribution without the direct involvement of network affiliates. In the broadcast-MVPD world of retransmission consent, local affiliates may have some recourse against broadcast networks bypassing their affiliates in this manner by negotiating for, and if necessary enforcing via Commission rules, contractual network non-duplication rights, which protect a broadcast station's right to be the exclusive distributor of network programming within a specified geographic zone.[234] By contrast, in the world of online video distribution, local affiliates lack a comparable regulatory backstop. The ability of networks to achieve online distribution of network programming in a local market, without the need for local affiliates to consent, may give networks some additional leverage in the network-affiliate relationship that did not exist in the pre-online video world.[235] What implications, if any, do developments related to the growth of online video distribution have for the Dual Network Rule and its underlying localism rationale?

88.     As the Commission has previously noted, the Dual Network Rule is intended to preserve the ability of local affiliates to advocate for local interests in programming decisions. Would a Big Four network merger reduce the ability of a network affiliate to use the availability of other top, independently-owned networks as a bargaining tool to influence programming decisions of its network, including the affiliate's ability to engage in a dialogue with its network over the suitability for local audiences of either the content or scheduling of network programming? Have changes discussed above, including the growth of online video or increased reverse compensation and retransmission consent fees, affected bargaining between networks and affiliates on programming and scheduling?

89.     In light of the longstanding existence of the Dual Network Rule, has localism increased, decreased, or remained roughly the same over time? Are there recent examples where local affiliates have influenced network programming to better serve local needs? Are there other metrics by which we can assess the effect of the Dual Network Rule on localism? Have other changes affected the network/affiliate relationship, such that the Commission would need to adjust assumptions made in previous reviews of the Dual Network Rule? For instance, has the growth over the last two decades of station groups not owned and operated by networks changed the dynamic between networks and their affiliates? Finally, we seek comment on whether recent changes affecting the network-affiliate relationship suggest that the Dual Network Rule should be modified, rather than being retained or eliminated, to promote localism? If so, what modifications should we make that would better promote localism?

90.     *Minority and Female Ownership.* The Commission previously concluded in the *2010/2014 Quadrennial Review Order* that, given the Dual Network Rule's unique focus on mergers involving the Big Four networks rather than ownership limits in local markets, the rule would not be expected to have any meaningful impact on minority and female ownership levels.[236] We seek comment on whether and how market or other changes since our last media ownership review may have affected this conclusion. We also seek comment on how retaining, modifying or eliminating the Dual Network Rule would affect broadcast television ownership and entry by minority and female owners, if at all. In addition, we seek comment on how retaining or modifying the Dual Network Rule might affect broadcast television ownership and entry by small business owners, if at all.

91.     *Cost-Benefit Analysis.* In addition, we seek comment on how to compare the benefits and costs associated with retaining, modifying or eliminating the Dual Network Rule. We ask commenters

---

[234] *See* 47 CFR §§ 76.92 and 76.122; *see also Comcast-NBCU Order*, 26 FCC Rcd at 4306-12, paras. 163-78.

[235] *National Cap NPRM*, Comments of the ABC Television Affiliates Association, CBS Television Network Affiliates Association, FBC Television Affiliates Association, and NBC Television Affiliates at 31 (filed Mar. 20, 2018) (stating that networks may allow OVDs to carry a "white feed," *i.e.*, a national network feed without any local affiliate content, including local news in the absence of the local station's signal and that OVDs will not negotiate with the station in such circumstances).

[236] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9960, para. 233.

supporting modification or elimination of the rule to explain the anticipated economic impact of any proposed action and, where possible, to quantify benefits and costs of proposed actions and alternatives. Does the current Dual Network Rule create benefits or costs for any segment of consumers?  Does the rule create benefits or costs for any segment of the broadcast or broader video program distribution industry that should be counted as social benefits or costs rather than transfers from one segment of the industry to another?  How does the Dual Network Rule create these benefits and costs, and what evidence supports this explanation?  How can the value of these benefits and costs be measured for parties receiving them?  What factors create uncertainty about the existence or size of these benefits and costs, and how should the Commission's economic analysis take these uncertainties into account?

92.     How would elimination of the Dual Network Rule alter the benefits and costs?  What are the comparative benefits and costs of modifying the rule rather than eliminating it entirely?  For instance, would allowing certain of the Big Four networks and not others to merge lead to any consumer benefits, such as increased choice, innovation, or investment in programming?  What amount of additional scale would be required to realize such benefits?  Would these benefits conflict with, or come at a cost to, our traditional policy goals of competition, viewpoint diversity or localism, and if so, how should we measure and evaluate these tradeoffs?  We ask commenters to support their claims about benefits and costs with relevant economic theory and evidence, including empirical analysis and data.

## IV.    DIVERSITY-RELATED PROPOSALS

93.     In addition to addressing the structural media ownership rules, the *2010/2014 Quadrennial Review Order* also discussed five proposals advanced by MMTC, which had been winnowed down from a larger list of 24 proposals advocated by MMTC in the 2010/2014 Quadrennial Review proceeding.[237]  MMTC focused on these five proposals based on guidance from the Third Circuit and discussions with Commission staff.[238]  The Commission adopted one of the five proposals as part of the *2010/2014 Quadrennial Review Order* (namely, making the promotion of minority ownership an integral part of relevant FCC rule making proceedings) and committed to further examine the remaining four proposals.  Recently, the Commission EEO implemented another of these proposals, namely the suggestion that the Commission's EEO functions be relocated from the Media Bureau to the Enforcement Bureau.[239]  The remaining three proposals include extending cable procurement requirements to broadcasters, developing a model for market-based tradeable "diversity credits" to serve as an alternative method for adopting ownership limits, and adopting formulas aimed at creating media ownership limits that promote diversity.  Consistent with the *2010/2014 Quadrennial Review Order* we seek comment below on these proposals and related issues.[240]

94.     *Extension of Cable Procurement Regulation*.  As part of the 1992 Cable Act, Congress established the so-called cable procurement requirement, which states that a cable system must: "encourage minority and female entrepreneurs to conduct business with all parts of its operation; and . . . analyze the results of its efforts to recruit, hire, promote, and use the services of minorities and women and explain any difficulties encountered in implementing its equal employment opportunity program."[241] Based on this statutory requirement, the Commission promulgated Section 76.75(e), which provides that a

---

[237] *Id.* at 10004-07, paras. 328-33.

[238] *Id.* at 10004-05, para. 328.

[239] *In the Matter of Equal Employment Opportunity Audit and Enforcement Team Deployment*, Order, FCC 18-103 (rel. July 24, 2018).

[240] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10006-07, paras. 331-32.   In the *2010/2014 Quadrennial Review Order*, the Commission stated that it would evaluate the feasibility of extending cable-procurement type rules to the broadcast industry.  In addition, it committed to consider further the ideas of tradeable diversity credits and the two formulas to promote broadcast diversity and to solicit input on these particular ideas in the document initiating the next quadrennial review of the media ownership rules.  *Id.*

[241] 47 U.S.C. § 554(d)(2)(E)-(F).

cable system must: "[e]ncourage minority and female entrepreneurs to conduct business with all parts of its operation." The rule explains that "[f]or example, this requirement may be met by: (1) Recruiting as wide as possible a pool of qualified entrepreneurs from sources such as employee referrals, community groups, contractors, associations, and other sources likely to be representative of minority and female interests."[242]

95.      Over the years, some parties have advocated exploring whether this type of procurement requirement could be applied to either broadcasting or other FCC-regulated industries.[243] As noted above, in the *2010/2014 Quadrennial Review Order*, the Commission committed to review the feasibility of extending the cable procurement requirement to the broadcast industry.[244]

96.      We seek comment on various aspects of this proposal beginning with the threshold issue of whether the Commission has authority to adopt a similar procurement requirement for broadcast licensees. We note as an initial matter that the cable procurement requirement and Section 76.75(e) of the Commission's rules flow directly from the statutory mandate pertaining explicitly to the cable industry contained in the 1992 Cable Act.[245] The Communications Act has requirements for equal employment opportunity applicable to broadcasters, but these do not extend to procurement.[246] Does this distinction reflect any limitation on the Commission's otherwise extensive Title III authority over broadcast licensees? We seek comment on potential sources of Commission authority, including any ancillary authority, to extend similar procurement regulation to the broadcast industry. [247]

97.      In addition, we seek comment on whether by specifically identifying minority/female entrepreneurs the proposed rule would classify these entrepreneurs differently from others such as to trigger heightened judicial scrutiny.[248] If that is the case, how would such a rule comport with the Commission's previous finding that it lacked the evidence to satisfy the heightened scrutiny needed to justify race- or gender-based broadcast regulation?[249] Would the inclusion of any type of audit, review, or enforcement mechanism pursuant to which the Commission considered broadcasters' compliance with the requirement be problematic or interpreted as tacitly encouraging broadcasters to favor certain entrepreneurs to the detriment of others in a way that would trigger heightened scrutiny?[250]

---

[242] 47 CFR § 76.75(e).

[243] *See, e.g.,* Recommendation on Procurement Issues, Emerging Technologies Subcommittee, Advisory Committee for Diversity in the Digital Age (June 10, 2008) available at http://transition.fcc.gov/DiversityFAC/061008/procurement-061008.pdf (last visited Dec.7, 2018)(Recommendation on Procurement Issues).

[244] *2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 10006, para. 330.

[245] 47 U.S.C. § 554(d)(2)(E).

[246] 47 U.S.C. § 334.

[247] In the past, supporters advocating an extension of the cable procurement rule have suggested that sections 151 and 257 of the Communications Act might form the basis of such an extension. *See* Recommendation on Procurement Issues. *See also Comcast Corp. v. FCC*, 600 F.3d 642, 651-61 (D.C. Cir. 2010) (extensively discussing Commission's reliance on ancillary authority in various proceedings).

[248] In *Adarand*, the Supreme Court held that any federal program in which the "government treats any person unequally because of his or her race" must satisfy the "strict scrutiny" constitutional standard of judicial review. *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 229-230 (1995). Likewise, any programs that are based on gender classifications would have to satisfy the "intermediate scrutiny" standard established for such classifications. *See 2010/2014 Quadrennial Review FNPRM* at 4508, para. 301 (citing *United States v. Virginia*, 518 U.S. 515, 531-33 (1996); *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003)).

[249] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9961-62, 9987-99, paras. 236, 297-312.

[250] The D.C. Circuit has held previously that *any* pressure to hire or recruit based on protected classifications as a result of the threat of Commission investigation triggers strict scrutiny. *See MD/DC/DE Broadcasters Assoc. v. FCC*, 236 F.3d 13, 20-21 (D.C. Cir. 2001) (rejecting the Commission's position that, "unlike affirmative action in

36

**Add.36**

Federal Communications Commission                                                      FCC 18-179

98.    If the broadcast procurement rule as proposed by MMTC would trigger heightened judicial scrutiny, can the proposed rule be modified to be race- and gender-neutral to avoid the potential legal impediments raised by a race- and gender-conscious broadcast procurement rule?  And in that case, how would the requirement be stated?  Would a race- and gender-neutral broadcast procurement rule be as effective as a race- and gender-conscious broadcast procurement rule?

99.    In addition, we also seek comment on MMTC's assertion that Section 76.75(e) "has been a springboard for the migration of minority and women entrepreneurs into operating and ownership positions in the cable and satellite industries."[251]  MMTC claims further that the rule has "contributed mightily to the economic success of scores of minority and women owned businesses engaged in banking, broker/dealer services, construction, fiber and satellite dish installation, programming, legal services, accounting, and much more."[252]  In deciding whether to adopt additional regulations and extend a regulatory regime to additional industries, it is important to assess the likelihood that the regulation would have the desired effect of increasing minority and female participation in the broadcast industry.  Consequently, we seek data on the degree to which Section 76.75(e), specifically, has promoted minority and women businesses and whether any broader trends in the intervening two decades since enactment of the cable procurement requirement have played a role in fostering greater minority and female participation in the cable industry.[253]  In this regard, we also seek comment on the relative benefits and costs of extending Section 76.75(e) to the broadcast industry.  How can the value of these benefits and costs be measured?  We encourage commenters to include in their evaluations of the relative benefits and costs of adopting such a rule the types of analyses called for in the questions posed in earlier sections of the instant *NPRM* about benefit-cost analysis.[254]

100.    Finally, we note that there are significant differences between the cable industry and the broadcast industry, and we seek comment on the feasibility – and utility – of imposing a Section 76.75(e)-type requirement on the broadcast industry.  For example, the cable industry requires the construction and maintenance of a significant physical plant, unlike that required for broadcasting.  As such, the cable industry purchases goods and services on a much larger scale than the broadcast industry,

(Continued from previous page) ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

hiring, 'affirmative outreach' in recruitment does not implicate equal protection concerns because it merely expands the applicant pool, and an individual applicant has no right to compete against fewer rivals for a job"), *cert. denied*, 534 U.S. 1113 (2002); *Lutheran Church/Missouri Synod v. FCC*, 141 F.3d 344, 351 ("the crucial point is… whether [the EEO rules] oblige stations to grant some degree of preference to minorities in hiring."), *rehearing en banc denied*, 154 F.3d 487, 491 (D.C. Cir. 1998) ("the degree to which the regulations require, oblige, pressure, induce, or even encourage the hiring of particular races is not the logical determinant of whether the regulation calls for a racial classification… the FCC's regulations at issue here indisputably pressure—even if they do not explicitly direct or require—stations to make race-based hiring decisions") (denying petition for rehearing).

[251] *2010/2014 Quadrennial Regulatory Review,* Letter from Kim Keenan, President & CEO and David Honig, President Emeritus and Senior Advisor, MMTC, to Thomas Wheeler, Chairman, FCC, at 5 (filed June 24, 2016)(MMTC June 24, 2016, *Ex Parte* Letter).

[252] *Id.*

[253] *See, e.g.,* "What is Corporate Social Responsibility," Business News Daily (June 8, 2018), available at https://www.businessnewsdaily.com/4679-corporate-social-responsibility.html (describing a study by Cone Communications finding that more than 60 percent of Americans hope businesses will drive social and environmental change in the absence of government regulation); *see also* "Making the Most of Corporate Social Responsibility" by Tracey Keys, Thomas W. Malnight, and Kees van der Graaf, McKinsey Quarterly (Dec. 2009), available at  https://www.mckinsey.com/featured-insights/leadership/making-the-most-of-corporate-social-responsibility (noting that "[i]ncreasingly, employees are choosing to work for organizations whose values resonate with their own.") and 2017 Comcast-NBCUniversal Corporate Social Responsibility Report, available at https://corporate.comcast.com/csr2017/suppliers-stir-up-fresh-perspectives (quoting Comcast's Chief Procurement Officer who stated that "[d]iversity within our supply chain gives our company a competitive edge, helps inspire innovation, and offers insights into the interests and needs of our customers. . . .").

[254] *See, e.g., supra* paras. 38-39.

37

**Add.37**

as cable operators continuously build and upgrade their distribution network. Cable service by its nature requires the laying of fiber or coaxial cable to every home, along with in most instances the deployment of equipment at the customer's premises. In contrast, the over-the-air delivery of broadcast radio and television service does not require the broadcaster to build and maintain the same type of distribution network or necessitate the regular purchase of equipment and material on a volume similar to cable. Moreover, the laying and maintenance of extensive cable networks requires the employment and contracting of far more labor than is required in the broadcast sector. Similarly, cable operators, unlike broadcasters, maintain a direct billing relationship with their customers, which may also offer the potential for more contracting opportunities – in the form of outsourced billing or customer service functions – than exist in the broadcast industry. Accordingly, we seek input on the feasibility and utility of imposing a cable procurement-type of regulation on the broadcast sector.

101.    *Develop a Model for Market-Based Tradeable Diversity Credits.* In reply comments submitted in the Commission's 2002 Biennial Review proceeding, a group of commenters, the Diversity and Competition Supporters (DCS), put forward a number of initiatives that it asserted would foster diversity, including the idea of tradeable "diversity credits" for the broadcast industry. Although the concept of diversity credits is not well-defined in the reply comments, the general idea appears to be that a system of "diversity credits" could be created that could be traded in a market-based system and redeemed by a station buyer to offset increased concentration that would result from a proposed transaction.[255] The DCS suggested that economists (presumably both at the Commission and beyond) could explore the concept and offered the idea of a tradeable diversity credit "in the hope that other parties will attempt to design a market-based Diversity Credit program."[256] The diversity credits proposal was put forth as a potential alternative to the use of the "voices tests" in the Commission's rules.[257] At the time, several of the Commission's structural media ownership rules included aspects that required that a minimum number of independent speakers or "voices" remain in a market in order for a transaction to be permitted consistent with those rules.[258]

102.    The idea of tradeable diversity credits was developed further in a 2004 proposal drafted by a member of the Transactional Transparency Subcommittee of the FCC Advisory Committee on Diversity in the Digital Age.[259] The 2004 Diversity Credits Proposal suggested that the Commission consider a concept of diversity credits that would be linked to broadcast licenses. As set forth in the 2004 Diversity Credits Proposal, the number of diversity credits attached to each license would be commensurate with the extent to which the licensee of the station was considered to be "socially and

---

[255] *See 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 10006-07, para. 332; *see also 2010 Quadrennial Review NPRM*, Supplemental Comments of the Diversity and Competition Supporters in Response to the Notice of Proposed Rulemaking at 75 (filed Apr. 3, 2012) (DCS Supplemental NPRM Comments); MMTC June 24, 2016, *Ex Parte* Letter at 7-8.

[256] *See 2002 Biennial Regulatory Review*, Reply Comments of the Diversity and Competition Supporters at 34-38 (filed Feb. 3, 2003) (DCS 2002 Biennial Review Reply Comments). *See also* DCS Supplemental NPRM Comments at 75-76; MMTC June 24, 2016, *Ex Parte* Letter at 7-8.

[257] *See* DCS Supplemental NPRM Comments at 75; MMTC June 24, 2016, *Ex Parte* Letter at 7.

[258] *See 2010/2014 Quadrennial Review Order on Reconsideration*, 32 FCC Rcd at 9824-31, 9834-36, paras. 49-65, 73-77 (eliminating the eight-voices test from the Local Television Ownership Rule and repealing the Radio/Television Cross-Ownership Rule, which limited ownership based on the number of media voices remaining in a local market post-merger).

[259] Proposal on Diversity Credits, dated May 22, 2004 (drafted by David Honig as a member of the Transactional Transparency Subcommittee of the FCC Advisory Committee on Diversity in the Digital Age) available at https://www.fcc.gov/DiversityFAC/040614/DiversityCredits-whitepaper.doc (last visited Dec. 7, 2018) (2004 Diversity Credits Proposal). The 2004 Diversity Credits Proposal was never adopted by the FCC Advisory Committee on Diversity in the Digital Age.

economically disadvantaged."[260]  The 2004 Diversity Credits Proposal suggested that when a transaction occurred that was deemed to promote diversity (*e.g.*, the breakup of a local radio ownership cluster, or the sale of a station to a socially and economically disadvantaged business), the Commission would award the seller additional diversity credits "commensurate with the extent to which the transaction promotes diversity."[261]  Similarly, the 2004 Diversity Credits Proposal suggested that when a transaction reduced diversity (perhaps by creating an ownership combination or expanding an ownership cluster), the Commission would require the submission of a certain number of diversity credits from the buyer, commensurate with the extent to the which the transaction reduced diversity.[262]  According to the 2004 Diversity Credits Proposal, when the number of diversity credits held by a company seeking approval of a transaction was insufficient to permit the company to gain approval, the buyer would need to purchase diversity credits on a secondary market from third-party companies with an excess of such credits.[263]  Beyond providing very general examples, however, the 2004 Diversity Credits Proposal did not define what it meant by either "promoting" or "reducing" diversity, or how the impact of a particular transaction would be measured and quantified.

103.     In the 2010/2014 Quadrennial Review proceeding, MMTC continued the advocacy for a concept of tradeable diversity credits.  Specifically, MMTC asked the Commission to explore the feasibility of a diversity credit program and urged that it issue a Notice of Inquiry to commence a rulemaking proceeding to explore the issue.[264]  Consistent with the Commission's commitment in the *2010/2014 Quadrennial Review Order*, we hereby seek comment on whether and how the Commission should create a system of tradeable diversity credits that would seek to foster ownership diversity in the broadcast industry.

104.     As an initial matter, we seek input on the Commission's authority to adopt regulations establishing the framework of a tradeable diversity credit system in the context of our structural broadcast ownership rules or otherwise.  The Communications Act of 1934, as amended, does not contain explicit authority for the creation of, or reliance on, such a program.  When DCS first presented the diversity credits concept, it asserted that the Commission had authority under sections 303(f), (g), and (r) of the Communications Act to implement such a program.[265]  We seek comment on the applicability of these Communications Act sections to a tradeable diversity credit scheme.

105.     In addition, assuming the Commission were to find that it has authority for such a system, we seek comment on the feasibility of implementing a scheme that builds on determinations about social/economic disadvantage in light of the Commission's previous concerns about programs dependent on such determinations.[266]  As proposed, the allocation of diversity credits was to be based on the extent to which the licensee of the station was considered to be "socially and economically disadvantaged."[267]  How should such a term be defined?  The 2004 Diversity Credits Proposal stated that "[m]inority status could be a factor in qualifying as an SDB if the Commission finds through rulemaking, that minorities, under certain conditions, are socially and economically disadvantaged in the broadcasting industry because of their race."[268]  The 2004 Diversity Credits Proposal does not, however, provide any guidance about when an individual might or might not qualify on the basis of race.  To the extent that this

---

[260] *See* 2004 Diversity Credits Proposal at 2.

[261] *Id.*

[262] *Id.*

[263] *Id.*

[264] *See* MMTC June 24, 2016, *Ex Parte* Letter at 8.

[265] *See* DCS 2002 Biennial Review Reply Comments at 37.

[266] *See 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 9961-62, 9987-99, paras. 236, 297-312.

[267] 2004 Diversity Credits Proposal at 2.

[268] *Id.* at 3.

definition would rely on the socially disadvantaged business (SDB) definition employed by the Small Business Administration (SBA),[269] we note that the Commission has previously declined to employ that definition in the media ownership context.[270]  Specifically, in the *2010/2014 Quadrennial Review Order*, the Commission declined to adopt an SDB eligibility standard that would have recognized the race and ethnicity of applicants, or any other race- or gender-conscious measure.  Based on the Commission's careful review of the extensive record developed in that proceeding, it found that the evidence did not establish a basis for race-conscious remedies and concluded that such measures were not likely to withstand review under the equal protection component of the Due Process Clause of the Constitution.[271]  Given the Commission's previous finding that it lacks the evidence that courts have accepted in other contexts to satisfy the heightened constitutional scrutiny accorded to race- or gender-based classifications,[272] can we adopt a diversity credit program that considers race or gender, or other protected classes, in a manner that could withstand equal protection review?  Commenters advocating for such a program should explain in detail, based on relevant judicial precedent and existing empirical data, how circumstances have changed such that the Commission could now overcome the significant evidentiary issues that it previously found would need to be resolved in order to adopt race- or gender-based policies that could withstand heightened judicial scrutiny.[273]

106.    If the description of the socially and economically disadvantaged concept in the 2004 Diversity Credits Proposal was a precursor to the Overcoming Disadvantages Preference (ODP) concept that MMTC has advanced in subsequent Commission rulemaking proceedings, we note that the Commission previously has assessed the concept of an ODP and articulated its concern that the agency lacks the resources to conduct the individualized reviews recommended as a central component of implementing ODP.[274]  We have similar concerns about the administrative and practical challenges of developing, implementing, and applying a diversity credit program.  The 2004 Diversity Credits Proposal suggested that the diversity credit program rely on ascribing a number of diversity credits to each broadcast license or possibly each licensee.[275]  Who would make that allocation of diversity credits, and on what criteria would the Commission or other arbiter determine the number of credits to be awarded to each station or licensee?

107.    We also note that the design of such a program raises some potentially complicated definitional issues.  How would the Commission define "diversity" in this context?  Previously, the Commission has described several types of diversity, focusing on viewpoint diversity as the relevant

---

[269] For example, the Small Business Administration administers the 8(a) Business Development Program "to assist eligible small disadvantaged business concerns."  *See* 13 CFR §§ 124.1-124.4, 124.101-112.  To qualify for the program, a small business must be unconditionally owned and controlled by one or more socially and economically disadvantaged individuals.  13 CFR § 124.101; *see also id.* at §§ 124.102–124.112 (discussing other eligibility requirements for the program).  Under the program, African Americans, Hispanic Americans, Asian Pacific Americans, Subcontinent Pacific Americans, and Native Americans are presumed to qualify, and other individuals can qualify if they can show by a preponderance of the evidence that they are disadvantaged.  13 CFR §§ 124.103(b)-(c), 124.104(a).

[270] *See 2010/2014 Quadrennial Review Order,* 31 FCC Rcd at 998, para. 297.

[271] *See id.* at 9961-62, 9987-99, paras. 236, 297-312.

[272] *See id.*

[273] *See 2010/2014 Quadrennial Review Order*, 31 FCC Rcd at 9988-10001, paras. 300-316.

[274] *See 2010/2014 Quadrennial Review FNPRM*, 29 FCC Rcd at 4507, para. 300; *see also In the Matter of Updating Part 1 Competitive Bidding Rules,* Report and Order, Order on Reconsideration of the First Report and Order, Third Order on Reconsideration of the Second Report and Order, Third Report and Order, 30 FCC Rcd 7493, 7551, para. 138 (2015) (stating concerns about the complexity of implementing such a preference).

[275] *See* 2004 Diversity Credits Proposal at 2.

touchstone for purposes of the structural media ownership rules.[276]  Would a tradeable diversity credit system have as its goal fostering viewpoint diversity, ownership diversity, both of these forms of diversity, or some other type of diversity?

108.    Once the notion of diversity is established, how would parties – or the Commission – determine, qualitatively or quantitatively, whether a transaction was deemed to promote diversity or harm diversity?  And how would the degree to which the transaction harms or benefits diversity be quantified, such that the number of credits awarded for, or required before approval of, such a transaction could be determined?  For example, would the impact on diversity vary depending on the size of the market, the number of operators therein, or the characteristics of the stations involved in the transaction?  Would the diversity credit program and the requirement that parties remit to the Commission a certain number of diversity credits in order to receive approval of a transaction replace the Commission's existing structural broadcast ownership rules, which are based primarily on other policy goals, such as competition and localism?  Or would compliance with the diversity credit regime be an additional requirement before a transaction were permitted?

109.    Recognizing that the diversity credits are intended to be used as a form of currency in the broadcast market, how could the Commission effectively test such a scheme to ensure it would not lead to any unintended consequences?  Developing and implementing a system that ensures that the award of diversity credits leads to the desired result – increasing diverse ownership in the broadcast market – rather than inadvertently skewing the market towards an unintended outcome, including greater concentration or loss of localism and viewpoint diversity, would seem to be a particular challenge.   We seek comment on how to address these issues.

110.    Finally, we seek comment on the benefits and costs of adopting a diversity credits scheme.  We encourage commenters to include in their evaluations the types of analyses called for in the questions posed in earlier sections of the instant *NPRM* about benefit-cost analysis.[277]

111.    *Tipping Point Formula and Source Diversity Formula*.   As noted above, the Commission committed in the *2010/2014 Quadrennial Review Order* to consider further two formulas that arose in previous proceedings and could ostensibly be used to establish media ownership limits while also promoting broadcast ownership diversity.  Both formulas were first presented approximately fifteen years ago and have had few, if any, refinements in the intervening years.  In 2002, MMTC proposed a "tipping point formula" for use in the local radio market in lieu of the "flagging" approach that was used at the time to identify potential radio transactions that might raise diversity and competition concerns and has since been abandoned.[278]  And in 2003, the DCS proposed a "source diversity formula" for use in the

---

[276] *See 2002 Biennial Review Order*, 18 FCC Record at 13627-37, paras. 18-52 (analyzing five types of diversity within the context of media ownership: viewpoint, outlet, program, source, and minority and female ownership diversity).

[277] *See, e.g., supra* paras. 39-40.

[278] *See Rules and Policies Concerning Multiple Ownership of Radio Broadcast Stations in Local Markets and Definition of Radio Markets,* Notice of Proposed Rulemaking and Further Notice of Proposed Rulemaking, Reply Comments of the Minority Media and Telecommunications Council at 22-24 (filed May 8, 2002) (2002 MMTC Reply Comments).  In August 1998, the Commission began "flagging" public notices of radio station transactions that, based on an initial analysis by the staff, proposed a level of local radio concentration that implicated the Commission's public interest concern for maintaining diversity and competition.  *See also 2002 Biennial Review Order*, 18 FCC Rcd at 13813, paras. 496-97.  Under this policy, the Commission flagged proposed transactions that would result in one entity controlling 50 percent or more of the advertising revenues in the relevant Arbitron radio market or two entities controlling 70 percent or more of the advertising revenues in that market.  *Id.*  Flagged transactions were then subject to a further competition analysis.  *Id.*  With the adoption of Arbitron markets as the basis for the radio market definition, the Commission chose to terminate the flagging policy.

broader media market.[279]  The latter formula seemed to be an attempt to quantify the benefit derived from increased viewpoint diversity.[280]

112.    Like the notion of tradeable diversity credits discussed above, both these formula proposals contain few details and raise a significant number of questions, which we seek to explore below.  As with the diversity credits concept, the Communications Act does not provide explicit statutory authority to adopt or apply either of these formulas.  Thus, we seek comment on possible sources of statutory authority for these proposals.  Moreover, because there has been little by way of update to the formulas since they were initially proposed we also seek input generally on the relevance of these formulas to today's marketplace.  Finally, the formulas also raise significant administrative and practical concerns that we discuss below and seek comment upon.

113.    *Tipping Point Formula.*  In 2002, MMTC proposed the "tipping point formula" as an alternative to the approach the Commission used at the time of flagging radio station transactions that, based on an initial analysis, would result in a level of local radio concentration that implicated public interest concerns for maintaining diversity and competition.[281]  MMTC's tipping point formula was based on the premise that "platforms . . . [should] not control so much advertising revenue that well run independents cannot survive or offer meaningful local service."[282]  MMTC states that its formula will show when "a market 'tips' in this manner."[283]  MMTC, however, did not define many of the terms contained in its proposal, such as "independents," "well run independents," or "meaningful local service."  The asserted goal of the formula is to assess how much "revenue" an "independent" would need (on average) to survive in a given market, with this number then being multiplied by the number of "independents" in that market.[284]  Given that the "flagging" approach in use at the time relied on advertising revenues, the term "revenue" in the proposed tipping point formula would appear to also refer to advertising revenue.[285]   By submitting its proposal, MMTC essentially suggested that the Commission should bar any transaction that would result in reducing the amount of revenue available to support independent operators in a market to a level below what could sustain those operators.  Stated differently, a broadcaster would not be permitted to acquire competing stations in a market if as a result the broadcaster would hold combined revenue so large as to leave insufficient revenue for the independents in the market.[286]  In its filing, MMTC provided the following variables as inputs for its formula, as well as the formula as shown below:

    MR: Market revenue.

    MR1: Amount of market revenue drawn by largest platform.

    MR2: Amount of market revenue drawn by second largest platform.

    IN: Number of independent stations in the market.

---

[279] DCS 2002 Biennial Review Reply Comments at 17-24.  Referring back to DCS's previous filings on the source diversity formula, MMTC subsequently requested that the Commission consider the feasibility of this formula.  *See* MMTC June 24, 2016, *Ex Parte* Letter at 6-7.

[280] DCS 2002 Biennial Review Reply Comments at 17-24.

[281] *See* 2002 MMTC Reply Comments at 22-24; *see also 2002 Biennial Review Order*, 18 FCC Rcd at 13813, paras. 496-97 (describing the Commission's past policy of "flagging" proposed radio transactions).

[282] 2002 MMTC Reply Comments at ii.

[283] *Id*.

[284] *Id*. at 22-24.

[285] *See id*. at 24 (noting before laying out the variables associated with the formula that "advertising revenue limits that promote diversity would involve these variables and coefficients").

[286] *See id*. at 22-24.

SU: Minimum fixed cost for an independent station to stay on the air.

VFSU: Variability Factor for Survival Operations, reflecting the average amount of revenues per independent station that must be available in the market, collectively, to take account of variations among the independent stations and thereby ensure that well-run weak independents stay on the air.

LS: Minimum additional cost, beyond SU, for an independent station to offer a meaningful local service.

VFLS: Variability Factor for Local Service reflecting the average amount of revenue per independent station that must be available in the market, collectively, to take account of variations among the independent stations and thereby ensure that well-run weak independents remain viable.

LSTP: Local Service Tipping Point, i.e., the point at which, if the top two station groups control more revenue, independents will begin to lose their ability to offer meaningful local service.

SUTP: Survival Tipping Point, i.e., the point at which, if the top two station groups control more revenue, independents will be unable to meet their fixed operating costs and must, therefore, sell out or go dark.[287]

Based on these inputs, according to MMTC, the Local Service Tipping Point is the point at which: IN (SU + VFSU + LS + VFLS) = MR – (MR1 + MR2), and the Survival Tipping point is the point at which: IN (SU + VFSU) = MR – (MR1 + MR2).[288]

114.    After presenting these variables, MMTC noted that "[t]he cost of maintaining a station on the air varies somewhat depending on local market factors."[289] According to MMTC, such regional or local differences "can be designed into a formula by indexing a market's cost of living relative to the national average."[290] MMTC stated that such an issue could be addressed in a negotiated rulemaking involving all interested parties.[291]

115.    We seek comment on the various terms used in the formula. For example, how should the terms "independent" and "platform" be defined in the context of today's radio marketplace? How should the terms "well-run independent" and "well-run weak independent" be defined? What objective criteria can we apply to distinguish between a "well-run independent" and a "well-run weak independent," so as to ensure that use of a tipping point formula does not prop up stations that are either poorly managed or simply not airing programming that responds to the community's interests? What is meant by "meaningful local service"? We also seek comment on whether any determinations about how well a station is run or the concept of a "meaningful local service" might implicate First Amendment concerns.

116.    The tipping point formula seems to rely on advertising revenues. If so, how would the Commission and potential applicants obtain reliable advertising revenue for all radio stations? If another type of revenue is more appropriate, what type of data would the Commission rely on to obtain information about this other form of revenue? How should the concept of "fixed operating costs" be quantified? How should the Commission account for local and regional cost differences?

---

[287] *Id*. at 24-25.

[288] *Id*.

[289] *Id*. at 24, n.38.

[290] *Id*.

[291] *Id*.

**Add.43**

117.     Finally, we seek comment on what seems to be MMTC's fundamental premise behind the tipping point formula, namely, that retaining independents (however that term is defined) in a market maintains diversity (however that term is defined).[292]  We also seek comment on the benefits and costs of adopting a tipping point formula.  We encourage commenters to include in their evaluations the types of analyses called for in the questions posed in earlier sections of the instant *NPRM* about benefit-cost analysis.[293]  We also invite commenters to address any other issues that they believe are raised by the tipping point formula proposal.

118.     *Source Diversity Formula*.  In a February 2003 filing, the DCS stated that it was offering the source diversity formula in response to then-Chairman Powell's challenge to "give a reward to anyone who derived a formula that provides an 'HHI for Diversity.'"[294]  Although MMTC requested most recently in 2016 that the formula be considered by the Commission, there has been little refinement or development of the DCS's initial proposal.[295]  Based on the DCS's 2003 filing, the source diversity formula appears to seek to measure the level of consumer welfare derived from viewpoint diversity in the broadcast market.[296]  Unlike the tipping point formula, the source diversity formula does not appear to be limited to the radio sector.  The DCS had suggested that the source diversity formula could be used as a "thermometer" to determine whether "a national or local market manifest[s] strong diversity, moderate diversity, or slight diversity."[297]  The DCS proposed that the Commission conduct a negotiated rulemaking to determine what significance to accord to various "temperature readings" on the HHI for Diversity thermometer.[298]  For example, what temperatures would reflect "poor health,"[299] versus measurements indicative of strong health.  While not clearly stated, it appears that the DCS was suggesting the source diversity formula could be used in lieu of a "number of voices" test.[300]

119.     DCS depicted the source diversity formula as shown below with the variables presented as follows:  X = consumer welfare derived from viewpoint diversity; p = a program consumed from a particular source; g = the number of programs from a particular source that are available for consumption; C = the number of consumers consuming a particular program; T = consumers' mean media consumption time devoted to the absorption of viewpoints in a particular program; Z = consumers' mean attentiveness to a particular program; m = a source (including all outlets owned by that source); and n =

---

[292] *See generally* MMTC Reply Comments.

[293] *See, e.g., supra* paras. 38-39.

[294] 2002 DCS Biennial Review Reply Comments at 17.  As part of its *2002 Biennial Regulatory Review*, the Commission developed a "Diversity Index" as a tool intended to measure the availability of outlets that contribute to viewpoint diversity in local media markets.  *2002 Biennial Review Order*, 18 FCC Rcd at 13775-90, paras. 391-431.  The *Prometheus I* court found several flaws with the Commission's creation of the index and remanded it to the Commission for further consideration.  *Prometheus Radio Project v. FCC*, 373 F.3d 372, 403-09 (3rd Cir. 2004).  The Commission subsequently declined to revise and reinstate the index as a means of measuring market concentration, stating that "as the Commission has learned from experience, there are too many qualitative and quantitative variables in evaluating different markets and combinations to reduce the task at hand to a precise mathematical formula."  *2006 Quadrennial Review Order*, 23 FCC Rcd at 2052-53, para. 73.

[295] *See* MMTC June 24, 2016, *Ex Parte* Letter at 6-7.

[296] 2002 DCS Biennial Review Reply Comments at 18-20.

[297] *Id*. at 23.

[298] *Id*.

[299] *Id*.  DCS noted, however, that "[s]ecuring consensus on the temperature levels that reflect poor health will require skill and patience."  *Id*. at 23, n. 38.

[300] *See id*. at 23-24 (stating that "[s]uch formulas, geared to market realities and consumer behavior, are far preferable to guesswork in establishing the number of voices needed to maximize consumer welfare.").

number of differently owned sources offering programs which are consumed.[301]  As proposed, the formula reads as:[302]

$$X = n^{1 + (\frac{1}{n})} \sum_{m=1}^{n} \left( \sum_{p=1}^{g} CTZ \right)$$

When it presented the formula, the DCS acknowledged that the formula was imperfect and would need testing and validation before deployment.[303]

120.     The DCS's formula raises several fundamental questions.  Is the formula sufficiently comprehensive for commenters to gauge without additional explanation whether it can provide a meaningful assessment of consumer welfare and viewpoint diversity in a particular market?  Are there terms used in the formula inputs that require definition prior to any assessment of the formula's utility?  For example, do terms such as "source" and "program" need to be defined before analyzing the formula?  Are there other terms that need defining?  How will the formula inputs be obtained?  For example, we seek comment on how to capture inputs such as "consumers' mean attentiveness to a particular program" and "consumers' mean media consumption time devoted to the absorption of viewpoints in a particular program."  How should the Commission determine the level of diversity to ascribe to various formula results (e.g., "strong diversity," "moderate diversity," or "slight diversity")?

121.     Finally, we seek comment on the benefits and costs of adopting a source diversity formula.  We encourage commenters to include in their evaluations the types of analyses called for in the questions posed in earlier sections of the instant *NPRM* about benefit-cost analysis.[304]  We also invite commenters to address any other issues that they believe are raised by the source diversity proposal.

## V.     PROCEDURAL MATTERS

122.     *Ex Parte Rules—Permit-But-Disclose.*  The proceeding that this Notice of Proposed Rulemaking initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[305]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are

---

[301] *Id*. at 21.

[302] *Id*.

[303] *Id*.  In 2012, the DCS offered up this formula again, without offering any further explanation about the formula or addressing the significant concerns it itself had raised.  DCS Supplemental NPRM Comments at 70-71.  In its 2016 letter to then-Chairman Wheeler, MMTC asked that the Commission as part of its 2018 Quadrennial Review proceeding issue an NOI seeking public input on the formula, directing readers back to the DCS's 2012 filing.  *See* MMTC June 24, 2016, *Ex Parte* Letter at 7.

[304] *See, e.g., supra* paras. 38-39.

[305] 47 CFR §§ 1.1200 *et seq*.

**Add.45**

deemed to be written *ex parte* presentations and must be filed consistent with Section 1.1206(b), 47 CFR §1.1206(b).  In proceedings governed by Section 1.49(f), 47 CFR § 1.49(f), or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the Commission's Electronic Comment Filing System (ECFS) available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

123.    *Filing Requirements—Comments and Replies.*  Pursuant to Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document.  Comments may be filed using ECFS.  *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

☐ Commenting parties may file comments in response to this Notice in MB Docket No. 18-349; interested parties are not required to file duplicate copies in the additional dockets listed in the caption of this notice.

☐ Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  http://apps.fcc.gov/ecfs/.

☐ Paper Filers:  Parties who choose to file by paper must file an original and one copy of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.

☐ Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

    ☐ All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, D.C. 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of <u>before</u> entering the building.

    ☐ Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.

    ☐ U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington, D.C. 20554.

124.    *Initial Regulatory Flexibility Act Analysis*—The Regulatory Flexibility Act of 1980, as amended (RFA), requires that a regulatory flexibility analysis be prepared for notice and comment rulemaking proceedings, unless the agency certifies that "the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities."[306]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[307]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3)

---

[306] 5 U.S.C. § 603.

[307] *Id*. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632).  Pursuant to the RFA, the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  5 U.S.C. § 601(3).

satisfies any additional criteria established by the Small Business Administration (SBA).[308]

125.    With respect to this Notice of Proposed Rulemaking, an Initial Regulatory Flexibility Analysis (IRFA) under the RFA is contained in the Appendix.  Written public comments are requested on the IFRA and must be filed in accordance with the same filing deadlines as comments on this Notice of Proposed Rulemaking, with a distinct heading designating them as responses to the IRFA.  In addition, a copy of this Notice of Proposed Rulemaking and the IRFA will be sent to the Chief Counsel for Advocacy of the SBA and will be published in the Federal Register.

126.    *Paperwork Reduction Act*—This document seeks comment on whether the Commission should adopt new or modified information collection requirements.  The Commission, as part of its continuing effort to reduce paperwork burdens and pursuant to the Paperwork Reduction Act of 1995, Public Law 104-13, invites the general public and the Office of Management and Budget (OMB) to comment on these information collection requirements.  In addition, pursuant to the Small Business Paperwork Relief Act of 2002, Public Law 107-198, *see* 44 U.S.C. § 3506(c)(4), we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.

127.    *People with Disabilities*—To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer and Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (tty).

128.    *Additional Information*—For additional information on this proceeding, please contact Brendan Holland of the Media Bureau, Industry Analysis Division, Brendan.Holland@fcc.gov, (202) 418-2757.

## VI.    ORDERING CLAUSES

129.    Accordingly, **IT IS ORDERED** that, pursuant to the authority contained in Sections 1, 2(a), 4(i), 257, 303, 307, 309, 310, and 403 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 257, 303, 307, 309, 310, and 403, and Section 202(h) of the Telecommunications Act of 1996, this Notice of Proposed Rulemaking **IS ADOPTED**.

130.    **IT IS FURTHER ORDERED** that, pursuant to applicable procedures set forth in Sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments on the Notice of Proposed Rulemaking in MB Docket No. 18-349 on or before sixty (60) days after publication in the *Federal Register* and reply comments on or before ninety (90) days after publication in the *Federal Register*.

131.    **IT IS FURTHER ORDERED** that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, **SHALL SEND** a copy of this Notice, including the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

---

[308] 15 U.S.C. § 632.

Federal Communications Commission                                    FCC 18-179

## APPENDIX

### Initial Regulatory Flexibility Act Analysis

1.        As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this Initial Regulatory Flexibility Act Analysis (IRFA) of the possible significant economic impact on small entities of the policies and rules proposed in this *Notice of Proposed Rulemaking* (NPRM).  The Commission requests written public comments on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments specified in the NPRM.  The Commission will send a copy of the NPRM, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the NPRM and IRFA (or summaries thereof) will be published in the Federal Register.[3]

### A.    Need for, and Objectives of, the Proposed Rules

2.        This NPRM begins an examination of the Commission's media ownership rules and possible changes to these rules.  As discussed in the NPRM, the Commission is required by statute to review its media ownership rules every four years to determine whether they "are necessary in the public interest as the result of competition."[4]  Consistent with the Communications Act, the Commission must examine its media ownership rules and consider whether they continue to serve our public interest goals of competition, viewpoint diversity and localism, or whether they should be modified or eliminated.  Specifically, the NPRM examines the three remaining media ownership rules, the Local Radio Ownership Rule, the Local Television Ownership Rule and the Dual Network Rule.  In addition, the NPRM seeks comment on several proposals that were advanced in previous rule makings and which the Commission indicated it would examine further in the context of this review of its structural ownership rules.  These proposals, to extend cable procurement requirements to broadcasters, develop a model for market-based, tradeable "diversity credits" to serve as an alternative method for adopting ownership limits, and adopt formulas aimed at creating media ownership limits that promote diversity, are presented by their proponents as initiatives that could further the Commission's diversity goal.  The Commission anticipates that these initiatives, if ultimately adopted, might benefit small entities.

### B.    Legal Basis

3.        The proposed action is authorized under Sections 1, 2(a), 4(i), 303, 307, 309, and 310 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152(a), 154(i), 303, 307, 309, and 310, and Section 202(h) of the Telecommunications Act of 1996.

---

[1] 5 U.S.C. § 603.  The RFA, 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).  The SBREFA was enacted as Title II of the Contract with America Advancement Act of 1996 (CWAAA).

[2] 5 U.S.C. § 603(a).

[3] *Id*.

[4] Section 202(h) of the 1996 Act, 47 U.S.C. § 303 note.  Section 202(h) of the 1996 Act further requires the Commission to "repeal or modify any regulation it determines to be no longer in the public interest."

48

C.    **Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply**

4.        The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rule revisions, if adopted.[5]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[6]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act (SBA).[7]  A small business concern is one which:  (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[8]  Below, we provide a description of such small entities, as well as an estimate of the number of such small entities, where feasible.

5.        *Television Broadcasting*.  This U.S. Economic Census category "comprises establishments primarily engaged in broadcasting images together with sound."[9]  These establishments operate television broadcast studios and facilities for the programming and transmission of programs to the public.[10]  These establishments also produce or transmit visual programming to affiliated broadcast television stations, which in turn broadcast the programs to the public on a predetermined schedule. Programming may originate in their own studio, from an affiliated network, or from external sources. The SBA has created the following small business size standard for such businesses: those having $38.5 million or less in annual receipts.[11]  The 2012 Economic Census reports that 751 firms in this category operated in that year.  Of that number, 656 had annual receipts of $25 million or less, 25 had annual receipts between $25 million and $49,999,999 and 70 had annual receipts of $50 million or more.[12] Based on this data, we estimate that the majority of commercial television broadcast stations are small entities under the applicable size standard.

---

[5] 5 U.S.C. § 603(b)(3).

[6] 5 U.S.C. § 601(6); *see infra* note 7 (explaining the definition of "small business" under 5 U.S.C. § 601(3)); *see* 5 U.S.C. § 601(4) (defining "small organization" as "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register"); 5 U.S.C. § 601(5) (defining "small governmental jurisdiction" as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register").

[7] 5 U.S.C. § 601(3) (incorporating by reference the definition of "small business concern" in 15 U.S.C. § 632(a)(1)). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id.*

[8] 15 U.S.C. § 632(a)(1)-(2)(A).

[9] U.S. Census Bureau, 2017 NAICS Definitions, "515120 Television Broadcasting," http://www.census.gov./cgi-bin/sssd/naics/naicsrch.

[10] *Id.*

[11] 13 C.F.R. § 121.201; 2012 NAICS code 515120.

[12] U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515120 Television Broadcasting). https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table.

6.      Additionally, the Commission has estimated the number of licensed commercial television stations to be 1,349.[13]  Of this total, 1,248 stations (or about 92.5 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) in November 2018, and therefore these stations qualify as small entities under the SBA definition.

7.      *Radio Broadcasting.*  This U.S. Economic Census category "comprises establishments primarily engaged in broadcasting aural programs by radio to the public."[14]  Programming may originate in their own studio, from an affiliated network, or from external sources.  The SBA has created the following small business size standard for such businesses: those having $38.5 million or less in annual receipts.[15]  Economic Census data for 2012 show that 2,849 firms in this category operated in that year.[16]  Of that number, 2,806 operated with annual receipts of less than $25 million per year, 17 with annual receipts between $25 million and $49,999,999 million and 26 with annual receipts of $50 million or more. [17]  Based on this data, we estimate that the majority of commercial radio broadcast stations were small under the applicable SBA size standard.

8.      Apart from the U.S. Economic Census, the Commission has estimated the number of licensed commercial AM radio stations to be 4,426 stations and the number of commercial FM radio stations to be 6,737, for a total number of 11,364.[18]  Of this total, 11,355 stations (or 99.9 percent) had revenues of $38.5 million or less, according to Commission staff review of the BIA Kelsey Inc. Media Access Pro Television Database (BIA) in November 2018, and therefore these stations qualify as small entities under the SBA definition.

9.      In assessing whether a business concern qualifies as small under the above definition, business (control) affiliations[19] must be included.  Our estimate, therefore, likely overstates the number of small entities that might be affected by our action because the revenue figure on which it is based does not include or aggregate revenues from affiliated companies.  In addition, an element of the definition of "small business" is that the entity not be dominant in its field of operation.  We are unable at this time to define or quantify the criteria that would establish whether a specific radio or television station is dominant in its field of operation.  Accordingly, the estimate of small businesses to which the proposed rules may apply does not exclude any radio or television station from the definition of small business on this basis and is therefore possibly over-inclusive.

---

[13] Broadcast Station Totals as of September 30, 2018, Press Release (MB Oct. 3, 2018) (September 30, 2018 Broadcast Station Totals),available at https://www.fcc.gov/document/broadcast-station-totals-september-30-2018. While the Commission also reports the number of licensed noncommercial educational (NCE) broadcast stations, it does not compile and does not have access to information on the revenue of NCE stations that would permit it to determine how many such stations would qualify as small entities.  Further, the Local Radio Ownership Rule, the Local Television Ownership Rule and the Dual Network Rule apply only to combinations of commercial entities.

[14] U.S. Census Bureau, 2017 NAICS Definitions, "515112 Radio Stations," http://www.census.gov/cgi-bin/sssd/naics/naicsrch.

[15] 13 C.F.R. § 121.201; 2017 NAICS code 515112.

[16] U.S. Census Bureau, U.S. Census Bureau, Table No. EC1251SSSZ4, *Information: Subject Series - Establishment and Firm Size: Receipts Size of Firms for the United States: 2012* (515112 Radio Stations) https://factfinder.census.gov/bkmk/table/1.0/en/ECN/2012_US/51SSSZ4//naics~515112|.

[17] *Id.*

[18] September 30, 2018 Broadcast Station Totals.

[19] "[Business concerns] are affiliates of each other when one [concern] controls or has the power to control the other, or a third party or parties controls or has to power to control both."  13 CFR § 121.103(a)(1).

Federal Communications Commission                    FCC 18-179

**D.    Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

10.    The proposals, if ultimately adopted, would require modification of several FCC forms and their instructions:  (1) FCC Form 301, Application for Construction Permit for Commercial Broadcast Station; (2) FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License; and (3) FCC Form 315, Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License.  The Commission also would modify, as necessary, other forms that include in their instructions the media ownership rules or citations to media ownership proceedings, including Form 303-S, Application for Renewal License for AM, FM, TV, Translator, or LPTV Station and Form 323, Ownership Report for Commercial Broadcast Station.  The impact of these changes will be the same on all entities, and we do not anticipate that compliance will require the expenditure of any additional resources or place additional burdens on small businesses.

**E.    Steps Taken to Minimize Significant Economic Impact on Small Entities, and Significant Alternatives Considered**

11.    The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[20]

12.    The NPRM begins a statutorily mandated examination of whether three remaining media ownership rules remain in the public interest as a result of competition and promote the Commission's longstanding policy goals of competition, viewpoint diversity and localism.  The NPRM acknowledges new technologies and changed marketplace conditions that affect whether the rules remain in the public interest in light of competition and the need to allow broadcasters, including small entities, to achieve the economies of scale and scope necessary to continue to compete in a changed marketplace.  The NPRM considers measures designed to minimize the economic impact of any changes to these rules on firms generally, as well as initiatives designed to promote broadcast ownership opportunities among a diverse group of owners, including small entities.  The NPRM also invites comment on the effects of any rule changes on different types of broadcasters (e.g., independent or network-affiliated), the benefits and costs associated with any proposals, and any potential to have significant impact on small entities.

13.    The NPRM proposes no new reporting requirements, performance standards or other compliance obligations, although, as discussed above, it may modify, as necessary, certain existing reporting forms should it adopt any changes to its media ownership rules.  Should the Commission ultimately adopt changes to its media ownership rules that could increase requirements or compliance burdens for small entities, it will determine whether possible exemptions, waiver opportunities, extended compliance deadlines or other measures would mitigate any potential impact on small entities.

**F.    Federal Rules that May Duplicate, Overlap, or Conflict with the Proposed Rule**

14.    None.

---

[20] *See* 5 U.S.C. § 603(c).

51

**Add.51**

Federal Communications Commission                           FCC 18-179

STATEMENT OF
CHAIRMAN AJIT PAI

Re:     *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996* (MB Docket No. 18-349)

Many years ago, Congress required the FCC to conduct a review of certain media ownership rules every four years. Today, we kick off the 2018 quadrennial review of our Local Radio Ownership Rule, Local Television Ownership Rule, and Dual Network Rule. As Congress instructed, we're seeking to determine whether these rules remain "necessary in the public interest as the result of competition."

Specifically, we're teeing up a broad range of questions about these rules. We want to know whether, given the current state of the media marketplace, we should retain, modify, or eliminate any of them. We're keeping an open mind as to what, if anything, should change, and we hope to develop a robust record to guide us on the best path forward.

Our endpoints may be unclear right now, but the end goal is not: Our rules must keep pace with the modern media marketplace.

The reforms that this Commission adopted last year to do just that are already having a positive impact. For example, in 2017, we eliminated the outdated newspaper-radio cross-ownership rule. Thanks to that reform, the owner of Colorado's *Grand Junction Daily Sentinel* was recently able to purchase a radio station group in Grand Junction. I recently met Jay Seaton, who runs the *Daily Sentinel*. He told me that this transaction will help him disseminate news across more formats and appeal more to advertisers (revenue from which can be poured back into the business). As he put it, ending the cross-ownership ban was "fifteen years overdue." And if anyone doubts the positive impact it makes in small markets in particular, "come out here and try running a newspaper sometime. It's a real struggle."

Additionally, consistent with the Commission's commitment in the 2010/2014 quadrennial review order, we're seeking comment on several diversity-related proposals that were offered in the record of that proceeding.

Given that this Notice doesn't include any tentative conclusions, I'm disappointed that we were unable to secure a unanimous vote for it. But unfortunately, our dissenting colleague requested edits that did not comply with the law. Specifically, we were urged to delete any discussion of the Dual Network Rule from the Notice. But the Dual Network Rule is one of our media ownership rules that we are required by statute to review every four years. Whatever one's opinion of it, refusing to include it in our quadrennial review would have violated the law. As a result, a request to remove it from the Notice doesn't constitute a good-faith attempt to reach consensus but rather gives the appearance of looking for an excuse to dissent for political reasons.

As always, I'd like to thank the hard-working staff who worked on this item. From the Media Bureau: Ty Bream, Michelle Carey, Lyle Elder, Chad Guo, Brendan Holland, Tom Horan, Radhika Karmarkar, Julie Salovaara, Julie Saulnier, Holly Saurer, and Sarah Whitesell. And from the Office of General Counsel: Bill Dever, Dave Konczal, Jake Lewis, Bill Richardson, Bill Scher, and Royce Sherlock. Your efforts are much appreciated.

**Add.52**

Federal Communications Commission                    FCC 18-179

STATEMENT OF
**COMMISSIONER MICHAEL O'RIELLY**

Re:    *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996* (MB Docket No. 18-349)

The item before us is a balanced effort to comply with our statutory obligation – itself the result of a bipartisan compromise – to review whether or what type of limitations should govern media ownership. I realize that some outside parties – and perhaps some internally – would prefer that we abdicate this responsibility, especially given the extensive litigation history and inevitable challenges that will eventually result. Others seem to cling to a vision of the media industry frozen in time in the early 1950s that has since been eviscerated by market developments and technological innovation. Despite these views, we are obligated under federal law to conduct this work.

From my perspective, this entire endeavor is an exciting opportunity, and I wholeheartedly welcome the beginning of our 2018 Quadrennial Review, even as we sneak it in just under deadline. In fact, everyone should embrace this effort because it is a chance to reformulate our media ownership rules to reflect the current marketplace. No one – including the Third Circuit Court of Appeals – should support maintaining rules that are outdated or restrict the ability of programming outlets to reasonably compete both domestically or globally. At its heart, this proceeding is about good government practices.

In reviewing the text, the document should be respected for what it does. While I would have endorsed more extensive relaxation of our rules and pushed the envelope further on our ultimate objective, I appreciate that parts of the previous draft that leaned a different way have been removed. That leaves a fairly benign document that appropriately tees up the relevant questions to allow for a meaningful comment process.

If I had one remaining concern, it's that the item still gives credence to the belief that certain audio or video offerings can be siloed into discrete segments. We must redefine and broaden the appropriate market definition to be consistent with consumer, advertising, and business realities. Contrast this Notice with the Competitive Marketplace Report (CMR), which has its own issues but correctly discusses and treats the audio and video markets each as a whole. The approach taken in the CMR, as well as other parts of the RAY BAUM'S Act of 2018, signal that Congress recognized the need to look holistically at the media marketplace, not in a piecemeal manner.

Substantively, I intend to pay specific attention, as this process continues, to how the Commission plans to reform our radio ownership rules. Despite substantial changes in the audio market, including increased competition for listeners and advertising dollars from satellite and Internet offerings, radio ownership rules have not undergone any significant changes since the 1990s. Proponents of keeping the current AM-FM subcaps have proffered underwhelming arguments. The debate has appropriately shifted to determining where to draw the line on the FM side, if at all, while permitting caps to be eliminated on the AM side.

Additionally, there is still more work to do to reform the television-related rules, as the Top-4 combination process is too susceptible to regulatory gamesmanship. We need to provide greater specificity or guidance, either via bright-line rules or presumptions, on which combinations are problematic and why. Depending on multiple variables, I tend to view a combination of the top station in a market and the number four station differently than a combination of the two largest stations.

Taken as whole, this item is the start, not the end, of yet another extensive quadrennial battle.

**Add.53**

Federal Communications Commission    FCC 18-179

STATEMENT OF
COMMISSIONER BRENDAN CARR

Re:    *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996* (MB Docket No. 18-349)

In this Quadrennial Review, we examine whether certain media ownership rules dating back to 1940 should be updated to reflect new technology and market conditions.  So as I was reading through this Notice, I started to wonder: What was the FCC doing in the early 1940s?  And I stumbled across a delightful book, *Commissioners of the FCC, 1927-1994*.  If it's not on your bookshelf already, maybe add it to your Christmas list or consider it as a stocking stuffer.

The Chairman of the FCC at the time was one James Lawrence Fly, who the book describes as a "lanky, six-feet, three-inch, begoggled Texan with sandy 'moth-eaten' hair."  I hope future historians are kinder and simply describe me as bald with a squirrel-eaten beard.  "He was said to be arrogant, offensive, hot-tempered, unfair, even ruthless, and to . . . love a bang-up fight."  "Under Fly's strong management and direction," the book goes on, "the Commission established a commanding place for itself.  According to some, his leadership was so strong that Fly was not merely the Chairman, he was the Commission."  The parallels are striking.  The book even describes Fly's fellow Commissioners as "being at swords' point with each other."  No parallel there, of course.

Fly was preoccupied with what he viewed as the dangerous radio duopoly—NBC and CBS—and the specter of newspapers buying up broadcast networks.  The result was a ban on long-term affiliation contracts with local stations and ownership of more than one station in a market.  And, along the way, Fly approved the first commercial operation of a TV station, to less controversy or fanfare.

Today, you hear less concern about radio monopolists or newspaper titans swallowing up the rest of media.  Things have changed.  We call news and entertainment "content" because it's no longer just TV or radio or magazines—content has been liberated from its medium.  So Congress got it right in the Telecom Act of 1996 when it required the Commission to ask in these quadrennial reviews whether our rules should change to keep up with the times.  After all, who in 1996 could have foreseen how online streaming would fundamentally disrupt the video and audio marketplace?

For instance, as today's Communications Marketplace Report notes, Netflix this year will spend more than $8 billion on content, a quarter of which is for original shows.  Amazon will spend $5 billion, Hulu: $3 billion.  Next year, Google is expected to earn $48 billion in ad revenue, including in competition with broadcasters for local ad dollars.  And Spotify and Pandora are increasingly competing for the ears of Americans whether we're at home or on the go.  The golden age of television—or the platinum age of content—is the direct result of choice.  The gatekeepers of the past are no longer gatekeepers.  Americans, using a broadband connection, can access any content, from any device, anywhere.

So I look forward to reviewing the record on how the Commission's broadcast ownership rules impact competition in the video and audio marketplace.  And I want to thank my colleagues as well for agreeing to add language that seeks additional comment on the relationship between the FCC's market definition and the one used in reviews by the Department of Justice.

Finally, I want to thank the Media Bureau for its work on this item.  It has my support.

**Add.54**

STATEMENT OF
COMMISSIONER JESSICA ROSENWORCEL
APPROVING IN PART, DISSENTING IN PART

Re:     *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules
        and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996* (MB
        Docket No. 18-349)

There was a time when we waited in the morning for the news to hit the front stoop in print and on paper. Then we gathered at night to bask in the glow of a single television screen for the evening news. Gone are the days. The world has changed. Not one of us expects our news and information to be available in such a limited way. Every one of us now looks for content at any time, in any place, and on any screen handy.

This is exciting. But let's be honest, it's also challenging. The economic models that sustained traditional newsgathering have been forever changed by digitization—and while new platforms are multiplying, what is viral is not always verifiable. The questions that result are undeniably complicated. How do we advance journalism when algorithms are ascendant? How do we advance trust in real facts instead of dismissing them as fake news? How do we foster a marketplace where there is competition for ideas so that we have the information we all need to make decisions about our lives, our communities, and our country?

There are no simple answers. But I think there are principles from the past that can guide us in the future. For decades, the FCC has built its media policies around the simple idea that localism, competition, and diversity matter. These values have their origin in the Communications Act. They may not be trendy, but they have stood the test of time. They continue to support journalism and jobs. I think it is essential that these principles lead this agency as it determines what comes next. Let me explain why.

Localism matters. Local broadcasting remains the most trusted source of news. When the unthinkable occurs, it is also the preferred source for local emergency information. But this month the University of North Carolina School of Media and Journalism released a study detailing the stark decline of local news in rural areas. Newspapers have collapsed, and stations are increasingly owned by national companies with limited ties to the communities they serve. What is emerging are news deserts—areas of the country where national news dominates but local news is disappearing.

Competition matters. It is axiomatic that more owners in more markets can mean more ideas. It can mean more news. The converse is also true. Too much consolidation can reduce the number of voices, jobs, and the newsgathering that results.

And finally, diversity matters. What we see and hear over the air says so much about who we are as individuals, as communities, and as a nation. For too long, women and minorities have struggled to take the reins at media outlets nationwide. Progress in diversity is slow. But study a bit of history and you can only come to one conclusion—excessive consolidation is unlikely to increase diversity and more likely to make the ownership of outlets look less like the communities they serve.

Once again—localism, competition, and diversity. These are the guiding principles I believe this agency should use in its Quadrennial Review of media ownership rules. I believe it is possible to use these guideposts to develop thoughtful reform.

In some ways, I believe today's rulemaking meets this mark, including with its proposals to rethink limitations on the ownership of AM radio and the proposals to increase ownership diversity of broadcast entities deserve serious consideration.

However, in other aspects it falls short.  We suggest eliminating the dual network rule, clearing the way for the merger of our four largest broadcast networks.  We seek comment on a proposal allowing a single company to own an unlimited number of FM and AM radio stations in most communities in this country.  That could mean one company controls every radio station in the town where you live.  We also fail to acknowledge that many new media sources are dependent on broadband—and in too many communities in this country, especially in rural areas, high-speed service is too hard to find.

To the extent this rulemaking offers thoughtful reform, I approve.  But in other aspects, I dissent.  It fails to honestly assess the impact of too many changes we propose on the values of localism, competition, and diversity that have informed this agency's media policies in the past—and I believe should still inform our efforts in the future.

# PUBLIC NOTICE

**Federal Communications Commission**
45 L Street NE
Washington, DC 20554

News Media Information 202-418-0500
Internet: www.fcc.gov
TTY: 888-835-5322

---

**DA 21-657**
**Released:  June 4, 2021**

## MEDIA BUREAU SEEKS TO UPDATE THE RECORD IN THE 2018 QUADRENNIAL REGULATORY REVIEW

**MB Docket No. 18-349**

**Comment Date:  [30 days after publication in the Federal Register]**
**Reply Comment Date:  [60 days after publication in the Federal Register]**

With this Public Notice, the Media Bureau seeks to update the record in the 2018 Quadrennial Review proceeding, in which the Commission has sought comment, pursuant to its obligation under Section 202(h) of the Telecommunications Act of 1996, on whether its media ownership rules remain "necessary in the public interest as the result of competition."[1]  The prior comment and reply comment period in this proceeding closed two years ago.[2]  Recently, on April 1, 2021, the U.S. Supreme Court (Supreme Court or Court) issued an opinion in *FCC v. Prometheus Radio Project*,[3] reversing a decision of the U.S. Court of Appeals for the Third Circuit and restoring the Commission's media ownership rules as adopted in the combined 2010/2014 Quadrennial Review proceeding.[4]  Consistent with the Supreme Court's decision, in a separate order, the Media Bureau is reinstating the changes adopted in three orders that were part of, or related to, the 2010/2014 proceeding—the *Incubator Order* (adopted in 2018); the *Order on Reconsideration* (adopted in 2017); and the eligible entity definition from the *Second Report and Order* (adopted in 2016).[5]  Given the passage of time since the prior comment period ended, as well

---

[1] *See 2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket No. 18-349, Notice of Proposed Rulemaking, 33 FCC Rcd 12111 (2018) (*2018 Quadrennial Review NPRM*); Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, § 202(h) (1996) ("1996 Act"); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) ("Appropriations Act") (amending Sections 202(c) and 202(h) of the 1996 Act).

[2] Comments in response to the *2018 Quadrennial Review NPRM* were due by April 29, 2019, and reply comments were due by May 29, 2019.  *See Media Bureau Announces Notice of Proposed Rulemaking in the 2018 Quadrennial Regulatory Review Published in the Federal Register on February 28, 2019*, MB Docket No. 18-349, Public Notice, 34 FCC Rcd 1043 (MB 2019).

[3] *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150 (2021) (*FCC v. Prometheus*).

[4] *See Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019) (*Prometheus IV*).  This was the fourth in a series of decisions from the Third Circuit regarding the Commission's media ownership rules.  *See Prometheus Radio Project v. FCC*, 824 F.3d 33 (3d Cir. 2016) (*Prometheus III*); *Prometheus Radio Project v. FCC*, 652 F.3d 431 (3d Cir. 2011) (*Prometheus II*); *Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004) (*Prometheus I*).

[5] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, DA 21-656 (rel. June 4, 2021); *Rules and Policies to Promote New Entry and Ownership Diversity in the Broadcasting Services*, MB Docket No. 17-289, Report and Order, 33 FCC Rcd 7911 (2018) (*Incubator Order*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules*          (continued….)

as the subsequent litigation culminating with the Supreme Court's recent decision, we now seek further comment to update the record in the 2018 Quadrennial Review proceeding.

*Background.* Section 202(h) of the Telecommunications Act of 1996 requires the Commission to review its media ownership rules every four years to determine whether they remain "necessary in the public interest as the result of competition."[6] The Commission reviews these rules to ensure that they continue to serve the core policy goals of competition, localism, and diversity as intended.[7] On December 12, 2018, the Commission adopted a Notice of Proposed Rulemaking to initiate the 2018 Quadrennial Review proceeding and to seek comment on whether to retain, modify, or eliminate any of its structural media ownership rules.[8] The NPRM also sought comment on several diversity-related proposals offered in the record of the 2010/2014 Quadrennial Review proceeding.[9] As a result of the Supreme Court's decision to restore the changes made in the *Order on Reconsideration*, including the elimination of several rules, three structural ownership rules remain that are subject to the Commission's quadrennial review process.[10] They are the Local Radio Ownership Rule,[11] the Local Television Ownership Rule,[12] and the Dual Network Rule.[13] These are the same three structural rules on which the Commission sought comment in the *2018 Quadrennial Review NPRM*.

As noted above, the decision of the Supreme Court reversed a prior decision by the Third Circuit, which had vacated and remanded the *Order on Reconsideration* and the *Incubator Order* in their entirety, as well as the eligible entity definition from *Second Report and Order*.[14] In its decision, the Third Circuit found that the Commission failed to consider adequately the effect of its rule changes on ownership by women and minorities.[15] The Commission sought review of that decision by the Third Circuit *en banc*,

(Continued from previous page) ————————————————

*Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Order on Reconsideration and Notice of Proposed Rulemaking, 32 FCC Rcd 9802 (2017) (*Order on Reconsideration*); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Second Report and Order, 31 FCC Rcd 9864, 9960-10008, paras. 234-336 (2016) (*Second Report and Order*).

[6] 1996 Act § 202(h); Appropriations Act § 629.

[7] *See, e.g., 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12116, 12128, 12140, paras. 9, 40, 77; *Second Report and Order*, 31 FCC Rcd at 9865, para. 3.

[8] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12111-12, para. 1.

[9] *See id.* at 12114, 12145-55, paras. 5, 93-121. Specifically, the diversity-related proposals mentioned in the *2018 Quadrennial Review NPRM* include extending cable procurement requirements to broadcasters, adopting formulas aimed at creating media ownership limits that promote diversity, and developing a model for market-based, tradeable "diversity credits" to serve as an alternative method for setting ownership limits.

[10] Specifically, consistent with the *Order on Reconsideration*, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the Television Joint Sales Agreement Attribution Rule are eliminated, and the Local Television Ownership Rule and Local Radio Ownership Rule are reinstated as adopted in the *Order on Reconsideration*.

[11] 47 CFR § 73.3555(a).

[12] *Id.* § 73.3555(b).

[13] *Id.* § 73.658(g).

[14] *Prometheus IV*, 939 F.3d at 589. The remainder of the *Second Report and Order* was not affected by the Third Circuit's decision.

[15] *Id.* at 585-89.

**Federal Communications Commission**                                    **DA 21-657**

which was denied on November 20, 2019.[16]  The court's mandate issued on November 29, 2019, reinstating the media ownership rules adopted in the *Second Report and Order*.[17]  The Media Bureau issued an Order on December 20, 2019 to restore those rules to the Code of Federal Regulations.[18]

The Commission, as well the National Association of Broadcasters, each filed a petition for a writ of certiorari seeking review of the Third Circuit's decision by the Supreme Court.[19]  The Court granted the petitions, and on April 1, 2021, the Supreme Court issued an opinion reversing the Third Circuit's decision and restoring the *Order on Reconsideration*, the *Incubator Order*, and the revenue-based eligible entity definition from the *Second Report and Order*.[20]  In doing so, the Court found that the Commission's decision in the 2017 *Order on Reconsideration* to repeal or modify several of its rules was not arbitrary and capricious under the Administrative Procedure Act and that the Commission had reasonably considered the available evidence in concluding that such changes were not likely to harm minority and female ownership.[21]  In addition, because the Court reached its decision based on other grounds, the Court did not reach arguments from industry petitioners that Section 202(h) bars the Commission from considering minority and female ownership as part of its quadrennial review.[22]

Contemporaneously with this Public Notice and consistent with the Supreme Court's decision, the Media Bureau, in a separate order, is reinstating the changes adopted in the *Order on Reconsideration* and the *Incubator Order* as well as the eligible entity definition adopted in the *Second Report and Order*.[23]  As the order sets forth, the Newspaper/Broadcast Cross-Ownership Rule, the Radio/Television Cross-Ownership Rule, and the Television Joint Sales Agreement Attribution Rule are eliminated, and the Local Television Ownership Rule and Local Radio Ownership Rule are reinstated as adopted in the *Order on Reconsideration*.[24]  In addition, the eligible entity standard and its application to regulatory measures

---

[16] *See* Sur Petition for Rehearing, *Prometheus Radio Project v. FCC*, Nos. 17-1107 et al., Document No. 0031133411693 (3d Cir. Nov. 20, 2019).

[17] *See* Letter from Patricia S. Dodszuweit, Clerk, U.S. Court of Appeals for the Third Circuit, to Commissioners, FCC, *Prometheus Radio Project v. FCC*, Nos. 17-1107 et al., Document No. 0031133419681 (3d Cir. Nov. 29, 2019).

[18] *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, 34 FCC Rcd 12360 (MB 2019).

[19] *See* FCC et al., Petition for a Writ of Certiorari, *FCC v. Prometheus Radio Project*, No. 19-1231 (filed Apr. 17, 2020); National Association of Broadcasters et al., Petition for a Writ of Certiorari, *Prometheus Radio Project*, No. 19-1241 (filed Apr. 17, 2020).

[20] *See FCC v. Prometheus*, 141 S.Ct. at 1160-61.

[21] *Id.* at 1157-60.

[22] *Id.* at 1160 n.3.

[23] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, DA 21-656 (rel. June 4, 2021)

[24] Accordingly, the Eight-Voices Test is eliminated from the Local Television Ownership Rule, and the ability to seek case-by-case review of the restriction on ownership of two top-four ranked stations in the same market (Top-Four Prohibition) is reinstated as part of the rule.  *See Order on Reconsideration*, 32 FCC Rcd at 9831-40, paras. 66-85. The presumption under the Local Radio Ownership Rule that would apply a two-prong test for waiver requests involving existing parent markets with multiple embedded markets also is reinstated.  *See id.* at 9841-46, paras. 86-95.

**Add.59**

as set forth in the *Second Report and Order* are reinstated, as are the regulatory measures adopted in the *Incubator Order*.[25]

    *Discussion.* With this Public Notice, we open a new comment window, specifically to encourage the submission of new or additional information to update the record in the 2018 Quadrennial Review proceeding. As noted above, the formal comment and reply period in this proceeding closed two years ago. Nonetheless, as evident from the docket in this proceeding, the 2018 Quadrennial Review proceeding has generated, and continues to generate, significant interest, including through the submission of additional information even after the initial comment period has ended. Accordingly, we ask commenters to take this opportunity to update the record in the 2018 Quadrennial Review proceeding, including with regard to the diversity-related proposals cited therein.[26]

    We seek comment, first, on materials that have been filed in the docket of this proceeding since the formal comment and reply period ended in May 2019. To the extent they have not already done so, commenters are invited to review these materials and the issues they raise and comment on them as they feel is appropriate. In particular, we seek comment on whether these materials, either individually or collectively, highlight any issues, including issues that may not have been fully explored by the *2018 Quadrennial Review NPRM*, that commenters believe now warrant further comment and consideration. Moreover, are there issues raised in the *2018 Quadrennial Review NPRM*, or in the record in response to that NPRM, for which new and relevant information has come to light? Commenters are strongly encouraged at this stage to provide detailed analysis, empirical evidence, and/or specific proposals that the Commission should consider in relation to such issues. In so doing, commenters should explain how such analysis, evidence, or proposals relate to the Commission's interest in ensuring that its rules continue to promote the goals of competition, localism, and diversity.

    Beyond reviewing the existing record in light of the passage of time, we also seek submission of new or additional information regarding the media marketplace that commenters believe is relevant to this proceeding. Specifically, we seek information regarding the broadcast industry's evolution since early 2019 and its current trajectory, including the effects, if any, of technological change, new entry, consolidation, or changing market conditions. We seek comment in particular on the further development and impact of technological advances and industry practices. In the *2018 Quadrennial Review NPRM*, the Commission sought comment on whether and, if so how, it should account for multicast streams, satellite stations, or low power television stations for purposes of the Local Television Ownership Rule.[27] How should the increased use of these platforms, and other innovations, such as the continued deployment and use of the ATSC 3.0 transmission standard by the broadcast television industry, inform our review? What implications, if any, do these or other developments have for the Commission's broadcast ownership rules or its core policy goals of competition, localism, and viewpoint diversity, which support those rules? Have recent industry developments altered the incentives or behavior of any market participants in ways that are relevant to this proceeding?

    Similarly, we seek comment on any other relevant trends that have been, or are being, observed within the broadcast industry or in related markets. Among other things, the *2018 Quadrennial Review NPRM* noted the growth of online audio and video sources, including as sources for news and information, as well as the continued strength and importance of broadcast radio and television stations in the local communities they serve.[28] To what extent, if at all, have trends such as these (or others)

---

[25] *See Incubator Order*, 33 FCC Rcd at 7911-12, para. 1; *Second Report and Order*, 31 FCC Rcd 9960-10008, paras. 234-336.

[26] *See supra* n. 9 (citing *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12114, 12145-55, paras. 5, 93-121).

[27] *See, e.g., 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12137-39, paras. 66-71.

[28] *See id.* at 12112-13, paras 2-3.

**Add.60**

continued, accelerated, flattened, or reversed in recent years, such that the Commission should take account of any new or continuing trendlines in the current proceeding?  What do these trends indicate with respect to consumers' relative reliance on various sources for local news and information, and is there any difference in this respect between local and national news and information?  Are there recent trends regarding broadcast industry ratings or revenues, including advertising, retransmission consent, and online revenues, that are relevant to this proceeding?  In what ways will such trends impact the evolution and the viability of the broadcast industry?  Are there other industry events or trends that have not previously been described or fully explored in this proceeding that may be relevant to the Commission?  The *2018 Quadrennial Review NPRM*, for example, notes the importance of the Internet as a means to access audio and video content today.[29]  In this regard, commenters should distinguish between Internet sources (e.g., websites, mobile applications, social media accounts) that are independent of, as opposed to those that are affiliated with, broadcast stations (e.g., television station websites).  How, if at all, should the Commission consider recent trends regarding access to, or usage of, broadband Internet service or other technologies in conjunction with the media ownership rules?

We note that the *2018 Quadrennial Review NPRM* sought comment on the impact, if any, of the 2017 completion of the Incentive Auction[30] and the repack of the spectrum band on the Local Television Ownership Rule.[31]  Shortly after the release of the *2018 Quadrennial Review NPRM*, the Commission reported that several dozen stations had discontinued operations while the vast majority of winning bidders chose instead to remain on the air through channel sharing arrangements.[32]  How, if at all, has the Incentive Auction and its aftermath affected the broadcast industry?

In considering market trends since the comment period ended in May 2019, we seek comment specifically on the impact of the COVID-19 pandemic on this proceeding.  For example, the Commission's most recent Communications Marketplace Report (released on December 31, 2020) discusses some possible effects of the COVID-19 pandemic on the broadcast radio and television industries, most notably through decreased advertising revenue.[33]  The report, however, also notes that, despite MVPD subscriber declines, "retransmission consent revenue earned by major station groups increased in both the first and second quarters of 2020 by nearly 20% compared to the first and second quarters of 2019," suggesting that retransmission consent revenues for television stations "have not been

---

[29] *See id.* at 12112-13, para 2 (noting that "the growth of broadband Internet and other technologies has given consumers access to more content on more platforms than ever before").

[30] The Incentive Auction included a reverse auction of broadcast television spectrum and the reassignment of certain full power and Class A television stations to new channels in a smaller TV band, referred to as repacking.  *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12139, para. 73 (citing *Incentive Auction Closing and Channel Reassignment Public Notice*, Public Notice, 32 FCC Rcd 2786, 2788, para. 1 (MB/WTB 2017); Middle Class Tax Relief and Job Creation Act of 2012, Pub. L. No. 112-96, §§ 6402 (codified at 47 U.S.C. §309(j)(8)(G)), 6403 (codified at 47 U.S.C. § 1452), 126 Stat. 156 (2012)).

[31] *2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12139, para. 73.

[32] While 175 commercial and non-commercial full power and Class A television stations were winning bidders in the reverse auction, "[o]nly 41 stations permanently discontinued operations as a result of their winning bid" and "134 of the 175 stations of winning bidders are still available to their viewers."  *Incentive Auction Task Force and Media Bureau Report on the Status of the Post-Incentive Auction Transition and Reimbursement Program*, Public Notice, 34 FCC Rcd 304, 308, para. 11 (MB/WTB 2019) (noting 104 other "off air" winning television stations implemented channel sharing arrangements and 30 auction winners moved from the UHF to the VHF band).  The 41 full power and Class A television stations that surrendered their licenses as a result of the Incentive Auction represented less than 2% of the 2,148 such stations that existed at the time.  *See Broadcast Station Totals as of Dec. 31, 2018*, News Release (Jan. 2, 2019).  The 39-month post-incentive auction transition period concluded on July 13, 2020 and all repacked stations have vacated their pre-auction channels.

[33] *See Communications Marketplace Report*, GN Docket No. 20-60, Report, paras. 217, 249 (2020).

**Add.61**

meaningfully affected by the COVID-19 pandemic."[34]  To what extent, if at all, should the Commission consider, in this proceeding, changes to, or effects on, the broadcast radio and television industries as a result of the COVID-19 pandemic?  What are those changes or effects?  Which, if any, should be considered temporary in nature and which could be expected to have a lasting impact?  What implications, if any, do they have for the Commission's broadcast ownership rules?

In addition to identifying and describing developments and trends, we also ask commenters to tell us whether there is any further empirical evidence the Commission should consider.  For instance, are there any new or additional data that are now available, or studies that have been published or performed, that would inform the Commission's analysis?[35]  If so, we encourage commenters to submit copies of such data or studies in the docket of this proceeding (to the extent they have not already done so) and urge commenters to provide any interpretations, analyses, and conclusions based on such materials.  In particular, we welcome any insights or analysis of research regarding how to further the Commission's policy goals and whether such research suggests any specific rule changes.  If so, in what ways do the data or other information support such changes?  We encourage commenters to draw any such conclusions or connections between the data and potential policy or rule changes as tightly and as explicitly as possible.  Where possible, we also encourage commenters to quantify and explain the benefits or costs associated with any policy or rule they discuss or, in the alternative, to explain the difficulties faced in trying to quantify benefits and costs in this context and how the Commission might nonetheless evaluate them in the absence of extensive or conclusive objective metrics.  Moreover, in addition to identifying, analyzing, and submitting existing materials, we welcome commenters to take this opportunity to compile data or conduct further research that can be submitted to the Commission during the new comment window.

Finally, we seek comment on whether there are any other legal or economic factors, changes, or issues that the Commission should consider in the context of this quadrennial review and, if so, how the Commission should evaluate or address them.

*Initial Regulatory Flexibility Analysis.*  The NPRM included an Initial Regulatory Flexibility Analysis (IRFA) pursuant to 5 U.S.C. § 603, exploring the potential impact on small entities of the Commission's proposals.[36]  We invite parties to file comments on the IRFA in light of this request to refresh the record.

*Ex Parte Rules – Permit But Disclose.*  This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[37]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the

---

[34] *See id.* at para. 217.

[35] For example, we note that earlier this year, two economists from the Commission's Office of Economics and Analytics released a working paper examining the relationship between the number of independent local television news operations in a market and market size.  *See* Kim Makuch and Jonathan Levy, FCC, Office of Economics and Analytics, OEA Working Paper 52, *Market Size and Local Television News* (Jan. 15, 2021), https://www.fcc.gov/reports-research/working-papers/market-size-and-local-television-news.

[36] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12159-62.

[37] 47 C.F.R. §§ 1.1200 *et seq.*

presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

*Filing Comments and Replies.* **All filings must be submitted in MB Docket No. 18-349**. Pursuant to sections 1.415 and 1.419 of the Commission's rules, 47 CFR §§ 1.415, 1.419, interested parties may file comments and reply comments on or before the dates indicated on the first page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://apps.fcc.gov/ecfs/.
- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.
- Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.
- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE Washington, DC 20554.
- Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19. See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, DA 20-304 (March 19, 2020). https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy

*People with Disabilities.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (TTY).

*Additional Information.* For additional information on this proceeding, please contact Ty Bream of the Media Bureau, Industry Analysis Division, Ty.Bream@fcc.gov, (202) 418-0644.

**-FCC-**

**Add.63**

# PUBLIC NOTICE

**Federal Communications Commission**
**45 L Street NE**
**Washington, DC 20554**

News Media Information 202-418-0500
Internet: www.fcc.gov
TTY: 888-835-5322

DA 22-1364
**Released: December 22, 2022**

**MEDIA BUREAU OPENS DOCKET AND SEEKS COMMENT FOR 2022
QUADRENNIAL REVIEW OF MEDIA OWNERSHIP RULES**

**Action Commences the 2022 Quadrennial Regulatory Review**

**MB Docket No. 22-459**

**Comment Date: [45 days after publication in the Federal Register]**
**Reply Comment Date: [60 days after publication in the Federal Register]**

With this Public Notice, the Media Bureau commences the 2022 Quadrennial Review of the Commission's media ownership rules. Accordingly, the Bureau seeks comment, pursuant to the obligation under section 202(h) of the Telecommunications Act of 1996, on whether the media ownership rules remain "necessary in the public interest as the result of competition."[1] Although the Commission has not yet adopted final rules in the 2018 Quadrennial Review proceeding, we remain cognizant of the statutory obligation to review the broadcast ownership rules every four years. Just as the previous (2018) quadrennial review was initiated in December of 2018, we seek to commence this subsequent (2022) review before the end of the 2022 calendar year.

As the Commission has observed previously, the media marketplace can change dramatically in between its periodic regulatory reviews. Moreover, economic studies and data collection, which we welcome as part of this proceeding, may take significant time to complete. Therefore, we find it prudent to provide commenters with ample time and advance notice so they may begin undertaking such efforts, if they so choose, as soon as possible. Accordingly, the Media Bureau finds that initiating the 2022 Quadrennial Review despite the pendency of the 2018 Quadrennial Review is appropriate in this instance.[2]

*Background.* As stated, Section 202(h) of the Telecommunications Act of 1996 requires the Commission to review its media ownership rules every four years to determine whether they remain "necessary in the public interest as the result of competition."[3] On December 12, 2018, the Commission

---

[1] Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, § 202(h) (1996) (1996 Act); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3 (2004) (Appropriations Act) (amending Sections 202(c) and 202(h) of the 1996 Act).

[2] The Commission similarly initiated the 2014 Quadrennial Review prior to completing the 2010 review. *See 2014 Quadrennial Regulatory Review — Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.,* Further Notice of Proposed Rulemaking and Report and Order, 29 FCC Rcd 4371, 4372, para. 1 (2014). In that previous instance, the Commission incorporated the existing 2010 record into the 2014 review. Here, the Media Bureau is creating a new docket for the Commission's future consideration of the 2022 proceeding.

[3] 1996 Act § 202(h); Appropriations Act § 629.

adopted a Notice of Proposed Rulemaking to initiate the 2018 Quadrennial Review proceeding and to seek comment on whether to retain, modify, or eliminate any of its media ownership rules.[4]  The three rules on which the Commission sought comment in the *2018 Quadrennial Review NPRM* are the Local Radio Ownership Rule,[5] the Local Television Ownership Rule,[6] and the Dual Network Rule.[7]

After the original comment period closed for the 2018 Quadrennial Review, a number of legal developments ensued that necessitated delaying Commission action on that proceeding.  Specifically, several parties had sought judicial review of the *2010/2014 Quadrennial Review Order on Reconsideration*, which had concluded the 2010/2014 Quadrennial Review and adopted rule changes that then became the basis for comment in the subsequent 2018 Quadrennial Review.[8]  On September 23, 2019, the Third Circuit vacated and remanded the bulk of the Commission's actions in the *2010/2014 Quadrennial Review Order on Reconsideration*.[9]  Accordingly, on December 20, 2019, the Media Bureau issued an Order reinstating the rules as set forth in the *2010/2014 Quadrennial Review Order*.[10]  The Third Circuit's actions thus effectively called into question the rules under review in the 2018 Quadrennial Review until the status of the Commission's rule modifications and repeals in the *2010/2014 Quadrennial Review Order on Reconsideration* could be legally settled.

The Commission and broadcast industry petitioners filed separate Petitions for Writ of Certiorari before the Supreme Court, each asking the Supreme Court to review and overturn the Third Circuit's decision on different grounds.[11]  The Supreme Court ultimately  reversed the Third Circuit's decision in

---

[4] *See 2018 Quadrennial Review NPRM*, 33 FCC Rcd at 12111-12, para. 1.  The NPRM also sought comment on several diversity-related proposals offered in the record of the 2010/2014 Quadrennial Review proceeding.  *See id.* at 12114, 12145-55, paras. 5, 93-121.

[5] 47 CFR § 73.3555(a).

[6] *Id.* § 73.3555(b).

[7] *Id.* § 73.658(g).

[8] *See* Petition for Review of Prometheus Radio Project and Media Mobilizing Project, *Prometheus Radio Project and Media Mobilizing Project v. FCC*, No. 18-1092, Document No. 003112828343 (3d Cir. Jan. 16, 2018); Petition for Review of Independent Television Group, *Independent Television Group v. FCC*, No. 18-1050, Document No. 1719478 (D.C. Cir. Feb. 20, 2018); Petition for Review of Multicultural Media, Telecom and Internet Council, Inc. and the National Association of Black-Owned Broadcasters, *Multicultural Media, Telecom and Internet Council and National Association of Black-Owned Broadcasters v. FCC*, No. 18-1071, Document No. 1721291 (D.C. Cir. Mar. 7, 2018); Petition for Review of Free Press et al., *Free Press et al. v. FCC*, No. 18-1072, Document No. 1722268 (D.C. Cir. Mar. 8, 2018).  These petitions were consolidated before the Third Circuit Court of Appeals with the previously filed reviews of the *2010/2014 Quadrennial Review Order*.  *See* Order, *Prometheus Radio Project et al. v. FCC*, No. 17-1107, Document No. 003112514755 (3d Cir. Jan. 18, 2017).

[9] *Prometheus Radio Project v. Federal Communications Commission*, 939 F.3d 567, 584 (3d Cir. 2019) (*Prometheus IV*).

[10] *See 2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, MB Docket Nos. 14-50 et al., Order, 34 FCC Rcd 12360 (MB 2019).

[11] *See* Petition for a writ of certiorari of the Federal Communications Commission, *Prometheus Radio Project et al. v. FCC,* Docket No. No. 19-1231, at 14-15 filed April 17, 2020 (arguing that the Commission was entitled to deference and that the Third Circuit was requiring it to meet an imprecise data threshold); Petition for a writ of certiorari of National Association of Broadcasters, et al., *Prometheus Radio Project et al. v. FCC*, Docket No. No. 19-1241, filed April 17, 2020; certiorari granted October 2, 2020 (arguing that the Third Circuit erred by raising atextual concerns regarding female and minority ownership above concerns over competition).

*Prometheus IV* on April 1, 2021, in a unanimous decision.[12] By then, however, nearly two years had passed since the original comment period closed for the 2018 Quadrennial Review.

On June 4, 2021, the Bureau released a public notice seeking to refresh the record in the 2018 Quadrennial Review proceeding.[13] In that public notice, the Media Bureau sought any new and relevant information concerning the proceeding, including new empirical and statistical evidence, proposals, and detailed analysis.[14] Additionally, the Bureau sought comment on how the media marketplace had evolved since early 2019 and whether new technological innovations had spurred noticeable trends or changed industry practices,[15] as well as how any trends had impacted the manner in which consumers obtain local and national news and information.[16] That proceeding remains pending.

*Discussion.* As with each new quadrennial review required by Congress, we start this proceeding to examine the media ownership rules in light of the media landscape of 2022 and beyond. Although they remain subject to the ongoing 2018 Quadrennial Review proceeding, the three rules currently in place and subject to this review are the Local Radio Ownership Rule and the Local Television Ownership Rule— which limit ownership by a single entity of broadcast radio or television stations in local markets respectively—and the Dual Network Rule, which effectively prohibits mergers among the Big Four broadcast television networks (ABC, CBS, Fox, and NBC). In the context of these three rules, as with prior reviews, we seek information regarding the media marketplace, including ongoing trends or developments (e.g., consolidation, technological innovation, or the emergence of new video or audio options for consumers), that commenters find relevant to the Commission's review of its media ownership rules.

In addition, we note that the statutory directive of section 202(h) is explicitly tied to the public interest standard, in that it requires the Commission to determine whether the rules remain "necessary in the public interest as the result of competition." Accordingly, we seek comment on the impact of the rules on the American public as consumers of media and the function and objectives of the rules as they relate to broadcasters' public interest obligations. Have the rules served, and do they continue to serve, consumers, particularly with respect to the Commission's longstanding policy goals of competition, localism, and diversity? If so, in what ways? Are there ways in which the rules have fallen short? Has the marketplace under our current rules delivered sufficient "returns" for consumers with respect to competition, localism, and diversity? How can the Commission measure or evaluate any "returns" that consumers have received as a result of those rules? Should the Commission adjust its analysis of the audio and video programming marketplace to account for fundamental changes in consumer behavior (e.g., use of streaming alternatives)? Are there areas in which consumers rely uniquely on broadcast media? More generally, how should the Commission define or redefine the policy goals for the rules? Are there other policy goals, besides competition, localism, and diversity, that the Commission should consider in relation to the rules?

We further note that commenters in prior proceedings have encouraged the Commission to evaluate the effects of its rules on the ownership of broadcast stations by minorities and women. To this

---

[12] *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1154 (2021).

[13] *Media Bureau Seeks to Update Public Record in the 2018 Quadrennial Regulatory Review*, Public Notice, 36 FCC Rcd 9363 (MB 2021).

[14] *Id.*

[15] *Id.*

[16] *See id.* at 9367. The Media Bureau also sought comment on what impact, if any, the completion of the 2017 Incentive Auction and related repack of the television spectrum had on the industry, as well as any legal or economic factors that should be considered in the context of its ongoing review. *Id.* at 9367-68.

**Add.66**

end, we seek comment on barriers to minority and female ownership of broadcast stations and areas in which commenters believe those barriers relate to, intersect with, or could be addressed by changes to the three ownership rules that are the subject of this proceeding. Specifically, we encourage commenters to identify concrete changes the Commission could or should make with respect to these or any additional ownership rules. We ask commenters to explain in detail or to demonstrate with legal analysis and empirical evidence how any such changes or additions would address concerns regarding minority and female ownership and how they could withstand legal scrutiny.

As always, commenters may provide any additional information regarding legal or economic factors, changes, or issues that the Commission should consider, evaluate, and/or address in the context of the 2022 Quadrennial Review. The record compiled in response to this Public Notice will help inform the Commission's next steps in the 2022 proceeding, such as any subsequent Notice of Proposed Rulemaking. In this regard, we reiterate the request from previous quadrennial reviews that commenters submit empirical evidence, data, and studies in support of their claims and positions wherever possible.[17] We encourage commenters to draw any conclusions or connections between data and potential policy or rule changes as tightly and as explicitly as possible. In addition to identifying, analyzing, and submitting existing data, commenters are encouraged to compile new data or to conduct further research that can be submitted to the Commission as part of the 2022 proceeding.

*Ex Parte Rules – Permit But Disclose.* This proceeding shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[18] Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies). Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation. If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum. Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with rule 1.1206(b). In proceedings governed by rule 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (*e.g.*, .doc, .xml, .ppt, searchable .pdf). Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

*Filing Comments and Replies.* **All filings must be submitted in MB Docket No. 22-459**. Interested parties may file comments and reply comments on or before the dates indicated on the first

---

[17] We note that empirical and statistical data submitted in the record of the Quadrennial Review play an important role in the Commission's evaluation of the ownership rules. *See generally FCC v. Prometheus Radio Project*, 141 S.Ct. at 1160 (affirming the Commission's actions based on the Commission's reasonable and reasonably explained analysis and interpretation of available data in the record); *2014 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996 et al.*, MB Docket Nos. 14-50 et al., Second Report and Order, 31 FCC Rcd 9864, 9976, para. 270 (2016) (noting that the Commission's improved ownership data contributes to meaningful analysis regarding media ownership and diversity policies and expressing hope that interested parties will use such data to conduct further studies and analyses).

[18] 47 CFR §§ 1.1200 *et seq.*

**Add.67**

page of this document. Comments may be filed using the Commission's Electronic Comment Filing System (ECFS). *See Electronic Filing of Documents in Rulemaking Proceedings*, 63 FR 24121 (1998).

- Electronic Filers: Comments may be filed electronically using the Internet by accessing the ECFS: http://apps.fcc.gov/ecfs/.

- Paper Filers: Parties who choose to file by paper must file an original and one copy of each filing.

- Filings can be sent by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.

- Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701. U.S. Postal Service first-class, Express, and Priority mail must be addressed to 45 L Street NE Washington, DC 20554.

- Effective March 19, 2020, and until further notice, the Commission no longer accepts any hand or messenger delivered filings. This is a temporary measure taken to help protect the health and safety of individuals, and to mitigate the transmission of COVID-19. See FCC Announces Closure of FCC Headquarters Open Window and Change in Hand-Delivery Policy, Public Notice, DA 20-304 (March 19, 2020). https://www.fcc.gov/document/fcc-closes-headquarters-open-window-and-changes-hand-delivery-policy

*People with Disabilities.* To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice), 202-418-0432 (TTY).

*Additional Information.* For additional information on this proceeding, please contact Ty Bream of the Media Bureau, Industry Analysis Division, Ty.Bream@fcc.gov, (202) 418-0644.

**-FCC-**

Before the
Federal Communications Commission
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| 2022 Quadrennial Regulatory Review | ) | MB Docket No. 22-459 |
| | ) | |
| 2018 Quadrennial Regulatory Review— | ) | MB Docket No. 18-349 |
| Review of the Commission's Broadcast | ) | |
| Ownership Rules and Other Rules Adopted | ) | |
| Pursuant to Section 202 of the | ) | |
| Telecommunications Act of 1996 | ) | |

### REQUEST TO TOLL THE 2022 QUADRENNIAL REGULATORY REVIEW AND TO EXPEDITIOUSLY CONCLUDE THE 2018 QUADRENNIAL REGULATORY REVIEW

The National Association of Broadcasters (NAB)[1] hereby requests that the

Commission temporarily toll the proceeding triggered by the Media Bureau's recent Public

Notice seeking comment on the 2022 quadrennial review of the broadcast ownership rules.[2]

Specifically, NAB respectfully requests the FCC to briefly toll its 2022 quadrennial ownership

proceeding, including all comment deadlines, until the Commission fulfills its obligation

under Section 202(h) of the Telecommunications Act of 1996 (1996 Act) by expeditiously

completing the 2018 quadrennial ownership review.[3] NAB strongly urges the Commission to

---

[1] NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Federal Communications Commission and other federal agencies, and the courts.

[2] *Media Bureau Opens Docket and Seeks Comment for 2022 Quadrennial Review of Media Ownership Rules*, Public Notice, MB Docket No. 22-459, DA 22-1364 (Dec. 22, 2022) (Public Notice). Comments and reply comments are currently due on March 3, 2023, and March 20, 2023, respectively. *Media Bureau Announces Comment and Reply Comment Deadlines for the 2022 Quadrennial Review*, Public Notice, MB Docket No. 22-459, DA 23-38 (Jan. 17, 2023).

[3] *See 2018 Quadrennial Regulatory Review*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111 (2018) (2018 Quadrennial NPRM).

**Add.69**

conclude its long overdue 2018 quadrennial review by the end of the first quarter of this year (2023).

As shown below, failure to timely complete the 2018 quadrennial review violates the direct mandate and clear purpose of Section 202(h). While delaying the ultimate determination of the 2018 review may have made sense given then-pending litigation, the Supreme Court concluded that litigation nearly two years ago. Apart from violating a congressional deadline, an incomplete but still pending 2018 review also makes it challenging, if not impossible, for stakeholders to submit useful and relevant comments to inform a distinct 2022 review. NAB accordingly asks the FCC to expeditiously conclude its 2018 proceeding and *then* move forward with the 2022 review, as Congress intended. Granting NAB's request additionally would enable interested parties to intelligibly comment and participate more effectively in the 2022 review to the benefit of the public and the FCC's examination of the evolving hyper-competitive audio, video, and advertising markets.

I.    THE FCC'S FAILURE TO TIMELY CONCLUDE ITS 2018 QUADRENNIAL REVIEW VIOLATES SECTION 202(h)

Section 202(h), as amended, provides that the Commission "shall" review its broadcast ownership rules "quadrennially"; "shall" determine whether any of them remain necessary in the public interest as the result of competition; and "shall" repeal or modify any regulation no longer in the public interest.[4] Congress's repeated use of the mandatory "shall" imposes an "obligation impervious to . . . discretion."[5] Because Section 202(h) "admits of no discretion on the part of" the Commission "to carry out the directive[s]," the

---

[4] 1996 Act, Pub. L. No. 104-104, § 202(h), 110 Stat. 56, 111-12 (1996); Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, § 629, 118 Stat. 3, 99-100 (2004).

[5] *Me. Cmty. Health Options v. U.S.*, 140 S. Ct. 1308, 1320 (2020), *quoting Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *accord Lopez v. Davis*, 531 U.S. 230, 241 (2001) (noting Congress's "use of a mandatory 'shall' . . . to impose discretionless obligations").

statute's mandates, including the requirement for timely reviews every four years, cannot be lawfully ignored or deferred.[6]

More specifically, the Commission has no authority to delay or to forego the 2018 review or to effectively roll that quadrennial review into the required 2022 review. Doing so would violate Section 202(h)'s directives for the Commission "quadrennially" to "review" its ownership rules, "determine" their necessity, and "repeal or modify" those no longer needed. The Third Circuit Court of Appeals previously found such a course contrary to Section 202(h) and congressional intent when the Commission, rather than completing the delayed 2010 review, began its 2014 review instead.[7]

In explaining its initiation of the 2022 quadrennial while failing to conclude the past due 2018 review, the Public Notice (at n.2) observed that the Commission had "similarly initiated" the 2014 quadrennial review before completing the 2010 review. But the Public Notice overlooks the Third Circuit's previous disapproval of that very maneuver in *Prometheus III*. While neglecting to mention *Prometheus III*, the Public Notice (at n.2) also apparently – and unsuccessfully – attempts to distinguish the FCC's current action from its 2014 action, stating that in 2014, the "Commission incorporated the existing 2010 record into the 2014 review[,] [and] "[h]ere, the Media Bureau is creating a new docket" for the

---

[6] *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661 (2007), *quoting Ass'n of Civil Technicians v. FLRA*, 22 F.3d 1150, 1153 (D.C. Cir. 1994) ("The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive."); *accord Prometheus Radio Project v. FCC*, 824 F.3d 33, 50 (3d Cir. 2016) (*Prometheus III*) (characterizing the repeated use of the word "shall" in Section 202(h) as "unmistakably mandatory" and "creat[ing] 'an obligation impervious to . . . discretion'") (quoting *Lexecon Inc.*, 523 U.S. at 35). *See also, e.g.*, *Amendment to the Commission's Rules Concerning Effective Competition,* Report and Order, 30 FCC Rcd 6574, 6575 ¶ 1, n.6 (2015) (indicating that Congress's direction that the FCC "shall complete a rulemaking to establish a streamlined process for filing of an effective competition petition" means the FCC "must" complete the rulemaking in the time allotted).

[7] *Prometheus III*, 824 F.3d at 50-51.

3

**Add.71**

FCC's consideration of the 2022 review. But in fact, the FCC in 2014 created a new docket (MB 14-50) for its consideration of the 2014 review, which differed from the 2010 review's docket (MB 09-182). In any event, putting a new number on a docket for the 2022 quadrennial review (regardless of whether the previous quadrennial's record is incorporated into the new docket or not) in no way satisfies Section 202(h)'s dictates to the Commission to "review" its rules, "determine" their necessity, and "repeal or modify" any unnecessary ones *every four years*. The logic of the FCC's position here suggests that the Commission could withhold a decision on the 2018 or other quadrennial review; it only would need to leave any previous review(s) pending and initiate a new review every four years – a result clearly at odds with Section 202(h)'s terms and purpose.[8]

Indeed, while the calendar now says 2023, the 2014 quadrennial remains the last review completed. Since that time, competition in the media and advertising markets has grown quickly and substantially, resulting in increasing dominance by large and unregulated digital platforms.[9] As multiple courts, including the Supreme Court, have indicated, failure to

---

[8] *See Prometheus III*, 824 F.3d at 50 (stating that the "very purpose of § 202(h) – to function as an ongoing mechanism to ensure that the Commission's regulatory framework would keep pace with the competitive changes in the marketplace – reinforces the need for timeliness") (internal citation omitted). The D.C. Circuit similarly concluded that the FCC's avoidance of ruling on the merits of a forbearance petition was contrary to another section of the 1996 Act, whose "very purpose" was "to force the Commission to act" – even if "inconvenient" – "within the statutory deadline." *AT&T Inc. v. FCC*, 452 F.3d 830, 836 (D.C. Cir. 2006).

[9] *See, e.g., 2020 Commc'n Marketplace Report*, 36 FCC Rcd 2945, 3047 (2020) (finding that the "past two years have seen a number of changes in terms of competition" among the three major participants (MVPDs, OVDs, and broadcast TV stations) that have "defined the [video] market for the past decade"); *2022 Commc'n Marketplace Report*, GN Docket No. 22-203, FCC 22-103, at ¶¶ 280, 289 (Dec. 30, 2022) (noting the "ascendance of OVDs" in the video marketplace and documenting that in 2021, broadcast TV stations' local advertising revenues fell to $9.7 billion while online local ad revenues grew to $65 billion); *id*. at ¶ 303, Fig. II.F.3, ¶ 328 (documenting that over the past decade, *annual* growth in online audio listeners was 29 percent, and that radio industry advertising revenues in 2020 and 2021 fell even further behind the industry's revenue levels reached 15 years earlier).

4

timely conclude the 2018 quadrennial review is contrary to the FCC's duties to "regularly reassess" how its ownership rules function to "keep pace" with industry developments and the marketplace,[10] and to "promptly" repeal or modify any unnecessary rules.[11] And the Public Notice (at 1) acknowledges that the "media marketplace can change dramatically in between [] periodic regulatory reviews," which makes the FCC's failure to timely conclude the 2018 review in accordance with Section 202(h) even more problematic.

The record in the 2018 proceeding, moreover, is complete and undoubtedly ripe for review. Numerous parties, including NAB, spent considerable time, effort, and expense in commenting in Spring 2019 and then submitting supplemental comments and reply comments on September 2 and October 1, 2021, respectively, at the FCC's request.[12] The Commission has no basis for flouting Section 202(h)'s clear directive, or the Administrative

---

[10] *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1156 (2021) (stating that § 202(h) established an iterative process requiring the "FCC to keep pace with industry developments and to regularly reassess how its rules function" in the market); *accord Prometheus III*, 824 F.3d at 50 (emphasizing that "timeliness" is needed if Section 202(h) is to fulfill its function to ensure that the FCC's regulations "keep pace" with competitive changes in the market) (internal citation omitted).

[11] *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1042 (D.C. Cir.), *modified on reh'g on other ground*, 293 F.3d 537 (D.C. Cir. 2002) (referring to the FCC's "statutory mandate promptly – that is, by revisiting the matter biennially [now, quadrennially] – to 'repeal or modify' any rule that is not 'necessary in the public interest'"); *see also Sinclair Broad. Group v. FCC*, 284 F.3d 148, 164 (D.C. Cir. 2002) (stating that the FCC's "wait-and-see approach" on TV station ownership could not be "squared with the statutory mandate" to repeal or modify any rule not necessary in the public interest) (citation omitted).

[12] *Media Bureau Seeks to Update the Record in the 2018 Quadrennial Regulatory Review*, Public Notice, 36 FCC Rcd 9363 (MB 2021) (2018 Quadrennial Update Public Notice); *see* Comments of NAB, MB Docket No. 18-349 (Sept. 2, 2021) (NAB 2021 Comments); Reply Comments of NAB, MB Docket No. 18-349 (Oct. 1, 2021) (NAB 2021 Reply Comments); Comments of NAB, MB Docket No. 18-349 (Apr. 29, 2019) (NAB 2019 Comments); Reply Comments of NAB, MB Docket No. 18-349 (May 29, 2019) (NAB 2019 Reply Comments). NAB again addressed questions of competition in the audio, video, and advertising markets, and the effects of that competition on broadcast stations, in the FCC's 2022 proceeding on competition in the communications marketplace. *See* Comments of NAB, GN Docket No. 22-203 (July 1, 2022) (NAB Commc'n Market Comments); Reply Comments of NAB, GN Docket No. 22-203 (Aug. 1, 2022) (NAB Commc'n Market Reply Comments).

Procedure Act, by defaulting on its duty to complete the 2018 review within the statutory deadline.[13] Certainly the reasons offered in the Notice (or any other reason) cannot excuse the FCC's failure to comply with a congressional mandate.[14] NAB therefore implores the FCC to finalize the 2018 review by March 31, 2023, and then proceed with the 2022 quadrennial so that review is concluded in at least a somewhat timely fashion, consistent with Section 202(h).[15]

## II.    THE FCC NEEDS TO TEMPORARILY TOLL THE 2022 QUADRENNIAL OWNERSHIP REVIEW UNTIL IT RESOLVES THE 2018 REVIEW

Beyond concluding the 2018 review, the Commission also should briefly toll the 2022 review until the prior review is completed. As an initial matter, stakeholders will find it challenging at best to submit specific, relevant, and useful comments in response to the generic Public Notice initiating the 2022 review. In this regard, the Commission asked – and NAB, along with other stakeholders, addressed -- as part of the 2018 quadrennial a number

---

[13] *See* 5 U.S.C. § 706(1) (providing that a "reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed").

[14] The Public Notice (at 2-3) noted the extensive litigation that followed the FCC's 2017 decision reconsidering its order that had belatedly completed the 2010/2014 quadrennial reviews. But the Supreme Court released its decision unanimously upholding that reconsideration order on April 1, 2021. Thus, the FCC has had ample time to conclude its 2018 review. The Public Notice also attempted (at 1) to justify the timing of the initiation of the 2022 review. Although it did initiate the 2018 review in December of that year, the FCC in 2018, unlike in 2022, had not failed to complete its previous quadrennial review. It also began the 2018 review with a notice of proposed rulemaking adopted by the full FCC, rather than with a generic Bureau-level public notice. Given that the Commission cannot repeal or modify rules on the basis of such a public notice, the Bureau's last-minute launch of the 2022 review raises doubts as to whether it can be concluded within a reasonable time.

[15] NAB also implored the Commission in our 2021 supplemental reply comments to comply with Section 202(h) and expeditiously conclude the 2018 review. NAB 2021 Reply Comments at 6-7. As the FCC's outdated regulations prevent broadcasters from competing on a remotely level playing field, NAB even suggested that the FCC, if it continued to decline to decide the 2018 review, begin its 2022 review as early as possible and complete it within a year (i.e., by the end of 2022). *See id.* at n.10. Obviously, the Commission has done neither, and both reviews are now guaranteed to be unacceptably tardy.

of the questions posed and issues raised in the Public Notice, again indicating that the FCC

could and should answer those questions by completing the 2018 review.[16]

The Public Notice also asked for comment on the "three rules currently in place and

subject to this [2022] review," even though "they remain subject" to the incomplete and still

"pending" 2018 review.[17] But how are stakeholders supposed to intelligibly comment for

purposes of the 2022 quadrennial review on rules subject to change in a previous

unfinished review? In the 2022 quadrennial, interested parties should be commenting on

the ownership rules in light of the FCC's final decisions in its 2018 review and how those

decisions affected marketplace competition. That is why Congress established an "iterative

process" in Section 202(h),[18] and why the FCC's failure to timely conduct and conclude its

required reviews upends the entire statutory scheme. Neither the Commission nor

interested stakeholders can "gain experience" with any FCC policies adopted in the 2018

quadrennial, or assess in the 2022 review how any rules modified by the 2018 review

---

[16] For example, the Public Notice (at 3-4) asked for comment on minority and female ownership of broadcast stations, an issue referenced in the 2018 Quadrennial Update Public Notice, 36 FCC Rcd at 9366, and addressed at length in the rulemaking notice initiating the 2018 review. 2018 Quadrennial NPRM, 33 FCC Rcd at 12127, 12138-39, 12145-55. In similar language, the Public Notice (at 3) and the 2018 Quadrennial Update Public Notice, 36 FCC Rcd at 9366, sought information on consolidation, technological innovation/change, and the emergence of online audio and video options/sources. The Public Notice (at 3) asked about "changes in consumer behavior (e.g., use of streaming alternatives)" that the 2018 Quadrennial NPRM had documented. *See* 33 FCC Rcd at 12112-13, 12129 & n. 145. And the FCC has asked multiple times about areas in which consumers rely heavily or uniquely on broadcast media, such as for news and information. *See* Public Notice at 3; 2018 Quadrennial Update Public Notice, 36 FCC Rcd at 9366-67; 2018 Quadrennial NPRM, 33 FCC Rcd at 12131-32. NAB addressed these and many other issues in comments, data, and studies submitted in 2019, 2021, and 2022. *See* NAB 2019 Comments; NAB 2019 Reply Comments; NAB 2021 Comments; NAB 2021 Reply Comments; NAB Commc'n Market Comments; NAB Commc'n Market Reply Comments.

[17] Public Notice at 3 (identifying the local radio, local TV, and dual network rules).

[18] *FCC v. Prometheus Radio Project*, 141 S. Ct. at 1156; *Prometheus Radio Project v. FCC*, 939 F.3d 567, 593 (3d Cir. 2019) (Scirica, J., dissenting in part), *reversed*, 141 S. Ct. 1150 (2021) (*Prometheus IV*).

"function in the marketplace," as Congress intended, because the Public Notice requests comment in the 2022 quadrennial while the 2018 review remains unresolved.[19]

Notably, the FCC's approach here risks turning either the 2018 or the 2022 quadrennial into a pointless and burdensome exercise for stakeholders. By setting deadlines for interested parties to comment in the 2022 review on the ownership rules as they exist today (i.e., prior to completion of the 2018 review), the Public Notice implies the Commission is not likely to alter those rules as a result of the 2018 quadrennial, when (or if) that review is eventually resolved. NAB finds it inherently unlikely that the FCC, after parties submit comments and supporting evidence for the 2022 review, would return to the 2018 quadrennial to seriously consider its rules in light of competition and "repeal or modify" any of them based on the earlier record in the 2018 proceeding. Thus, it seems possible, if not probable, that NAB and other stakeholders expended significant time and resources to prepare multiple sets of comments, data, and studies in the 2018 proceeding for no real purpose.[20] But in the event the FCC were to retroactively complete and change its rules pursuant to the 2018 quadrennial following the submission of comments and empirical evidence for the 2022 review, then those parties participating in the 2022 review would have unnecessarily expended time and resources analyzing and commenting on ownership rules and policies that became outdated after all their work. In short, if the Commission does not grant NAB's request to toll the 2022 quadrennial until the expeditious completion of the 2018 proceeding, it will effectively undermine the public's participation and waste participating parties' resources in either the 2018 or the 2022 proceeding.

---

[19] The "iterative process" Congress prescribed in Section 202(h) "assumes the FCC can gain experience with its policies so it may assess how its rules function in the marketplace." *Prometheus IV*, 939 F.3d at 593 (Scirica, J., dissenting in part).

[20] See NAB 2019 Comments and Attachments A-I; NAB 2019 Reply Comments; NAB 2021 Comments and Attachments A-M; NAB 2021 Reply Comments and Attachment A.

**Add.76**

NAB stresses that participating in quadrennial ownership reviews and submitting data and studies, as the Commission strongly urges,[21] is burdensome and expensive for stakeholders. These proceedings are not costless exercises. In NAB's experience, economic and other empirical studies are particularly costly to undertake, often requiring the hiring of outside economists, industry analysts, or other experts. Beyond failing to comply with statutory deadlines for the 2018 quadrennial, it is manifestly unfair and inappropriate for the Commission to pursue a path under which the efforts of regulated entities and other interested parties to prepare comments, gather (and perhaps pay to acquire) data, and conduct costly studies would be for naught.

Beyond abdicating its statutory responsibilities and burdening stakeholders with various rounds of unaddressed comments, the FCC's failure to complete the 2018 review is particularly egregious given the hundreds of millions of dollars paid by broadcasters in regulatory fees, which supposedly reflect the "benefits" conferred on the broadcast industry from Commission work. Indeed, radio and TV stations have paid approximately $230,421,000 in regulatory fees to fund much of the Media Bureau's and other FCC activities while the 2018 review has been pending (i.e., from December 2018 until today). Despite these exorbitant fees, broadcasters have not "benefitted" – but in fact have been harmed – from the FCC's inability to perform its statutorily-mandated and high-priority quadrennial reviews.[22] As such, the Commission should take into account the evident lack

---

[21] Public Notice at 1, 4 (stating that "we welcome" "economic studies and data collection" as part of the 2022 proceeding; requesting that "commenters submit empirical evidence, data, and studies in support of their claims and positions wherever possible"; and "encourag[ing]" commenters to "compile new data or to conduct further research"); *accord* 2018 Quadrennial Update Public Notice, 36 FCC Rcd at 9366, 9368.

[22] *See* 47 U.S.C. § 159(d) (directing the FCC to amend its regulatory fee schedule if required so that those fees reflect the full-time equivalent number of employees within the bureaus and offices of the Commission, "adjusted to take into account factors that are reasonably related to the benefits provided to the payor of the fee by the Commission's activities").

9

of meaningful work on quadrennial reviews since 2018 as it considers assigning dozens of full-time equivalent employees to broadcasters' direct full-time equivalent ledger for determining stations' regulatory fees in 2023.

For all these reasons, NAB requests the Commission to toll its 2022 quadrennial ownership review proceeding, including all comment deadlines, until it fulfills its duty under Section 202(h) by completing the mandated 2018 quadrennial review. The FCC has no lawful basis for withholding the belated 2018 review and NAB requests its completion by the end of the first quarter of 2023. Continuing to refrain from resolving the 2018 review, while appearing to initiate the 2022 review and requesting comments, data, and studies from interested parties, is contrary to the terms of Section 202(h) and congressional intent, and places undue burdens on stakeholders' effective participation in the quadrennial review process. Given the existing analog-era ownership rules' negative competitive impact on our radio and TV station members, NAB urges the FCC to act expeditiously on our requests.

Respectfully submitted,

**NATIONAL ASSOCIATION OF BROADCASTERS**
1 M Street, SE
Washington, DC 20003
(202) 429-5430

_____
Rick Kaplan
Jerianne Timmerman

February 1, 2023

**Add.78**

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| 2022 Quadrennial Regulatory Review | ) | MB Docket No. 22-459 |
| | ) | |
| 2018 Quadrennial Regulatory Review— | ) | MB Docket No. 18-349 |
| Review of the Commission's Broadcast | ) | |
| Ownership Rules and Other Rules Adopted | ) | |
| Pursuant to Section 202 of the | ) | |
| Telecommunications Act of 1996 | ) | |

**SUPPLEMENTAL SUBMISSION REGARDING REQUEST TO TOLL THE 2022 QUADRENNIAL REGULATORY REVIEW AND TO EXPEDITIOUSLY CONCLUDE THE 2018 QUADRENNIAL REGULATORY REVIEW**

On February 1, 2023, the National Association of Broadcasters (NAB)[1] submitted in the above-captioned proceedings a Request to Toll the 2022 Quadrennial Regulatory Review and to Expeditiously Conclude the 2018 Quadrennial Regulatory Review (Request).[2] In its Request, NAB asked the Commission to temporarily toll the proceeding triggered by the Media Bureau's Public Notice seeking comment on the 2022 quadrennial review of the broadcast ownership rules.[3] Specifically, NAB asked the FCC to briefly toll its 2022 quadrennial ownership proceeding, including all comment deadlines, until the Commission fulfilled its duty under Section 202(h) of the Telecommunications Act of 1996 by expeditiously completing the 2018 quadrennial regulatory review. NAB also strongly urged the FCC to conclude its overdue 2018 quadrennial review by the end of the first quarter of

---

[1] NAB is a nonprofit trade association that advocates on behalf of local radio and television stations and broadcast networks before Congress, the Federal Communications Commission and other federal agencies, and the courts.

[2] NAB, Request, MB Docket Nos. 22-459, 18-349 (Feb. 1, 2023).

[3] *Media Bureau Opens Docket and Seeks Comment for 2022 Quadrennial Review of Media Ownership Rules*, Public Notice, MB Docket No. 22-459, DA 22-1364 (Dec. 22, 2022).

2023.[4] As NAB explained, the Commission has no lawful basis for withholding the belated 2018 review,[5] and that failure independently threatens the viability of the 2022 review.[6]

      To date, the Commission has not responded to NAB's Request. NAB thus respectfully hereby notifies the Commission that, unless the Commission acts on NAB's Request by April 12, 2023, NAB will deem the Request denied and reserves its right to seek judicial relief to protect its interests in lawfully conducted quadrennial broadcast ownership reviews.

      Respectfully submitted,

**NATIONAL ASSOCIATION OF BROADCASTERS**
1 M Street, SE
Washington, DC 20003
(202) 429-5430

_____
Rick Kaplan
Jerianne Timmerman

March 29, 2023

---

[4] Request at 1-2, 10.

[5] *Id*. at 2-6.

[6] *Id*. at 6-8.

**Add.80**

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing document with the Clerk of the Court for the U.S. Court of Appeals for the District of Columbia Circuit using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing petition to be served by FedEx overnight service and by electronic mail on the Commission as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C.  20554
litigationnotice@fcc.gov


April 24, 2023                                    Respectfully submitted,

                                                       /s/ Helgi C. Walker
                                                      Helgi C. Walker
                                                      GIBSON, DUNN & CRUTCHER LLP
                                                      1050 Connecticut Avenue, N.W.
                                                      Washington, D.C. 20036
                                                      Telephone: (202) 887-3599
                                                      Facsimile:  (202) 530-9595
                                                      hwalker@gibsondunn.com